## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HIS TABERNACLE FAMILY CHURCH, INC. and MICHEAL SPENCER,<br><br>Plaintiffs,<br><br>v.<br><br>STEVEN A. NIGRELLI, Acting Superintendent of the New York State Police, in his official and individual capacities; WEEDEN A. WETMORE, District Attorney for the County of Chemung, New York, in his official and individual capacities; and MATTHEW VAN HOUTEN, District Attorney for the County of Tompkins, New York, in his official and individual capacities,<br><br>Defendants. | **Case No.:**<br><br><br><br><br><br>**COMPLAINT** |

## PRELIMINARY STATEMENT

1.     The United States Supreme Court has recently and repeatedly admonished the State of New York for infringing upon its citizens' constitutional rights.  In 2020, the Court enjoined New York's draconian COVID-19 occupancy restrictions, which "single[d] out houses of worship for especially harsh treatment" in violation of the First Amendment.  *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020).  Two years later, the Court struck down New York's exceedingly restrictive concealed-carry licensing regime as a violation of the Second Amendment, concluding that it could not be squared "with the Nation's historical tradition of firearm regulation."  *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022).

2.     Those decisions should have taught New York to proceed with extreme caution where First or Second Amendment rights are at stake going forward.  Instead, the state recently doubled down on its rights-denying tendencies—by infringing two fundamental liberties at the

1

same time.  New York now puts houses of worship and religious adherents to an impossible choice: forfeit your First Amendment right to religious worship or forfeit your Second Amendment right to bear arms for self-defense.

3.     Barely more than a week after the Supreme Court issued its opinion in *Bruen*, New York enacted Senate Bill S51001 ("S51001") (June 30, 2022, Extraordinary Session), a law imposing onerous restrictions on the carrying of firearms outside the home.  Among those restrictions is a total ban on carrying firearms in houses of worship, which S51001 designates "sensitive locations."  That ban applies regardless of whether someone is otherwise authorized to carry a firearm in public under New York law and regardless of whether a house of worship prefers to permit—or even encourage—people to carry a firearm on its premises.

4.     New York's attempt to force houses of worship and their parishioners to choose between their First Amendment rights and their Second—an outlier policy shared by no other state in the Nation—stands as an act of defiance to the Supreme Court's recent and emphatic holdings protecting *both*.

5.     First, by prohibiting the exercise of a fundamental constitutional right in places of worship while permitting its exercise on a wide variety of other private property, and denying to religious leaders the authority it gives other private property owners to decide whether to permit the carrying of firearms, the state discriminates on the basis of religious status, singles out houses of worship for especially harsh treatment, and treats comparable secular activity more favorably than religious exercise.  Additionally, S51001 runs into the Establishment Clause by entrenching on core matters of internal church governance.  The state may have power to dictate many things, but how worshippers should conduct themselves at worship services on church property is not one of them.

6.      Second, by prohibiting law-abiding, responsible citizens from carrying firearms in places of worship that otherwise would allow them to do so, the State severely restricts Second Amendment rights in a manner inconsistent with this Nation's history and traditions.  Worse still, New York's disarmament of religious bodies leaves all houses of worship particularly vulnerable to violence.  To take just one example, in 2019, an armed parishioner at West Freeway Church of Christ in Fort Worth, Texas, thwarted a mass shooting attack and saved the lives of countless fellow congregants.  S51001, however, would prevent worshippers in New York from defending themselves, thereby making houses of worship even greater targets than they already are for massacres like the tragic attack at Tree of Life Synagogue in Pittsburgh, Pennsylvania.

7.      This Court should put an end to New York's latest attempt to trample on its citizens' First and Second Amendment rights.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 because this action arises under the Constitution and laws of the United States.

9.      This Court has authority to issue the relief sought pursuant to 28 U.S.C. §§1343(a), 2201, and 2202 and 42 U.S.C. §§1983 and 1988.

10.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(b)(1) and (2).  All Defendants maintain offices and perform their official duties in this district, and a substantial part of the events giving rise to the claims occurred in this district.

## THE PARTIES

11.      Plaintiff His Tabernacle Family Church, Inc. ("the Church") is a non-profit religious organization.  The Church's principal location is 16 Level Acres Drive, Horseheads, New York 14845, where it operates a Christian house of worship.

12.     Plaintiff Micheal Spencer is the senior pastor for the Church.  Spencer is a resident of Elmira, New York.

13.     Defendant Steven A. Nigrelli is the Acting Superintendent of the New York State Police.  As Acting Superintendent, he exercises, delegates, or supervises all the powers and duties of the New York Division of State Police, which is responsible for executing and enforcing New York's laws and regulations governing the carrying of firearms in public, including S51001. Nigrelli's official address is New York State Police, 1220 Washington Avenue, Building 22, Albany, New York 12226.  Nigrelli is sued in his official and individual capacities.

14.     Defendant Weeden A. Wetmore is the Chemung County District Attorney and chief prosecutor of the County.  Wetmore "is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which he serves." *People v. Di Falco*, 377 N.E.2d 732, 735 (NY 1978); N.Y. Cnty. Law §700(1).  Wetmore's official address is 226 Lake Street, Elmira, New York 14901.  Wetmore is sued in his official and individual capacities.

15.     Defendant Matthew Van Houten is the Tompkins County District Attorney and chief prosecutor for the County.  Van Houten "is the prosecutorial officer with the responsibility to conduct all prosecutions for crimes and offenses cognizable by the courts of the county in which he serves." *People v. Di Falco*, 377 N.E.2d 732, 735 (NY 1978); N.Y. Cnty. Law §700(1).  Van Houten's official address is 320 N. Tioga Street, Ithaca, New York 14850.  Van Houten is sued in his official and individual capacities.

## BACKGROUND

A.  *Roman Catholic Diocese of Brooklyn v. Cuomo*

16.     When it comes to respecting religious liberty, New York's recent track record is decidedly nothing to brag about.   From virtually the onset of the COVID-19 pandemic, state and

4

local officials in New York used the public health emergency as an excuse to scapegoat religious communities, targeting them for special burdens that did not apply to comparable establishments. *See, e.g.*, Matt Katz, *Jewish Americans Say They Are Scapegoated for the Coronavirus Spread*, NPR (May 13, 2020), https://archive.ph/zPLe0.  Making matters worse, those burdens struck at the very core of religious organizations' internal decision-making—how to conduct worship and other activities in the sanctuary, church, temple, mosque, or whatever it may be.

17.     Among other restrictions, the Governor of New York issued an executive order establishing a color-coded system imposing capacity restrictions at houses of worship across the state.  In "red zones," houses of worship were limited to a maximum of 10 people at any given time; in "orange zones," they were capped at 25.  In either scenario, the cap applied no matter how large a religious community's facilities might be and no matter what precautions it had undertaken to assure congregant safety.  Meanwhile, "essential" services in the very same "zones" were exempted from capacity restrictions entirely.  And while "essential" services spanned everything from liquor stores to bicycle shops to acupuncturists, New York took the remarkable position that religious worship is not "essential." *Roman Catholic Diocese*, 141 S. Ct. at 66-67 (per curiam).

18.     It is hard to see how the state could ever have thought such a regime could be consistent with the First Amendment.  But like the handful of other states seemingly blind to the special status that our Constitution affords religious exercise, New York kept "moving the goalposts on pandemic-related sacrifices for months, adopting new benchmarks that always seem to put restoration of liberty just around the corner." *South Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 720 (2021) (statement of Gorsuch, J.).

19.     Most notably, after fighting "th[e] case at every step of the way," New York's Governor changed the rules "just as th[e] [Supreme Court] was preparing to act" on emergency

applications filed by Catholic and Jewish applicants seeking relief from New York's onerous restrictions. *Roman Catholic Diocese*, 141 S. Ct. at 72 (Gorsuch, J., concurring).  The Governor then used that as an excuse to urge the Court to withhold relief, "all while continuing to assert the power to [reclassify] them again anytime as conditions warrant." *Id.*

20.     The Supreme Court made quick work of New York's arguments.  Even in the emergency posture of an application for an injunction pending appeal, the Court had no trouble concluding that New York's edict likely violated the absolute "minimum" of the First Amendment's protections—namely, that the government may not "single out houses of worship for especially harsh treatment." *Id.* at 66 (per curiam).  Because the "disparate treatment" between worship service and those activities the state deigned to deem "essential" rendered the restrictions neither neutral nor generally applicable, they easily triggered strict scrutiny. *Id.* at 66-67.  And the Court found it hard to see how New York's restrictions could be "narrowly tailored" when there was zero evidence that houses of worship posed a unique risk of spreading COVID, let alone that less restrictive alternatives could not sufficiently address any risk that might exist. *Id.* at 67.  As for the Governor's last-minute efforts to fend off relief, that only exacerbated the Court's concerns, as the "Governor regularly changes the classification of particular areas without prior notice" and thus threatened to relegate worshippers' rights to perpetual limbo. *Id.* at 68.

21.     When some states and lower courts *still* failed to get the message, the Supreme Court made it emphatically clear in *Tandon v. Newsom*, reiterating that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise."  141 S. Ct. 1294, 1297-98 (2021) (per curiam).

**B.**     *N.Y. State Rifle & Pistol Ass'n v. Bruen*

22.     New York's recent track record with the Second Amendment has fared no better. Here, too, the Court has recently and emphatically rejected New York's outlier efforts to treat the Second Amendment as a second-class right.

23.     In *District of Columbia v. Heller*, 554 U.S. 570, 630 (2008), the Supreme Court made clear that the Second Amendment protects an individual right to keep and bear arms for self-defense.  And in *McDonald v. Chicago*, 561 U.S. 742, 750 (2010), the Court made clear that this individual and fundamental right is protected against infringement by the states as well.

24.     Nevertheless, New York continued to deprive law-abiding citizens of any avenue to lawfully bear arms for self-defense outside the home.  Like many states, New York makes it a crime to possess a firearm outside the home without a license.  *Bruen*, 142 S. Ct. at 2122.  But *unlike* the vast majority of states, New York made it nearly impossible to obtain the license that state law required.  To obtain a license, and thereby avoid criminal punishment just for exercising a constitutional right, a law-abiding citizen had to "demonstrate a *special need* for self-protection distinguishable from that of the general community."  *Id.* at 2123 (emphasis added).  In other words, "ordinary self-defense needs"—*i.e.*, the needs underlying the very "core" of the Second Amendment—were not enough to justify exercising Second Amendment rights.  *Id.* at 2150.

25.     The Supreme Court, unsurprisingly, confirmed that the right "to keep and bear Arms" means just that—the right to keep *and bear* arms, whether inside or outside of the home. *Id.* at 2134-35.  The Court reiterated, moreover, that this guarantee is no "second-class right," subject to a unique set of rules or available to only those with "some special need" to exercise it. *Id.* at 2156.  Accordingly, when evaluating government burdens on the Second Amendment's "unqualified command," courts must assess "this Nation's historical tradition" of regulating firearms—not conduct some means-end balancing.  *Id.* at 2125-34.  Only if the state can

"affirmatively prove that its firearm regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" may a restriction on that right be upheld.  *Id.* at 2127.  Applying that test, the Supreme Court invalidated New York's special need restriction on carrying a firearm outside the home.  *Id.* at 2134-56.

26.     In the course of its decision, the Court acknowledged that laws forbidding the carrying of firearms in certain "sensitive places" may be consistent with historical tradition, but it noted that "the historical record yields relatively few 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited—*e.g.*, legislative assemblies, polling places, and courthouses." *Bruen*, 142 S. Ct. at 2133.  And in a discussion that practically predicted abuses like those that would soon come to pass, the Court specifically rejected New York's attempt to justify its law as a "sensitive place" restriction, admonishing that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." *Id.*  at 2133-34.

C.     **S51001**

27.     Unfortunately, while *Bruen* and *Roman Catholic Diocese* should make New York particularly sensitive to protecting its citizens' First and Second Amendment rights, they seem to have prompted exactly the opposite reaction.  Barely before the ink on *Bruen* could dry, New York embarked on a campaign "to offset the impact of the court's decision"—a campaign that also tramples First Amendment rights.  Giavanni Alves, *N.Y.'s New Gun Control Laws*, Staten Island Live (July 9, 2022), https://archive.ph/7by4T.  Of course, New York was able to move so quickly because it began preparing legislation to undercut any eventual Supreme Court decision before it was even handed down and regardless of what it might say about the Constitution's demands.

28.     On July 1, 2022—a mere eight days after *Bruen* issued—New York enacted S51001, a bill that imposes sweeping new restrictions on where law-abiding citizens may carry firearms by designating large swathes of the state "sensitive places."

29.     Among 20 categories of places that S51001 declares to be "sensitive locations" where firearms are flatly prohibited is "any place of worship or religious observation." Accordingly, New York law now provides:

> A person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, and such person knows or reasonably should know such location is a sensitive location.  For the purposes of this section, a sensitive location shall mean: . . . any place of worship or religious observation[.]

S51001 §4, *codified at* N.Y. Penal Law §265.01-e(1), (2)(c).

30.     S51001 also creates a presumption that firearms are prohibited on any and all private property.  But, unlike with places of worship, the law allows owners or lessees of *other* types of private property to override that presumption by posting "clear and conspicuous signage" or "otherwise giv[ing] express consent" to carry firearms on their property.  S51001 §5, *codified at* N.Y. Penal Law §265.01-d.

31.     Possession of a firearm in any "sensitive location" is a Class E felony so long as the person "knows or reasonably should know such location is a sensitive location."  S51001 §4, *codified at* N.Y. Penal Law §265.01-e.  It is thus now a felony in New York to carry a firearm in a place of worship, regardless of whether one has a license to carry a firearm and regardless of whether the place of worship expressly authorizes—or even encourages—the carrying of firearms on its property.

32.     That otherwise-blanket ban is subject to only a handful of narrow exceptions for federal and state law enforcement officers, registered business security guards, and active military

duty personnel.  S51001 §4, *codified at* N.Y. Penal Law §265.01-e(3).  There is no exception for leaders of houses of worship or for congregants whose place of worship permits law-abiding individuals to carry a firearm on its premises.

33.     New York's blanket ban on carrying firearms in churches is an outlier in the extreme.  No other state in the Union has taken the radical step of completely disarming houses of worship and stripping them of their right to decide who may carry firearms on their premises.  To the contrary, most states treat houses of worship just like any other private property, permitting the carrying firearms either generally or with the authorization of the religious leader.  And several states expressly respect the rights of churches to decide for themselves who may carry firearms on their premises, including Arkansas, Louisiana, Michigan, Missouri, Nebraska, North Dakota, Ohio, South Carolina, and Utah.  *See* Ark. Code § 5-73-306(15)(B); La. Code. §40:1379.3(N)(8); Mich. Comp. Laws §28.425o(1)(e); Mo. Stat. § 571.107(1)(14); Neb. Rev. Stat. §69-2441(1)(c); N.D. Code §62.1-02-05(2)(m); Ohio Code §2923.126(B)(6); S.C. Code §23-31-215(M)(8); Utah Code §76-10-530.

34.     New York officials have made abundantly clear both their contempt for *Bruen* and their intention to vigorously enforce all aspects of S51001 notwithstanding the constitutional rights upon which it tramples.

35.     In a statement announcing that she had signed S51001 into law, Governor Kathy Hochul labeled *Bruen* a "reckless" decision that necessitated a "bold" response from New York.  She then warned that "[i]ndividuals who carry concealed weapons in sensitive locations or in contravention of the authority of an owner of private property will face criminal penalties."  Press Release, N.Y. Governor's Press Office, *Governor Hochul Signs Landmark Legislation to*

*Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision* (July 1, 2022), https://archive.ph/wGx1M.

36.     Defendant Nigrelli similarly warned that, if "you violate this law, you will be arrested.  Simple as that."  New York law enforcement officers, he added, "are standing ready" to ensure enforcement and will have "zero tolerance" for violations.  Statement by First Deputy Superintendent of State Police Steven Nigrelli, *Governor Hochul Delivers a Press Conference on Gun Violence Prevention* (Aug. 31, 2022),  https://www.youtube.com/watch?v=gC1L2rrztQs (remarks at 37:40).

37.     S51001's designation of "sensitive locations" as no-carry zones took effect on September 1, 2022, *see* S51001 §26, although two courts have already temporarily restrained or preliminarily enjoined the operation of several of its provisions.  *See Hardaway v. Nigrelli*, No. 1:22-cv-00771-JLS, ECF 35 (W.D.N.Y. Oct. 20, 2022); *Antonyuk v. Hochul*, No. 1:22-cv-00986-CFH, ECF 27 (N.D.N.Y. Oct. 6, 2022).

**D.     His Tabernacle Family Church**

38.     His Tabernacle Family Church is a nondenominational Christian church founded by Pastor Micheal Spencer in 1998.  Since the Church's creation, Pastor Spencer has led its congregation through immense growth and change, and he continues to serve as the Church's senior pastor.

39.     The Church initially met at a local Holiday Inn Hotel in Horseheads, New York, but it moved to a small commercial location shortly thereafter, and then to a series of progressively larger buildings.  Today, the Church ministers to more than 1,100 people at three different campuses—one in Horseheads, New York, a second in Ithaca, New York, and a third in Mansfield, Pennsylvania.  Pastor Spencer continues to serve as the Church's senior pastor.

40. The Church owns or leases the properties and buildings housing both of its New York campuses. Pastor Spencer serves as president and CEO of the Church's corporate entity in addition to his role as senior pastor.

41. Pastor Spencer is responsible and law-abiding—as the State itself has recognized. He owns several firearms, all of which are registered in accordance with New York law, and he holds a New York license to carry a concealed pistol or revolver. New York first issued Pastor Spencer a concealed-carry license on October 21, 1996. Pastor Spencer also possesses a Pennsylvania concealed-carry license, and Utah in the past granted him a concealed-carry license that he intends to renew. Pastor Spencer is proficient in the safe and effective use of firearms and has competed with a pistol in competitions governed by the rules and scoring standards of the International Defensive Pistol Association.

42. Pastor Spencer believes that, as the Church's pastor, he has a moral and a religious duty to take reasonable measures to protect the safety of his congregation. After all, the Christian scriptures often refer to a worship leader as a "shepherd" tasked with caring for and protecting his "flock." *See* Ezekiel 34:1-10; Isaiah 40:11; Matthew 9:36; John 21:15-17; I Peter 5:2-3; Acts 20:28; Hebrews 13:17. Pastor Spencer believes that providing for the safety of the Church—the "Body of Christ"—is therefore a religious act for a pastor. *See* Romans 12:5; I Corinthians 12:27; Ephesians 4:15-16; Colossians 1:18. These religious beliefs are shared by the Church.

43. Consistent with his view of the Christian scriptures and what they say about a pastor's role, Pastor Spencer regularly carried a concealed firearm on the Church's New York campuses before S51001 went into effect.

44. As president and CEO of the corporation and senior pastor of the Church, Pastor Spencer also has the authority to determine which personal items members of the public may bring

onto the Church's campuses.  Other members of the congregation share his conviction that the scriptures call on them as members of a single "family" united in Jesus Christ to love, serve, and protect one another.  *See, e.g.*, Genesis 9:5-6; Psalm 82:3-4; Proverbs 24:11; John 13:34-35; Romans 12:10; Philippians 2:4; Galatians 6:2, Ephesians 2:19; I Peter 4:10.

45.     To ensure the ability to protect the Church and its worshippers in case of violent confrontation, Pastor Spencer allowed churchgoers to carry concealed firearms at both of the Church's New York campuses before S51001 was enacted, and he continues to allow churchgoers to carry concealed firearms at the Mansfield campus because such carrying remains permissible in Pennsylvania (and every other state but New York).

46.     Pastor Spencer knows numerous church members who hold New York concealed-carry licenses and who would like to carry firearms on the Church's New York campuses as a means of self-defense.  Both New York campuses also have members who volunteer to oversee church security.  These individuals have performed many tasks, ranging from helping a woman into an ambulance as she was giving birth to keeping watch for suspicious activities during worship services.  Volunteers have included a former U.S. Navy SEAL, a former U.S. Marine, a woman who has provided armed security for foreign dignitaries, current law enforcement officers, and a former chief of police and state judge.  Before S51001 was enacted, many of these volunteers carried their firearms in the Church.

47.     Pastor Spencer desires to carry his firearm—and desires to allow others to carry their firearms—on the Church's New York campuses because he believes that doing so will protect himself and churchgoers from the kind of violence that other houses of worship across the country have suffered.  Pastor Spencer believes that someone planning to harm or kill his flock will not be deterred by S51001, and may in fact be emboldened by it since it leaves houses of worship

defenseless against those bent on doing violence to people of faith. But for the enactment and enforcement of S51001, Pastor Spencer would carry on the Church's New York campuses a concealed pistol that New York law otherwise generally allows him to possess and carry and would permit other licensed churchgoers to do the same.

48.     Pastor Spencer's concerns are not hypothetical. The Church televises its services and is the largest Protestant church in Chemung County, so Pastor Spencer and the Church are well known. Pastor Spencer regularly receives threatening mail, and he has received at least two death threats that necessitated the involvement of law enforcement. In one incident, an individual threatened to shoot Pastor Spencer and his late wife in the head with a .45 caliber pistol. In another, Pastor Spencer's mentally disturbed neighbor made threats during and after a church service, then fired his gun while the pastor was at home. Responding state police officers asked Pastor Spencer whether he had a weapon. When he informed them that he had a loaded firearm, one of the officers responded that keeping a firearm was "smart."

49.     In addition to these threats targeted at Pastor Spencer himself, the Church has been burglarized and vandalized on multiple occasions. Pastor Spencer is particularly concerned about the large number of children present during Sunday services. At the Horseheads campus, the Church often hosts between 100 and 160 children on any given Sunday. Before enactment and enforcement of S51001, the Church typically had at least one lawfully armed member keeping watch over the children's wing.

50.     Nor is there any denying the sad truth that houses of worship across faith traditions have increasingly become targets for violence. One organization, the Faith Based Security Network, collects data on violent attacks at worship centers. In a recent report, it found that attacks on non-denominational churches like Pastor Spencer's account for nearly a quarter of all faith-

based attacks over a 20-year period.  Faith Based Security Network, *Deadly Force Incidents Statistics* (updated Dec. 31, 2018), https://bit.ly/3SVAESz.  "FBI statistics show a 35 percent increase in hate crimes at churches, synagogues, temples and mosques from 2014 to 2018."  Reis Thebault, *Too Small to Hire Guards, Too Scared to Go Gun-Free, Community Churches Are Now Arming Themselves*, Wash. Post (Feb. 14, 2020), https://archive.ph/U5yjb.  Unsurprisingly, other states have sought to "revise firearm laws to make it easier for people to carry guns in houses of worship," and other leaders have armed their congregations to keep them safe.  *Id.*

51.    While the recent uptick in violence against faith-based communities may be a new development, the desire to ensure that worshippers can defend themselves is not.  In the colonies, many governments *required* churchgoers to bring weapons with them to services.  In 1619, for example, Virginia required "all suche as beare arms" to bring their "pouder and shott" with them to "church on the Sabbath."[1]  Similar laws requiring at least some parishioners to bear arms "[t]o prevent or withstand such sudden assaults … upon the Sabboth" could be found in Massachusetts in 1636,[2] Rhode Island in 1639,[3] Maryland in 1642,[4] Connecticut in 1643,[5] Virginia in 1738,[6] and

---

[1]  Proceedings of the Virginia Assembly, 1619 *reprinted in* Lyon Gardiner Tyler, Narratives of Early Virginia, 1606-1625 at 273 (1959).

[2]  Nathaniel B. Shurtleff, Records of the Governor and Company of the Massachusetts Bay in New England 1:190 (1853) (all persons over 18 years old should bring their "muskets, or other peeces fit for servise" "to the publike assemblies").

[3]  Records of the Colony of Rhode Island and Providence Plantations, in New England 1:94 (1856) ("none shall come to any public meeting without his weapon").

[4]  Archives of Maryland 3:103 (1885) (any "man able to bear arms" must not "goe to church or Chappell … without fixed gunn").

[5]  Public Records of the Colony of Connecticut, Prior to the Union with New Haven Colony 1:95 (1850) ("one person in every several howse where in is any souldear or souldears" should bring a firearm on "the Sabboth").

[6]  William Waller Hening, The Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619 at 1:198 (1823) (all militiamen must go to church armed if requested by militia commander).

South Carolina in 1743.[7]

52.     Nor were these laws in any way fringe.  In 1867, one painter famously depicted New England Puritans headed to church the way most nineteenth century Americans imagined them—with rifles in hand:



George Henry Boughton, *Pilgrims Going to Church* (1867) (on display at the New York Historical Society, New York, NY), https://archive.ph/IIoZV.  New York's law is flatly inconsistent with America's history of allowing—even *requiring*—firearms during worship attendance.

53.     New York's ban is in keeping, however, with the kinds of episodes that helped animate the First and Second Amendments.  Throughout history, governments unfortunately all too often have oppressed disfavored religious groups by disarming them and stripping them of any means to protect themselves.  During the English Reformation, the pendulum swung both directions:  Catholic governments disarmed Protestants, and Protestant governments disarmed

---

[7]   Statutes at Large of South Carolina 7:417 (1840) ("every white male inhabitant … liable to bear arms in the militia" must carry his gun "on any Sunday or Christmas day" if in a "public place of divine worship").

Catholics.  *See* English Bill of Rights, 1 W.&M. sess. 2 c. 2 (1689), *reprinted in* 6 Statutes of the Realm 142-45 (1819).  In the late nineteenth and early twentieth century, the Muslim Ottoman Empire "disarmed" the Armenian population—a sizeable minority of "Christians of Asia minor"—in its prelude to the murder of roughly 1 million Armenians.  *See* John Kifner, *Armenian Genocide of 1915: An Overview*, N.Y. Times (Dec. 7, 2007), https://archive.ph/eMJr7.

54.     That helps explain why the First and Second Amendments "are good constitutional neighbors":  History shows that "they both protect religious liberty."  *See* David Kopel, *The Second Amendment vs. Anti-Catholicism*, Wash. Post (Nov. 20, 2015), https://archive.ph/XomeY.

55.     It is therefore a constitutional *vice*, not a virtue, that New York has disarmed all religious people all at once, whether they kneel in prayer or stand in worship.  In short, S51001 is a compendium of constitutional infirmities, infringing in one fell swoop on Pastor Spencer's and the Church's rights to freely engage in religious exercise, to exercise autonomy over the Church's internal affairs, and to carry firearms to ensure the safety of all persons on the Church's premises.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### First and Fourteenth Amendments — Free Exercise Clause
### (42 U.S.C. §1983)

56.     Plaintiffs incorporate herein by reference each allegation contained in the preceding paragraphs of this Complaint.

57.     The Free Exercise Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, prohibits any state action abridging "the free exercise" of religion.  U.S. Const. amend. I.

58.     The Supreme Court has interpreted the Free Exercise Clause to mean that the government may not enact non-neutral and non-generally applicable laws or policies that substantially burden a sincerely held religious belief unless they are narrowly tailored to a

compelling government interest.  Such laws are narrowly tailored only if they are the least restrictive means of achieving the asserted compelling interest.  *Carson v. Makin*, 142 S. Ct. 1987, 1997-98 (2022).

59.     The Supreme Court has held that "government regulations are not neutral and generally applicable … whenever they treat any comparable secular activity more favorably than religious exercise." *Tandon*, 141 S. Ct. at 1296.

60.     Moreover, any state action that discriminates on the basis of religion or targets religion for specially disfavored treatment is subject to strict scrutiny and must be invalidated unless it is "justified by a compelling interest and is narrowly tailored to advance that interest." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993).

61.     Plaintiffs have sincere religious beliefs that they have a moral and religious duty to take reasonable measures to protect the safety of the Church's congregants.  They therefore permit members of the Church to carry concealed firearms as a means of self-defense in case of a violent confrontation.

62.     S51001 substantially burdens Plaintiffs' right to the free exercise of religion by forcing them to choose between complying with their religious beliefs or complying with New York law.  Specifically, S51001 forbids Pastor Spencer and the Church's members, under threat of criminal penalties, from exercising their religious conviction to carry firearms into the Church to protect themselves and other congregants.  Since S51001's enactment, Pastor Spencer has stopped carrying a firearm at the Church and New York law mandates that the Church's members comply with the law despite the burden it places upon their religious beliefs.

63.     S51001 is not a neutral or generally applicable law for multiple reasons.

64.     First, it subjects houses of worship to disfavored treatment while treating comparable secular organizations, such as retail stores or restaurants, more favorably than those offering religious exercise.  *Tandon*, 141 S. Ct. at 1296.  While owners of other establishments may still establish their own policies regarding the carrying of firearms upon their premises, S51001 forecloses houses of worship from doing the same.  Moreover, S51001 discriminates and imposes special disability upon the Church and its members because of their religious status. *Carson*, 142 S. Ct. at 2000-02.  It unlawfully conditions the right to bear firearms on a private location for self-defense either upon the Church renouncing its status as a house of worship or on the individual foregoing their right to attend religious services.[8]

65.     S51001 fails strict scrutiny.  New York has no compelling interest in denying Plaintiffs the right to exercise their religious beliefs regarding the protection of their flock.  Even if it did, S51001 is not the least restrictive means of accomplishing the state's purported interest, as demonstrated by the fact that no other state places similar restrictions upon houses of worship. *Cf. Holt v. Hobbs*, 574 U.S. 352, 368-69 (2015).  Moreover, there are manifestly less restrictive means to accomplish any permissible interest the state may have than a complete ban on all firearms in a house of worship regardless of the preferences of the house of worship or whether an individual would otherwise be permitted to carry a firearm under New York law.

66.     Accordingly, S51001 violates Plaintiffs' rights to the free exercise of religion under the First Amendment.

---

[8]  Even if S51001 could somehow be deemed neutral and generally applicable, it burdens rights under "the Free Exercise Clause in conjunction with other constitutional protections," so strict scrutiny nonetheless applies. *Employment Div. v. Smith*, 494 U.S. 782, 881-82 (1990); *see infra* ¶¶69-94.

67.     On information and belief, Defendants intend to enforce the statute against Plaintiffs in particular.

68.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal damages, and attorneys' fees.

**SECOND CAUSE OF ACTION**
**First and Fourteenth Amendments — Establishment Clause**
**(42 U.S.C. §1983)**

69.     Plaintiffs incorporate herein by reference each allegation contained in the preceding paragraphs of this Complaint.

70.     The Establishment Clause of the First Amendment, made applicable to the states through the Fourteenth Amendment, restricts "law[s] respecting an establishment of religion." U.S. Const. amend. I.

71.     As part of its restriction on the official establishment of religions, the Constitution necessarily prohibits states from meddling in the internal affairs of houses of worship.  Whether the discrete issue is personnel and hiring matters, *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), disputes over church property, *Jones v. Wolf*, 443 U.S. 595 (1979), or policing the boundary between orthodoxy and heresy, *Watson v. Jones*, 80 U.S. (16 Wall.) 679 (1872), houses of worship are autonomous within their sphere.

72.     S51001 implicates the very core of a religious group's activities—worship in the sanctuary.  Even under ordinary property principles, a church, like any other "private property owner," has the "right to control who may enter, and whether that invited guest can be armed." *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012).  But houses of worship are not mere private property owners:  A church's authority over who may enter the sanctuary and under what circumstances lies at the very heart of "the general principle of church autonomy"

20

protected by the Establishment Clause.  *Our Lady of Guadalupe*, 140 S. Ct. at 2061; *see also*

Michael W. McConnell & Luke W. Goodrich, *On Resolving Church Property Disputes*, 58 Ariz.

L. Rev. 307, 313-16 (2015).

73.     So, absent a longstanding historical tradition of restrictions like New York's,

S51001 is plainly unconstitutional.  *See Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2427-

28 (2022) (instructing that "the Establishment Clause must be interpreted by 'reference to

historical practices and understandings'" and collecting cases).  And no history or tradition

justifies New York's unheralded intrusion into the inner sanctum to disable citizens from

defending themselves if violently attacked during worship.  To the extent American governments

have restricted the ability of houses of worship to determine who may enter and how, they have

done so in the other direction—*requiring* certain congregants to be armed to protect themselves

and others.  *See supra* ¶51.

74.     More generally, the Establishment Clause requires government neutrality towards

religion.  By subjecting houses of worship to the disfavored treatment of a total ban on firearms

while allowing comparable secular organizations to establish their own policies regarding the

carrying of firearms upon their premises, S51001 demonstrates "'a hostility toward religion that

has no place in our Establishment Clause traditions.'"  *Am. Legion v. Am. Humanist Ass'n*, 139 S.

Ct. 2067, 2074 (2019) (quoting *Van Orden v. Perry*, 545 U.S. 677, 704 (2005) (Breyer, J.,

concurring in judgment)).

75.     Accordingly, S51001 violates the Establishment Clause's church autonomy

guarantee under the First Amendment.

76.     On information and belief, Defendants intend to enforce the statute against

Plaintiffs in particular.

77.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal damages, and attorneys' fees.

**THIRD CAUSE OF ACTION**
**Second and Fourteenth Amendments — Right to Bear Arms**
**(42 U.S.C. §1983)**

78.     Plaintiffs incorporate herein by reference each allegation contained in the preceding paragraphs of this Complaint.

79.     The Second and Fourteenth Amendments protect the right of law-abiding citizens to "keep and bear Arms" for self-defense outside the home.  U.S. Const. amend. II; *Bruen*, 142 S. Ct. at 2122.

80.     Pastor Spencer and other law-abiding members of the Church wish to exercise that right by carrying firearms on Church property for lawful purposes, including immediate self-defense in case of confrontation.   "The Second Amendment's plain text … presumptively guarantees" their "right" to do so.  *Bruen*, 142 S. Ct. at 2135.

81.     But N.Y. Penal Law §§265.01-e(2)(c), and all related regulations, policies, and enforcement practices, individually and collectively, burden, delay, chill, and/or deny law-abiding people like and including Pastor Spencer and the Church's members from exercising their fundamental, individual right to bear arms.  And Defendants have made clear that they intend to enforce those provisions to their fullest extent.

82.     Pastor Spencer and the Church's similarly situated members would carry a loaded, operable firearm for immediate self-defense in case of confrontation in the Church, as they previously were permitted to do, but for their reasonable fear of Defendants' enforcement and threatened enforcement of New York's laws, which could lead to their arrest and prosecution, and if convicted, the loss of their rights.

83.     Defendants have not identified and cannot identify any "enduring American tradition of state regulation" forbidding the carrying of firearms in houses of worship.  *Id.* at 2135. Because New York cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," *id.* at 2127, it unconstitutionally infringes upon Plaintiffs' Second Amendment rights, *id.* at 2130.

84.     Accordingly, S51001 violates Plaintiffs' rights to keep and bear arms under the Second Amendment.

85.     On information and belief, Defendants intend to enforce the statute against Plaintiffs in particular.

86.     As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal damages, and attorneys' fees.

**FOURTH CAUSE OF ACTION**
**Fourteenth Amendment — Equal Protection**
**(42 U.S.C. §1983)**

87.     Plaintiffs incorporate herein by reference each allegation contained in the preceding paragraphs of this Complaint.

88.     The Equal Protection Clause of the Fourteenth Amendment forbids state action that discriminates on the basis of religion.  U.S. Const. amend. XIV, §1.

89.     A state violates the Equal Protection Clause when it treats one party differently from similarly situated parties based on a protected characteristic of the disfavored party, such as religion, and is not narrowly tailored to achieving a compelling government interest.  *See Larson v. Valente*, 456 U.S. 228, 246 (1982).  Accordingly, "the government may not discriminate against religion generally or against particular religious denominations."  *Morris County Bd. of Chosen*

*Freeholders v. Freedom From Religion Found.*, 139 S. Ct. 909 (2019) (Kavanaugh, J., respecting denial of certiorari).

90.   S51001 discriminates against Plaintiffs based on their religious beliefs by forbidding the carrying of firearms within houses of worship while allowing secular groups congregating in similar numbers and under similar circumstances to establish their own policies regarding the carrying of firearms upon their premises.  Targeting Plaintiffs' religious beliefs in this manner "is never permissible" and is therefore a denial of equal protection of the law.  *Id.* at 910 (quoting *Church of the Lukumi*, 508 U.S. at 532-33).

91.   For the reasons set forth above, Defendants' discriminatory treatment of Plaintiffs cannot survive strict scrutiny under the Equal Protection Clause.  S51001 neither serves any compelling governmental interest nor is the least restrictive means of achieving Defendants' purported ends.

92.   Accordingly, S51001 violates Plaintiffs' rights to equal protection under the Fourteenth Amendment.

93.   On information and belief, Defendants intend to enforce the statute against Plaintiffs in particular.

94.   As a direct and proximate result of Defendants' conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including the loss of their constitutional rights, entitling them to declaratory and injunctive relief, nominal damages, and attorneys' fees.

### PRAYER FOR RELIEF

Plaintiffs respectfully asks the Court to:

1.   Declare that S51001's prohibition on carrying firearms in houses of worship violates the First, Second, and Fourteenth Amendments;

2.     Enjoin Defendants from taking any steps to enforce that prohibition;

3.     Award Plaintiffs nominal damages;

4.     Award Plaintiffs attorney's fees and costs under 42 U.S.C. §1988;

5.     Award such other relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil

Procedure, of all issues so triable.

Dated: November 3, 2022                    Respectfully submitted,


                                           /s/ Anjan K. Ganguly
DAVID J. HACKER                            ANJAN K. GANGULY
JEREMY DYS*                                GANGULY BROTHERS, PLLC
KEISHA RUSSELL*                            140 Allens Creek Road
RYAN GARDNER*                              Suite 220
FIRST LIBERTY INSTITUTE                    Rochester, NY 14618
2001 West Plano Parkway                    (585) 232-7747
Suite 1600
Plano, TX 75075                            ERIN E. MURPHY*
(972) 941-4444                             ANDREW C. LAWRENCE*
                                           TREVOR W. EZELL*
JORDAN E. PRATT*                           NICHOLAS M. GALLAGHER*
FIRST LIBERTY INSTITUTE                    CLEMENT & MURPHY, PLLC
227 Pennsylvania Avenue S.E.               706 Duke Street
Washington, D.C. 20003                     Alexandria, VA 22314
(972) 941-4444                             (202) 742-8900


*Applications for admission *pro hac vice*     *Counsel for Plaintiffs*
forthcoming.