## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| HIS TABERNACLE FAMILY CHURCH, INC. and MICHEAL SPENCER,<br><br>*Plaintiffs*,<br><br>v.<br><br>STEVEN A. NIGRELLI, Acting Superintendent of the New York State Police, in his official and individual capacities; WEEDEN A. WETMORE, District Attorney for the County of Chemung, New York, in his official and individual capacities; and MATTHEW VAN HOUTEN, District Attorney for the County of Tompkins, New York, in his official and individual capacities,<br><br>*Defendants*. | **Case No. 6:22-cv-06486** |

## MEMORANDUM IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................................iii

INTRODUCTION ........................................................................................................... 1

ARGUMENT ................................................................................................................... 3

I.      Plaintiffs Are Likely To Succeed On The Merits Of Their Claims................................... 4

        A.      S51001 Singles Out Religious Worship for Burdens that the Law Does Not Impose on Secular Activities in Violation of the Free Exercise Clause................................................................................................................. 4

        B.      By Dictating How Individuals May Attend Worship Services, S51001 Encroaches on Church Autonomy in Violation of the Establishment Clause............................................................................................................... 14

        C.      New York's One-of-a-Kind Law Prohibiting Worshippers from Carrying Firearms for Self Defense Flouts the Second Amendment.................... 17

II.     The Remaining Factors All Favor Injunctive Relief........................................................ 25

CONCLUSION................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Antonyuk v. Hochul*,
  2022 WL 5239895 (N.D.N.Y. Oct. 6, 2022) ............................................................. 23

*Bouldin v. Alexander*,
  82 U.S. 131 (1872) ...................................................................................................... 15

*Bronx Household of Faith v. Bd. of Educ. of City of New York*,
  331 F.3d 342 (2d Cir. 2003) .......................................................................................... 3

*Brown v. Entm't Merchants Ass'n*,
  564 U.S. 786 (2011) ...................................................................................................... 8

*Burwell v. Hobby Lobby Stores, Inc.*,
  573 U.S. 682 (2014) ...................................................................................................... 9

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940) ...................................................................................................... 8

*Carson v. Makin*,
  142 S. Ct. 1987 (2022) ............................................................................................ 5, 12

*Church of Lukumi Babalu Aye, Inc. v. Hialeah*,
  508 U.S. 520 (1993) .................................................................................................. 5, 8

*District of Columbia v. Heller*,
  554 U.S. 570 (2008) ................................................................................... 20, 21, 23, 24

*Elrod v. Burns*,
  427 U.S. 347 (1976) .................................................................................................... 25

*Emp't Div. v. Smith*,
  494 U.S. 872 (1990) .................................................................................................. 4, 8

*Espinoza v. Mont. Dep't of Rev.*,
  140 S. Ct. 2246 (2020) .................................................................................................. 7

*Everson v. Bd. of Educ.*,
  330 U.S. 1 (1947) ........................................................................................................ 14

*GeorgiaCarry.Org, Inc. v. Georgia*,
  687 F.3d 1244 (11th Cir. 2012) .................................................................................. 16

*German Reformed Church v. Seibert*,
  3 Pa. 282 (Pa. 1846) ................................................................................................... 14

*Gonzalez v. Roman Catholic Archbishop of Manila*,
  280 U.S. 1 (1929) ........................................................................................................ 15

*Hardaway v. Nigrelli*,
  2022 WL 16646220 (W.D.N.Y. Nov. 3, 2022) ............................................ 1, 18, 23, 25

*Harmon v. Dreher*,
  Speers Eq. 87 (S.C. Ct. App. Equity 1843)................................................................. 14

*Holt v. Hobbs,*
    574 U.S. 352 (2015).................................................................................... 10

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC,*
    565 U.S. 171 (2012).................................................................................... 15

*Jones v. Wolf,*
    443 U.S. 595 (1979).................................................................................... 15

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.,*
    344 U.S. 94 (1952)...................................................................................... 15

*Kennedy v. Bremmerton Sch. Dist.,*
    142 S. Ct. 2407 (2022)........................................................................... 4, 17

*Kreshik v. Saint Nicholas Cathedral,*
    363 U.S. 190 (1960).................................................................................... 15

*Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.,*
    396 U.S. 367 (1970).................................................................................... 15

*McCullen v. Coakley,*
    573 U.S. 464 (2014).................................................................................... 10

*McDaniel v. Paty,*
    435 U.S. 618 (1978)...................................................................................... 8

*McDonald v. City of Chicago,*
    561 U.S. 742 (2010)................................................................................. 8, 22

*Murdock v. Pennsylvania,*
    319 U.S. 105 (1943)...................................................................................... 8

*N.Y. Progress & Protection PAC v. Walsh,*
    733 F.3d 483 (2d Cir. 2013)........................................................................... 3

*N.Y. State Rifle & Pistol Ass'n v. Bruen,*
    142 S. Ct. 2111 (2022)........................................................................ *passim*

*Nken v. Holder,*
    556 U.S. 418 (2009).................................................................................... 25

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
    140 S. Ct. 2049 (2020)................................................................ 14, 15, 16, 17

*Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian
    Church,*
    393 U.S. 440 (1969).................................................................................... 15

*Ramirez v. Collier,*
    142 S. Ct. 1264 (2022).................................................................................. 4

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    141 S. Ct. 63 (2020)............................................................................. *passim*

*S. Bay United Pentecostal Church v. Newsom,*
    141 S. Ct. 716 (2021).................................................................................... 6

*Serbian Eastern Orthodox Diocese for U.S. & Canada v. Milivojevich*,
    426 U.S. 696 (1976) ........................................................................ 15

*Shannon v. Frost*,
    3 B. Mon. 253 (Ky. Ct. App. 1842) ............................................... 14

*Shepard v. Barkley*,
    247 U.S. 1 (1918) ............................................................................ 15

*Sir John Knight's Case*,
    3 Mod. 117, 87 Eng. Rep. 75 (K.B. 1686) ..................................... 20

*State ex rel. Watson v. Farris*,
    45 Mo. 183 (Mo. 1869) ................................................................... 14

*Tandon v. Newsom*,
    141 S. Ct. 1294 (2021) ....................................................... 5, 6, 7, 11

*Thomas v. Review Bd. of Ind. Emp't Sec. Div.*,
    450 U.S. 707 (1981) ...................................................................... 4, 6

*Watson v. Jones*,
    80 U.S. 679 (1871) .......................................................................... 15

*Wisconsin v. Yoder*,
    406 U.S. 205 (1972) .......................................................................... 8

**Constitutional Provisions**

Ala. Const. of 1819 art. I ...................................................................... 22

Conn. Const. of 1818 art. I .................................................................... 22

Ky. Const. of 1799 art. X ...................................................................... 22

Miss. Const. of 1832 art. I ..................................................................... 22

Ohio Const. of 1802 art. VIII ................................................................ 22

U.S. Const. amend. I ............................................................................... 4

U.S. Const. amend. II ............................................................................ 18

U.S. Const. amend. IV ........................................................................... 16

**Statutes**

1889 Ariz. Sess. Law 16 ........................................................................ 23

1889 Ariz. Sess. Law 17 ........................................................................ 23

Ark. Code §5-73-306 ............................................................................. 10

1 Public Records of the Colony of Connecticut 95 (J. Hammond Trumbull ed., 1850) ............... 21

1870 Ga. Laws 421 .......................................................................... 22, 23

19 The Colonial Records of the State of Georgia, Part 1 (Allen D. Candler ed., 1911) ............... 20

La. Code. §40:1379.3 ............................................................................. 10

Mich. Comp. Laws §28.425o .......................................................................................... 10

1883 Mo. Laws 76 ........................................................................................................ 22

Mo. Stat. §571.107 ....................................................................................................... 10

Revised Ordinances of City of Huntsville, Mo. of 1894, §2 ....................................... 22

Neb. Rev. Stat. §69-2441 ............................................................................................. 10

Records of the Colony and Plantation of New Haven, From 1638 to 1649 (Charles J.
    Hoadly ed., 1857) ................................................................................................... 21

N.Y. Penal Law §70.00 .................................................................................................. 5

N.Y. Penal Law §265.01-d ............................................................................................. 6

N.Y. Penal Law §265.01-e ...................................................................................... *passim*

N.D. Code §62.1-02-05 ................................................................................................. 10

Ohio Code §2923.126 ................................................................................................... 10

Statutes of Okla., 1890, §7 ........................................................................................... 23

S.C. Code §23-31-215 .................................................................................................. 10

1870 Tex. Gen. Laws 63, ch. 46, §1 ............................................................................ 22

Utah Code §76-10-530 .................................................................................................. 10

1877 Va. Acts 305 ........................................................................................................ 22

1877 Va. Acts 305, §21 ................................................................................................ 22

**Other Authorities**

Isaac J. Bailey, *These Black Churches Are Considering Arming Their Congregations*,
    Vice (June 10, 2018), https://bit.ly/3FINosu ............................................................2

Black's Law Dictionary (11th ed. 2019) ........................................................................4

Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. Firearms & Pub. Pol'y 1 (2004)
    ...............................................................................................................................21

Aaron Earls, *Half of US Churches Now Enlist Armed Security*, Christianity Today (Jan.
    28, 2020), https://bit.ly/3fAjn3E .............................................................................2

*Hardaway v. Nigrelli*, No. 1:22-cv-771, ECF 40 (W.D.N.Y. Oct. 28, 2022) ...............19

His Tabernacle Family Church, *Our Beliefs*, https://bit.ly/3t09ijx .................................5

Gov. Kathy Hochul, N.Y. State, *Governor Hochul Signs Landmark Legislation to
    Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in
    Response to Reckless Supreme Court Decision* (July 1, 2022),
    https://on.ny.gov/3E1Uuat ............................................................................9, 11, 20

Peter Holley et al., *The Sound of Hymns Drifted from the Country Church. Then Came
    Gunfire.*, Wash. Post (Nov. 8, 2017), https://wapo.st/3Wx1jrx ...............................2

Bill Hutchinson & Josh Margolin, *Armed Parishioner Says He's 'No Hero,' as New Details Emerge About the Texas Church Shooter*, ABC News (Dec. 31, 2019), https://abcn.ws/3NDSk3R ........................................................................................2

Anna M. Kaplan, N.Y. State Senate, *NYS Senate Fixes Gun Laws Following Reckless Supreme Court Decision* (July 1, 2022), https://bit.ly/3hbBWvk ................................9

Brian Kavanagh, N.Y. State Senate, *Taking Action to Stop Gun Violence* (July 19, 2022), https://bit.ly/3WuBUPn ..........................................................................9

Marissanne Lewis-Thompson, *Black Pastors Work to Protect Churches from Violence—In and Outside of the Community*, St. Louis Public Radio (Feb. 4, 2020), https://bit.ly/3DtAyM8 ..............................................................................................2

Anne McCloy (@AnneMcCloyNews), Twitter (June 29, 2022, 7:16 PM), https://bit.ly/3E35nJ2 ..........................................................................................14

*I Peter* 4:10 (English Standard Version) .......................................................................5

Campbell Robertson et al., *11 Killed in Synagogue Massacre; Suspect Charged with 29 Counts*, N.Y. Times (Oct. 27, 2018), https://nyti.ms/2RoOrSj ...............................2

Andrea Stewart-Cousins, Sponsor Memo No. S51001 (July 1, 2022), https://bit.ly/3hh1yXW ..........................................................................................9

Reis Thebault, *Too Small to Hire Guards, Too Worried to Go Gun-free, Community Churches Are Now Arming Themselves*, Wash. Post (Feb. 14, 2020), https://archive.ph/U5yjb ..................................................................................2, 10

2 St. George Tucker, Blackstone's Commentaries app. 4 (1803) .....................................4

Va. Att'y Gen. Op. No. 11-043, 2011 WL 4429173 (Apr. 8, 2011) ...............................23

John Witte & Justin Latterell, *The Last American Establishment: Massachusetts, 1780-1833*, *in* Religious Dissent and Disestablishment (2019) .......................................21

# INTRODUCTION

As this Court has already recognized, Senate Bill S51001's ("S51001") ban on carrying firearms in houses of worship is an affront to the Second Amendment. *Hardaway v. Nigrelli*, 2022 WL 16646220, at *1 (W.D.N.Y. Nov. 3, 2022) . But the law is constitutionally infirm for yet another reason: It is a direct assault on First Amendment rights as well. New York now puts its citizens to an impossible choice: Forfeit your First Amendment right to gather for religious worship or forfeit your Second Amendment right to armed self-defense. The Constitution cannot tolerate such cavalier treatment of fundamental rights.

By conditioning the exercise of each of these rights on the relinquishment of the other, New York cements its status as a national outlier in the suppression of both. That is particularly remarkable given the Supreme Court has recently admonished New York both for "singl[ing] out houses of worship for especially harsh treatment," *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 66 (2020) (per curiam), and for imposing harsh restrictions on the carrying of firearms that could not be squared "with the Nation's historical tradition of firearm regulation," *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022). Yet rather than heed those cautionary notes, New York responded by rushing out a sweeping new set of restrictions on carrying firearms—including a flat ban on carrying them in houses of worship. S51001, §4, *codified at* N.Y. Penal Law §265.01-e(1), (2)(c). Unsurprisingly given the haste with which it acted, the state's efforts once again fall far short of respecting rights enshrined in the Constitution.

*First*, by prohibiting the exercise of a fundamental constitutional right in places of worship while permitting its exercise on other private property—and by denying to religious leaders the authority it reserves to other private property owners to permit firearms—the state treats comparable secular activity more favorably than religious exercise and discriminates on the basis of religion. It likewise encroaches on church autonomy by telling houses of worship whom they

can admit into their sanctuaries to worship and under what circumstances. Indeed, the notion that the government could categorically disarm houses of worship surely would have struck the founding generation as quite extraordinary. S51001 thus violates both of the First Amendment's religion guarantees. *Second*, by prohibiting ordinary, law-abiding, responsible citizens from exercising their right to armed self-defense in places of worship that otherwise would allow them to do so, S51001 severely restricts the right to keep and bear arms in a manner that lacks any meaningful historical pedigree. As a result, it violates the Second Amendment as well.

New York's disarmament of religious bodies not only violates at least three constitutional guarantees; it also exposes to violence a vulnerable population when they need protection most. That concern is not hypothetical. On November 5, 2017, a shooter killed 26 people and injured 20 more at a Baptist church in Sutherland Springs, Texas.[1] Less than a year later, a shooter killed 11 and injured 6 at the Tree of Life Synagogue in Pittsburgh, Pennsylvania.[2] By contrast, when a shooter attempted mass violence at the West Freeway Church of Christ in Fort Worth, Texas, in 2019, it was the quick and decisive action of an armed parishioner that ended the violent confrontation within seconds.[3] It is no wonder, then, that many churches across the country have undertaken greater security measures to protect their members, including permitting congregants who are authorized by state law to carry arms.[4] Yet New York would deprive worshippers of the

[1] Peter Holley et al., *The Sound of Hymns Drifted from the Country Church. Then Came Gunfire.*, Wash. Post (Nov. 8, 2017), https://wapo.st/3Wx1jrx.

[2] Campbell Robertson et al., *11 Killed in Synagogue Massacre; Suspect Charged with 29 Counts*, N.Y. Times (Oct. 27, 2018), https://nyti.ms/2RoOrSj.

[3] Bill Hutchinson & Josh Margolin, *Armed Parishioner Says He's 'No Hero,' as New Details Emerge About the Texas Church Shooter*, ABC News (Dec. 31, 2019), https://abcn.ws/3NDSk3R.

[4] *See, e.g.*, Reis Thebault, *Too Small to Hire Guards, Too Worried to Go Gun-free, Community Churches Are Now Arming Themselves*, Wash. Post (Feb. 14, 2020), https://archive.ph/U5yjb; Marissanne Lewis-Thompson, *Black Pastors Work to Protect Churches from Violence—In and*

means of protecting themselves against the very violent attacks that presumably animated the state's decision to designate houses of worship "sensitive locations."  That is not even a sensible mode of legislating, let alone one that satisfies strict scrutiny or is consistent with our Nation's historical tradition.  The court should preliminarily enjoin Defendants from enforcing N.Y. Penal Law §265.01-e(2)(c) against Pastor Spencer and His Tabernacle Church, Inc. (the "Church").

## ARGUMENT

A preliminary injunction is appropriate when (1) plaintiffs are "likely to prevail" on the merits, (2) denying an injunction "would lead to irreparable injury," and (3) "granting relief would not harm the public interest."  *Roman Catholic Diocese*, 141 S. Ct. at 66; *see Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 348-49 (2d Cir. 2003).  Each of those factors is easily satisfied here.  Indeed, this Court has already recognized that they are satisfied with respect to Plaintiffs' Second Amendment claims.  And in the First Amendment context, "the likelihood of success on the merits is the dominant, if not the dispositive, factor."  *N.Y. Progress & Protection PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).  Here, the merits of Plaintiffs' First Amendment claims are just as straightforward as the merits of their Second Amendment claim.

Just as in *Roman Catholic Diocese*, New York has "single[d] out houses of worship for especially harsh treatment," 141 S. Ct. at 66, prohibiting them from permitting the carrying of firearms on their property even as it allows other private property owners to make that decision for themselves.  Making matters worse, the state has purported to dictate what churches may permit during religious worship itself—a matter that strikes at the very core of church autonomy—through

---

*Outside of the Community*, St. Louis Public Radio (Feb. 4, 2020), https://bit.ly/3DtAyM8; Aaron Earls, *Half of US Churches Now Enlist Armed Security*, Christianity Today (Jan. 28, 2020), https://bit.ly/3fAjn3E; Isaac J. Bailey, *These Black Churches Are Considering Arming Their Congregations*, Vice (June 10, 2018), https://bit.ly/3FINosu.

a law that, again, is decidedly neither neutral nor generally applicable, let alone historically grounded.  And all of that in service of restricting the exercise of rights protected by the Second Amendment to boot.  In short, the state's one-of-a-kind prohibition on carrying firearms in church poses a compendium of constitutional problems, and it neither satisfies strict scrutiny nor is remotely consistent with our Nation's historical traditions.  A preliminary injunction is therefore warranted several times over.

I.      **Plaintiffs Are Likely To Succeed On The Merits Of Their Claims.**

  A.      **S51001 Singles Out Religious Worship for Burdens that the Law Does Not Impose on Secular Activities in Violation of the Free Exercise Clause.**

  1. The First Amendment guarantees all people the right to "the free exercise" of religion. U.S. Const. amend. I.  The word "exercise" captures not only a person's beliefs but also his conduct in conformance to the will of God.  After all, to "exercise" means "to make use of" or "to put into action."  Black's Law Dictionary (11th ed. 2019).  The founding generation therefore understood the First Amendment to protect "the absolute and unrestrained exercise of our religious *opinions, and duties*, in that mode which our own reason and conviction dictate."  2 St. George Tucker, Blackstone's Commentaries app. 4 (1803) (emphasis added); *see Emp't Div. v. Smith*, 494 U.S. 872, 877-78 (1990).  Laws thus burden religious exercise both when they pressure a person to take actions that he finds religiously abhorrent, *see, e.g.*, *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 713-16 (1981), and when they prevent him from taking actions that he finds religiously necessary or motivated, *see, e.g.*, *Kennedy v. Bremmerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022); *Ramirez v. Collier*, 142 S. Ct. 1264, 1277 (2022); *Roman Catholic Diocese*, 141 S. Ct. at 65-66.

  To be sure, the Supreme Court has held that the government may burden religious exercise when it acts pursuant to a neutral and generally applicable law.  *See Smith*, 494 U.S. at 879.  But

4

if a law is *not* neutral and generally applicable, then the government must run the gauntlet of strict scrutiny, which requires it to show that the law furthers "interests of the highest order" by means "narrowly tailored in pursuit of those interests." *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 546 (1993). "That standard is not watered down; it really means what it says." *Tandon v. Newsom*, 141 S. Ct. 1294, 1298 (2021) (per curium) (quotation marks omitted). Accordingly, when strict scrutiny applies, a state law "rare[ly]" survives. *Carson v. Makin*, 142 S. Ct. 1987, 1997 (2022).

2. S51001 unquestionably burdens Plaintiffs' religious exercise. Pastor Spencer believes that he has a religious duty as a Pastor to protect the flock that God has entrusted to his charge. *See* Compl. ¶42; Spencer Declaration ¶22. Before New York enacted S51001, he consistently acted in accordance with that belief, regularly carrying a firearm on the Church's New York campuses to protect his flock. *See* Compl. ¶43; Spencer Declaration ¶24. Pastor Spencer and his congregation likewise share a conviction that the scriptures call on all members to use their individual "gift[s]" and talents to love, serve, and protect one another as members of a single family united in Jesus Christ. *I Peter* 4:10 (English Standard Version). For those Church members proficient in handling firearms, that may mean volunteering to attend Church armed and prepared to protect fellow congregants. *See* Compl. ¶¶41, 44, 46; Spencer Declaration ¶¶8-13, 23, 28; Pruitt Declaration ¶¶11-16. Once again, Pastor Spencer and others in the Church acted consistent with that belief before. *See* Compl. ¶44, 46; Spencer Declaration ¶¶14, 24; Pruitt Declaration ¶¶6-8.

There can be no serious dispute that S51001 burdens all of this religious exercise, as it makes it a Class E felony, punishable by up to four years in prison, for Pastor Spencer and members of his congregation to carry a firearm in "any place of worship or religious observation," like the Church. N.Y. Penal Law §§70.00(2)(e), 265.01-e(2)(c). In doing so, New York prohibits

Plaintiffs from doing something that they believe God asks of them, as revealed in the Christian scriptures.  *See* His Tabernacle Family Church, *Our Beliefs*, https://bit.ly/3t09ijx ("This assembly accepts the Holy Scriptures as the revealed will of God … both the Old and New Testaments, are verbally inspired of God and are the revelation of God to man—the infallible, authoritative rule of faith and conduct.").  Although people of faith may sometimes disagree about what scripture commands, "[c]ourts are not arbiters of scriptural interpretation."  *Thomas*, 450 U.S. at 716.  New York, likewise, may not second-guess Plaintiffs' views of their religious obligations.

3. S51001 just as surely triggers strict scrutiny.  Indeed, the law triggers strict scrutiny for the same reason that the occupancy restrictions in *Roman Catholic Diocese* did:  It imposes on houses of worship restrictions that it does not impose on places where secular activities take place.  That is plain on the face of the law.  By its terms, S51001 prohibits the carrying of firearms "in or upon a sensitive location," which it defines to include, among other things, "any place of worship or religious observation."  N.Y. Penal Law §265.01-e(1), (2)(c).  That prohibition applies without regard to whether the house of worship consents to the carrying of firearms on its property.  Yet for all manner of other "private property," the owner remains free to authorize visitors to carry a firearm on its premises.  *Id.* §265.01-d(1).  Proprietors of hair salons, retail stores, shopping malls, gas stations, office buildings, garages, and countless other private actors hosting secular activities thus remain free to do what a house of worship may not: decide for themselves whether to permit the carrying of firearms on their property.  *See Roman Catholic Diocese*, 141 S. Ct. at 66-67; *Tandon*, 141 S. Ct. at 1297 (such secular establishments are appropriate comparators for houses of worship); *accord S. Bay United Pentecostal Church v. Newsom*, 141 S. Ct. 716, 719 (2021) (statement of Gorsuch, J.).  Likewise, a New Yorker who hosts friends on a Sunday afternoon to watch the Bills game may carry a firearm and authorize his guests to do the same.  But a pastor

who invites congregants to watch the same game in the church recreational room to build community fellowship may not.  The only way to avoid that disability is for the church to "divorce itself from any religious control or affiliation"—*i.e.*, to choose between religious exercise and armed self-defense.  *Espinoza v. Mont. Dep't of Rev.*, 140 S. Ct. 2246, 2256 (2020).

To be sure, houses of worship are not the *only* places where S51001 prohibits the carrying of firearms; the state has taken an exceedingly capacious (and ahistorical) view of what constitutes a "sensitive location."  *See* N.Y. Penal Law §265.01-e(2).  But the fact that New York "treats some comparable secular businesses or other activities as poorly as or even less favorably than" houses of worship is "no answer."  *Tandon*, 141 S. Ct. at 1296.  As the Supreme Court has now made emphatically clear, government rules and regulations "are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable activity more favorably than religious exercise."  *Id.*  And "[c]omparability is concerned with the risks various activities pose, not the reasons why people gather."  *Id.*  Although the state legislature in its haste to countermand *Bruen* did not bother to include any findings in S51001, it is hard to see how the state could articulate any serious argument that the "various activities" in which law-abiding citizens engage in houses of worship pose a greater risk of firearm misuse than the secular activities that the state exempts from its firearms ban.  And it is certainly true that houses of worship may be targets for some criminals bent on using firearms *illegally*, especially during religious services.  But even assuming the risk that *others* pose to those gathered at houses of worship were an appropriate metric for measuring comparability (a highly doubtful proposition), that risk is not so categorically different in kind as to relieve the state of its burden to justify its decision to explicitly "single out houses of worship for especially harsh treatment." *Roman Catholic Diocese*, 141 S. Ct. at 66.

Making matters worse, S51001 singles out houses of worship for special disfavored treatment when it comes to an exercise of another constitutional right: the Second Amendment right to keep and bear arms.  *See* Compl. ¶¶78-86; *infra* Part I.C.  That too compels application of strict scrutiny to Plaintiffs' free-exercise claims, as even a neutral and generally applicable law must satisfy strict scrutiny if it burdens "the Free Exercise Clause in conjunction with other constitutional protections."  *Smith*, 494 U.S. 881-82.  The Supreme Court has applied that principle to laws that implicate both free exercise and another First Amendment guarantee, like the freedom of the press or freedom of speech, *see, e.g.*, *Cantwell v. Connecticut*, 310 U.S. 296, 304-07 (1940); *Murdock v. Pennsylvania*, 319 U.S. 105, 108-09 (1943), as well as to laws that implicate both free exercise and substantive due process rights under the Fourteenth Amendment, *see, e.g.*, *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972).  The same principle thus necessarily governs here, as the Supreme Court has now made clear—twice—that the Second Amendment "is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'" *Bruen*, 142 S. Ct. at 2156 (quoting *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010) (plurality opinion)).  For this reason, too, the state bears the burden of proving that its ban on carrying firearms in houses of worship satisfies strict scrutiny.

4. "To satisfy" strict scrutiny, a state must prove that the challenged law both "advance[s] 'interests of the highest order'" and is "'narrowly tailored in pursuit of those interests.'" *Church of Lukumi*, 508 U.S. at 546 (quoting *McDaniel v. Paty*, 435 U.S. 618, 628 (1978)).  S51001 is not one of the "rare" laws that can clear this high bar.  *Carson*, 142 S. Ct. at 1997.

As noted, the New York Legislature never took the time to explain what compelling government interest it thinks S51001 (let alone its ban on carrying firearms in houses of worship) serves.  *But see Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011) ("The State must

*specifically identify* an 'actual problem' in need of solving…." (emphasis added)).  But at least judging by the statements of its chief proponents, the law appears to have been animated by the state's general interest in preventing the commission of violent crimes with firearms.[5]  Of course, no one doubts that the state has a compelling interest in preventing violent crime, and—putting aside church autonomy and Second Amendment concerns—perhaps that level of generality might suffice for a neutral and generally applicable law.  But when, as here, a law is *not* neutral and generally applicable, the state must identify a compelling interest in "singl[ing] out houses of worship for especially harsh treatment."  *Roman Catholic Diocese*, 141 S. Ct. at 66; *cf. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 726 (2014) (state cannot satisfy strict scrutiny by pressing interests "couched in very broad terms, such as promoting 'public health' and 'gender equality' ").  Given that the state has chosen to burden the exercise of both First and Second Amendment rights, any interest sufficiently compelling to justify the former must be consistent with the latter—*i.e.*, it cannot be an interest at odds with the people's determination that the government's principal job is to *protect* "the general right to publicly carry arms for self-defense."  *Bruen*, 142 S. Ct. at 2134.

In all events, whether New York asserts an undifferentiated interest in combatting violent crimes committed with firearms or a more particularized interest in combatting such crimes in

---

[5] *See, e.g.*, Gov. Kathy Hochul, N.Y. State, *Governor Hochul Signs Landmark Legislation to Strengthen Gun Laws and Bolster Restrictions on Concealed Carry Weapons in Response to Reckless Supreme Court Decision* (July 1, 2022), https://on.ny.gov/3E1Uuat (governor describing S51001 as passed "to combat the gun violence epidemic"); Andrea Stewart-Cousins, Sponsor Memo No. S51001 (July 1, 2022),  https://bit.ly/3hh1yXW (lead sponsor describing the law's "justification" as "further[ing] the State's compelling interest in preventing death and injury by firearms"); Anna M. Kaplan, N.Y. State Senate, *NYS Senate Fixes Gun Laws Following Reckless Supreme Court Decision* (July 1, 2022), https://bit.ly/3hbBWvk (co-sponsor describing S51001 as enacted "to address the problems created by the [*Bruen*] decision" and to prevent "the unnecessary pain and suffering that gun violence inflicts"); Brian Kavanagh, N.Y. State Senate, *Taking Action to Stop Gun Violence* (July 19, 2022), https://bit.ly/3WuBUPn (co-sponsor touting S51001 as an effort "[t]o rid our country of atrocities like the recent mass shootings … and the day-to-day gun violence").

houses of worship makes little difference, as flatly prohibiting the carrying of firearms in houses of worship is not remotely a narrowly tailored means of accomplishing either end.  At the outset, "it is hard to see how" New York's blanket ban "can be regarded as 'narrowly tailored'" when it is "far more restrictive than any [similar] regulations that have previously come before the Court, [and] much tighter than those adopted by many other jurisdictions." *Roman Catholic Diocese*, 141 S. Ct. at 67; *cf. McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (observing that a state fails narrow tailoring when it fails to show "that it considered different methods that other jurisdictions have found effective"); *Holt v. Hobbs*, 574 U.S. 352, 368-69 (2015) ("That so many other prisons allow inmates to grow beards while ensuring prison safety and security suggests that the Department could satisfy its security concerns through a means less restrictive than denying petitioner the exemption he seeks.").  After all, the problem of armed violence, both generally and targeting houses of worship, is hardly confined to New York.

Yet every other state in the Nation plus the District of Columbia has found means of addressing that problem that are more protective of First (and Second) Amendment rights than categorically disarming places of worship.  Indeed, no other state bans worshippers from carrying firearms even when the religious community and its leaders would permit law-abiding citizens to do so.  In fact, several states have memorialized in statute the right of churches to decide for themselves who may carry firearms on their premises, including Arkansas, Louisiana, Michigan, Missouri, Nebraska, North Dakota, Ohio, South Carolina, and Utah.  *See* Ark. Code §5-73-306(15)(B); La. Code. §40:1379.3(N)(8); Mich. Comp. Laws §28.425o(1)(e); Mo. Stat. §571.107(1)(14); Neb. Rev. Stat. §69-2441(1)(c); N.D. Code §62.1-02-05(2)(m); Ohio Code §2923.126(B)(6); S.C. Code §23-31-215(M)(8); Utah Code §76-10-530.  Others have recently contemplated similar changes to confirm the right of religious congregations to choose whether to

permit firearms on their premises for self-defense.  *See* Thebault, *supra*, at 2 n.4 (noting that "[s]ince the Sutherland Springs shooting in November 2017, lawmakers in 14 states have introduced 40 bills" seeking to make it easier for worshippers to carry firearms and discussing proposed legislation in Florida, New Jersey, and Virginia).

Even setting aside the practices of other jurisdictions, New York itself has found means far more respectful of constitutional rights when it comes to protecting other private property from the risk of violent attacks.  For most forms of private property, the state lets the property owner decide whether to permit the otherwise-lawful carrying of firearms on its property.  If the owners of hair salons, retail stores, shopping malls, gas stations, office buildings, garages, and an untold array of other private property owners can all be trusted to decide for themselves whether they are better or worse off permitting patrons with concealed-carry licenses to carry firearms on their property, then it is hard to see why the same cannot be said for those who lead houses of worship. That much more calibrated regime shows that "there are many other less restrictive rules that could be adopted to" address the state's public-safety concerns.  *Roman Catholic Diocese*, 141 S. Ct. at 67; *see also Tandon*, 141 S. Ct. at 1297 ("Where the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied.").  Simply put, there is no evident justification for New York's seeming view that secular business owners are more qualified than religious leaders to determine whether to allow armed self-defense on their property.

Nor is there any evident justification for New York's extreme position that churches "are always unsafe for guns," no matter who may be carrying them.  Hochul, *supra*, at 9 n.5.  To the contrary, it is hard to see how New York's complete ban on firearms in houses of worship meaningfully addresses any legitimate public safety concern the state may have.  Presumably the

state's concern is not that law-abiding pastors and congregants who possess concealed carry licenses and would like to carry their lawfully owned firearms while in their houses of worship are more likely than patrons of any other establishment to use those weapons to commit violent crimes. Nor, unlike with, say, chemical-dependence and addiction-treatment facilities, N.Y. Penal Law §265.01-e(2)(b), (h), or mental-health treatment facilities, *id.* §265.01-e(2)(i), could the state legitimately claim that houses of worship are frequented by an abnormally high number of people who may be prone to misuse a firearm or unable to arm themselves to defend against violent attack.

Indeed, any such claim is readily refuted by the exceedingly "formal distinctions," *Carson*, 142 S. Ct. at 1998, on which S51001 relies. Were the Church to disavow its religious character and re-brand itself as a club dedicated to the discussion of secular philosophy or atheism, Pastor Spencer would then be free to carry his firearm and grant other licensed members and visitors permission to carry theirs as well. It would not matter if the Church's membership remained the same. It would not matter if the buildings and facilities remained the same. It would not matter if meetings continued to involve communal singing and a motivational talk from Pastor Spencer. Under New York law, all that matters for purposes of whether Pastor Spencer could authorize members and visitors to carry concealed firearms is whether the Church designates itself or operates as a "place of worship or religious observation." N.Y. Penal Law §265.01-e(2)(c). Were the Church to change nothing but extirpate religion from the picture, its members and visitors would enjoy the right to armed self-defense. The law thus has nothing to do with any concerns about any conduct in which Pastor Spencer or the Church's members may engage.

Undoubtedly the state's concern is instead that houses of worship and those who attend them may be likely *targets* for animus-driven attacks. Yet armed criminals bent on committing atrocities against worshippers will not be deterred in the slightest by the fact that the state can now

add unlawful carry in a "sensitive location" to the slew of criminal charges that would stem from such an attack.  This fact may be lost on Defendants, but it is not lost on their officers.  When responding to an armed violent threat against Pastor Spencer last year, a New York State Police officer admitted that carrying a firearm was "smart."  Spencer Declaration ¶37.  New York's approach thus succeeds only in disarming the victims, leaving them defenseless against the very attacks the state presumably fears will come to pass.

That approach is particularly remarkable given that proponents of S51001 all but admitted that they have no evidence to support the highly dubious proposition that prohibiting law-abiding citizens with concealed carry licenses from carrying firearms in purportedly "sensitive locations"—let alone in houses of worship—will achieve any public safety benefit.  Indeed, when asked during a press conference whether she had any data to back that claim, the Governor scoffed at the suggestion that evidence mattered:

> **REPORTER:**  *Do you have numbers to show that it's the concealed carry permit holders that are committing crimes?*  Because the lawful gun owner will say that you're attacking the wrong person.  It's really people that are getting these guns illegally that are causing the violence, not the people going and getting the permit legally and *that's basis for the whole Supreme Court argument*.  Do you have the numbers?
>
> **HOCHUL:**  *I don't need to have numbers.*  I don't need—I don't have to have a data point to point to to say that this is gonna make—All I know is I have a responsibility to the people of this state to have sensible gun safety laws. … *I don't need a data point* to make the case that I have a responsibility to protect the people of this state.

Anne McCloy (@AnneMcCloyNews), Twitter (June 29, 2022, 7:16 PM), https://bit.ly/3E35nJ2.

That shoot-first-aim-later approach is the antithesis of the narrow tailoring required when not one but *three* constitutional provisions are at stake.

**B.    By Dictating How Individuals May Attend Worship Services, S51001 Encroaches on Church Autonomy in Violation of the Establishment Clause.**

The Free Exercise Clause undoubtedly protects the conduct of religious people seeking to order their lives in accordance with the dictates of their faith.  But by restricting "law[s] respecting an establishment of religion," the First Amendment also "protect[s] the right of churches and other religious institutions to decide matters 'of faith and doctrine' without government intrusion."  *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2060 (2020).  This "general principle of church autonomy" is "broad," and it prohibits interference with a religious entity's "independence in matters of faith and doctrine and in closely linked matters of internal government."  *Id.* at 2061.  In fact, the church autonomy principle is so firmly rooted in American traditions that many state courts recognized it—whether as a matter of state common law or of the religion guarantees under their own constitutions—long before the Establishment Clause was incorporated against the states in *Everson v. Board of Education*, 330 U.S. 1 (1947).  *See, e.g.*, *Shannon v. Frost*, 3 B. Mon. 253, 258 (Ky. Ct. App. 1842) ("This Court, having no ecclesiastical jurisdiction, cannot revise or question ordinary acts of church discipline or excision."); *Harmon v. Dreher*, Speers Eq. 87, 120 (S.C. Ct. App. Equity 1843) ("The judgements, therefore, of religious associations, bearing upon their own members, are not examinable here."); *German Reformed Church v. Seibert*, 3 Pa. 282, 291 (Pa. 1846) (ecclesiastical authorities "are the best judges of what constitutes an offence against the word of God and the discipline of the church"); *State ex rel. Watson v. Farris*, 45 Mo. 183, 197-98 (Mo. 1869) (similar).

Over the decades, the Supreme Court has enforced the Establishment Clause's guarantee of church autonomy to prevent state interference with religious doctrine and the line between

14

orthodoxy and heresy,[6] rules for church governance (or "ecclesiology"),[7] appointing, removing, and fixing the authority of church leaders,[8] the admission and discipline of church members,[9] and other matters.   While many of these sensitive issues of faith, doctrine, and governance arose in disputes involving church property[10] or the hiring and firing of church personnel,[11] the principle that the Supreme Court has consistently applied across all of them is much more fundamental.  *See, e.g.*, *Milivojevich*, 426 U.S. at 709 ("[T]his case essentially involves not a church property dispute, but a religious dispute ....").  At bottom, it is for the religious institution to decide what is necessary

---

[6] *See Watson v. Jones*, 80 U.S. 679, 725-33 (1871) (religious entities are autonomous over a "matter which concerns theological controversy, church discipline, ecclesiastical government, or the conformity of the members of the church to the standard of morals required of them"); *Presbyterian Church in the U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449-51 (1969) (rejecting "departure-from-doctrine element of Georgia's implied trust theory"); *Md. & Va. Eldership of Churches of God v. Church of God at Sharpsburg, Inc.*, 396 U.S. 367, 368 (1970) (per curiam).

[7] *See Shepard v. Barkley*, 247 U.S. 1, 2 (1918) (aff'd mem.) (courts could not interfere with merger of two Presbyterian denominations); *Serbian Eastern Orthodox Diocese for U.S. & Canada v. Milivojevich*, 426 U.S. 696, 708 (1976) (Illinois court impermissibly "substitute[d] its own inquiry into church polity"); *Jones v. Wolf*, 443 U.S. 595, 606-09 (1979) (court may not decide questions of "religious doctrine and polity" to decide "which faction is the true representative of the Vineville church").

[8] *See Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16 (1929) ("Because the appointment is a canonical act, it is the function of the church authorities to determine what the essential qualifications of a chaplain are and whether the candidate possesses them."); *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (houses of worship have the "[f]reedom to select the clergy" without "state interference"); *Kreshik v. Saint Nicholas Cathedral*, 363 U.S. 190, 191 (1960) (per curiam) (same).

[9] *See Bouldin v. Alexander*, 82 U.S. 131, 139-40 (1872) ("We have no power to revise or question ordinary acts of church discipline, or of excision from membership. ... [W]e cannot decide who ought to be members of the church, not whether the excommunicated have been irregularly cut off.").

[10] *See, e.g.*, *Church of God at Sharpsburg*, 396 U.S. at 368; *Presbyterian Church*, 393 U.S. at 445-47 (trespass); *Kreshik*, 363 U.S. at 191 (ejectment); *Jones*, 443 U.S. at 598-99 (functional quiet title action); *Milivojevich*, 426 U.S. at 709; *Watson*, 80 U.S. at 734; *Kedroff*, 344 U.S. at 95-96.

[11] *See, e.g.*, *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171 (2012); *Our Lady of Guadalupe*, 140 S. Ct. 2049.

for the propagation and protection of the faith.  A law that forbade the singing of hymns, or required all services to be conducted only in Latin, or mandated the pre-approval of a minister's sermons, or directed that communion be celebrated only with grape juice or not at all, thus not only would infringe the free exercise of religion, but would impermissibly encroach on church autonomy to a far greater degree than awarding church property to one of two rival factions or mandating that a church keep a dissident on its staff.

S51001 plainly entrenches on matters "closely linked" with the Church's right to determine how best to conduct its own affairs.  *Our Lady of Guadalupe*, 140 S. Ct. at 2061.  By its terms, S51001 regulates religious entities specifically with respect to the places where they conduct "worship" or "religious observation."  N.Y. Penal Law §265.01-e(2)(c).  And it not only tells them what worshippers may "possess[]" while in those places, *id.*, but also dictates how churches may (and may not) protect worshippers in their sanctuaries.  That makes S51001's intrusion arguably worse than many of those occasioned in the property and employment disputes.  When it comes to ejectment actions and employment disputes, the state is at least acting within an area of general competence.  But the state ordinarily has no power to tell private property owners whom to admit to their property and under what conditions.  *See* U.S. Const. amend. IV.  That is why every "private property owner"—including a church—ordinarily has the "right to control who may enter, and whether that invited guest can be armed."  *GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1264 (11th Cir. 2012).  Yet while New York has preserved that right for private property owners conducting secular activities, it purports to restrict whom and what churches may admit and how they may protect themselves *even while conducting worship in the sanctuary*.  That gets things backwards.  A church's right to control activities in its sanctuary stems not just from the protection of private property, but from "the general principle of church autonomy" protected by the

Establishment Clause.  *Our Lady of Guadalupe*, 140 S. Ct. at 2061.  For a state to dictate whether and how a house of worship may protect itself and its worshipers thus strikes at the very core of the Establishment Clause.

That is not to say that houses of worship are immune from all neutral and generally applicable restrictions on their own conduct or that of their congregants.  But there is no question that S51001 concerns matters that are "essential" to the "central mission" of houses of worship, *id.* at 2060, and neutral and generally applicable secular rules must give way in that context, *see, e.g.*, *Hosanna-Tabor*, 565 U.S. at 190.  And in all events, S51001 is manifestly not a neutral and generally applicable law, as it denies to houses of worship rights that it preserves for other property owners.  *See supra* at 6-7.  The law thus can be saved from invalidation under the Establishment Clause, if at all, only if New York can prove that it satisfies strict scrutiny and that it is consistent with our Nation's "'historical practices and understandings.'"  *Kennedy*, 142 S. Ct. at 2427-28.  For the reasons just explained, the state cannot do the former.  *See supra* Part I.A.  And for the reasons that follow, it cannot do the latter.  *See infra* Part I.C.  Indeed, particularly given the religious discrimination that helped lead to the recognition of the right of the people to keep and bear arms, the notion that the government could categorically disarm houses of worship undoubtedly would have struck the founding generation as extraordinary.  Plaintiffs are thus likely to succeed on their claims that New York's ban on carrying firearms in houses of worship violates the First Amendment twice over.

## C.   New York's One-of-a-Kind Law Prohibiting Worshippers from Carrying Firearms for Self Defense Flouts the Second Amendment.

For reasons this Court already recognized in its November 3, 2022, order, Plaintiffs will likely succeed on their Second Amendment claim, too.  In *Bruen*, the Supreme Court held—and New York agreed—that "ordinary, law-abiding citizens have a … right to carry handguns publicly

for their self-defense." 142 S. Ct. at 2122; *id.* at 2134 (noting that New York "do[es] not dispute" that "the plain text of the Second Amendment protects … carrying handguns publicly for self-defense"). And by carrying firearms "publicly," *Bruen* meant carrying firearms "outside the home." *See, e.g.*, *id.* at 2122 ("We … now hold … that the Second and Fourteenth Amendments protect an individual's right to carry a handgun for self-defense *outside the home*" (emphasis added)); *id.* at 2134 ("Nothing in the Second Amendment's text draws *a home/public distinction* with respect to the right to keep and bear arms." (emphasis added)).

When Pastor Spencer and other law-abiding citizens attend the Church carrying a firearm, they unquestionably "bear Arms" outside the home. U.S. Const. amend. II. And houses of worship—just like the infinite number of other places "outside the home"—are places where "confrontation can surely take place." *Bruen*, 142 S. Ct. at 2135. New York's ban on carrying firearms in houses of worship thus indisputably constrains activity that "the Second Amendment's plain text covers." *Id.* at 2126. Accordingly, "the Constitution presumptively protects that conduct," and it is the state's job to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* Indeed, the Supreme Court made clear at least nine different times in *Bruen* that the state bears the burden of proving that a restriction on Second Amendment rights is consistent with a longstanding American tradition. *See, e.g.*, *id.* at 2126, 2127, 2130, 2133, 2135, 2138, 2149 n.25, 2150, 2156. As this Court noted when discussing the importance of policing that rule, it is therefore not Plaintiffs' duty to prove that there is "overwhelming evidence of an enduring tradition to the contrary" of New York's approach, as that would "turn[] the test and its burden on their heads." *Hardaway*, 2022 WL 16646220, at *16 n.21. Demonstrating an enduring historical tradition of comparable restrictions is New York's burden— and it is one New York cannot shoulder here.

In fact, New York has yet to identify a single "American law that existed between the founding and 1870" that prohibited the carrying of firearms in houses of worship. *Id.* at 35 n.20. Instead, the best the state has been able to muster is a handful of laws—from five states and one territory—that did not come about until the late nineteenth century. *See Hardaway v. Nigrelli*, No. 1:22-cv-771, ECF 40 at 13-16 (W.D.N.Y. Oct. 28, 2022).  That alone suffices to doom New York's law, as six Reconstruction Era laws—mostly from formerly Confederate jurisdictions *resisting* reconstruction—is about as far as it gets from an "enduring American tradition." *Bruen*, 142 S. Ct. at 2154.  And the state cannot try to salvage its case by resorting to reasoning by analogy, as the Supreme Court sanctioned the "use [of] analogies" only when it comes to "*new* and analogous sensitive places." *Id.* at 2133 (emphasis original).  Places of worship are nothing new in America. Their presence long predates the founding of the Republic.  And the risk of violent attacks on houses of worship is neither an "unprecedented societal concern[]" nor the product of some "dramatic technological change[]." *Id.* at 2132.  To the contrary, it is a "general societal problem that has persisted since the 18th century," *id.*, at 2131, as evidenced by the fact that most colonies had laws in place addressing it—laws that looked nothing like New York's blanket carry ban.

In all events, while it is the state's burden to prove that its restriction is consistent with American tradition, it is worth noting that, just as in *Bruen*, the historical record affirmatively refutes any claim that houses of worship were traditionally understood to be gun-free zones. Indeed, assessed against the relevant traditions from before the founding all the way up until today, New York's novel approach has consistently been an outlier in the extreme.

***Medieval to Early Modern England.***  Resistance to the prospect of criminal liability for carrying firearms in church played an important role in the enshrinement of the predecessor to the Second Amendment in the 1689 English Bill of Rights.  As *Bruen* recounted, Sir John Knight was

"a prominent detractor of James II" who was charged "with violating the Statute of Northampton because he allegedly 'did walk about the streets armed with guns, and that he went into the church of St. Michael, in Bristol, in the time of divine service, with a gun, to terrify the King's subjects.'" *Bruen*, 142 S. Ct. at 2140-41 (quoting *Sir John Knight's Case*, 3 Mod. 117, 87 Eng. Rep. 75, 76 (K.B. 1686)). Although the Statute by that time "had largely become obsolete through disuse," Chief Justice Herbert explained that it prohibited only carrying a firearm "with evil intent or malice," and thus Knight was acquitted. *Id.* at 2141 & n.10. In other words, in the leading English case concerning the carrying of firearms outside the home, the English courts held that bearing arms in church was *not* a crime. And the misguided Knight prosecution helped prompt Parliament to strengthen gun rights by including in the 1689 Bill of Rights "the 'predecessor to our Second Amendment.'" *Id.* at 2141-42. The origins of the Second Amendment thus affirmatively refute the suggestion that churches were historically understood to be (as New York claims) "always unsafe for guns." Hochul, *supra*, at 9 n.5. And, of course, the long history of efforts in England to disarm people based on religion is part of why the framers of *our* Nation's founding documents made sure to enshrine a Second Amendment right even *more* protective than the one found in the 1689 Bill of Rights. *See District of Columbia v. Heller*, 554 U.S. 570, 592-94, 606 (2008).

**The American Colonies and the Early Republic.** To the extent the early American experience reveals a relevant tradition, it is one of *mandating*, rather than *banning*, the carrying of firearms in churches. Most of the colonies had laws that required at least some churchgoers to bring weapons with them to services. *See* Compl. ¶¶51-52. For instance, in 1770, "for the better security of the inhabitants," Georgia required every militia-eligible citizen to carry to his place of worship—and specifically to his pew or seat—"a gun, or a pair of pistols, in good order and fit for service, with at least six charges of gun-powder and ball." 19 The Colonial Records of the State

of Georgia, Part 1, at 137-40 (Allen D. Candler ed., 1911).  The law provided a robust enforcement mechanism, requiring church officials to "examine all such" persons at least 14 times a year to determine whether they appeared "without the arms and ammunition by this act directed."  *Id.*; *see also Heller*, 554 U.S. at 601 (discussing the law).  These laws were motivated by a desire to enable worshippers to "prevent or withstand such sudden assaults" as might occur "upon the Sabboth," while the population was most vulnerable.  1 Public Records of the Colony of Connecticut 95 (J. Hammond Trumbull ed., 1850).  Unfortunately, sudden attacks on religious congregations are still a concern today, both for houses of worship generally and for Pastor Spencer's congregation in particular.  *See* Compl. ¶¶48-50; Spencer Declaration ¶¶32-39.  And historically, the solution was to ensure that they had the means to protect themselves, not to leave churches defenseless against senseless acts of violence.

These laws, which pre-date ratification of the Constitution, and thus hail from a time when many colonies maintained established churches, do not appear to have persisted after the founding.  But their denouement likely says more about the prevalence of concerns regarding state interference with organized religion than about concerns regarding the carrying of firearms in houses of worship.  Even during the colonial period, for example, Pennsylvania did not require its citizens to carry firearms, likely owing to "its Quaker origins and Quaker pacifism."  Clayton E. Cramer, *Colonial Firearm Regulation*, 16 J. Firearms & Pub. Pol'y 1, 10-11 (2004).  Other colonies, it seems, allowed case-by-case exemptions for worshippers burdened by a carry requirement.  *See, e.g.*, Records of the Colony and Plantation of New Haven, From 1638 to 1649, at 501 (Charles J. Hoadly ed., 1857) ("free[ing]" William Paine from the carry requirement "because he lives farr of and hath three small children, and his wife is lame and cannot help to bring ye children").  And by 1833, all states had disestablished official state churches, presaging

the incorporation of the Establishment Clause against the states more than a century later.  *See* John Witte & Justin Latterell, *The Last American Establishment: Massachusetts, 1780-1833*, in Religious Dissent and Disestablishment 399-424 (2019).  Alongside this expansion of religious freedoms, of course, was an expansion in individuals' right to armed self-defense, as the new states promptly ratified the Second Amendment in 1791 and began providing similar guarantees in their own charters—like Kentucky in 1799, Ohio in 1802, Connecticut in 1818, Alabama in 1819, and Mississippi in 1832.[12]  In all events, the salient point is that for the first century of our Nation's existence, the only relevant laws mandated, rather than prohibited, the carrying of firearms in houses of worship.

 ***Reconstruction.***  The very few laws in our history that resemble New York's did not surface until Reconstruction, and even then did so for perhaps less than admirable reasons.  Four former Confederate states enacted prohibitions on carrying firearms that included places of worship,[13] contemporaneous with other laws aimed at disarming newly emancipated black Americans.  *See McDonald*, 561 U.S. at 846-48 (Thomas, J., concurring in part and concurring in the judgment).  And even those laws were typically less onerous than New York's.  Texas, for example, provided an exception for "persons whose duty it is to bear arms on such occasions in discharge of duties imposed by law."  1870 Tex. Gen. Laws 63, ch. 46, §1.  Virginia, meanwhile, provided an exception for those carrying with "good and sufficient cause" and exempted those for whom places of worship were their "own premises."  1877 Va. Acts 305, §21.  And in at least one Missouri locality, it was a defense to prosecution that the defendant "has been threatened with great bodily

---

[12] *See* Ky. Const. of 1799 art. X, §23; Ohio Const. of 1802 art. VIII, §20; Conn. Const. of 1818 art. I, §17; Ala. Const. of 1819 art. I, §23; Miss. Const. of 1832 art. I, §23.

[13] *See* 1870 Ga. Laws 421; 1870 Tex. Gen. Laws 63, ch. 46, §1; 1877 Va. Acts 305, §21; 1883 Mo. Laws 76.

harm, or had good reason to carry" for self-defense, or that the defendant was a person whose "duty it is to … suppress breaches of the peace."  Revised Ordinances of City of Huntsville, Mo. of 1894, §2.  To the extent any of these laws ever approached New York's severity, states have since walked them back.  Virginia's Attorney General, for example, has construed that state's law to permit carrying weapons for self-protection.  *See* Va. Att'y Gen. Op. No. 11-043, 2011 WL 4429173, at *1 (Apr. 8, 2011).  And while Georgia's church carry ban appears to have been categorical, *see* 1870 Ga. Laws 421 (providing that "[n]o person" may carry in "a place of public worship"), even that law later "evolved … to allow church leaders to decide the issue for their own churches."  *Hardaway*, 2022 WL 16646220, at *16 n.19.  Accordingly, the state's only historical evidence both comes too late and proves too little.

   ***The Late-19th and Early-20th Centuries.***  Two territories (not yet states) enacted general bans on the carrying of firearms in churches during the late-19th century.[14]  *See Antonyuk v. Hochul*, 2022 WL 5239895 at *15 (N.D.N.Y. Oct. 6, 2022).  But the Supreme Court has already dismissed laws like these:  While Oklahoma and Arizona, along with three other states or territories, had exceptionally restrictive regimes for carrying firearms during this period, the Court reiterated in *Bruen* that "we will not stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption, governed less than 1% of the American population, and also 'contradic[t] the overwhelming weight' of other, more contemporaneous historical evidence."  *Bruen*, 142 S. Ct. at 2155 (quoting *Heller*, 554 U.S. at 632).  Indeed, not only were these laws adopted relatively late in our constitutional history; they were adopted during *the very same sessions* of the Arizona and Oklahoma legislatures as the laws

---

   [14]  *See* 1889 Ariz. Sess. Laws 16-17; Statutes of Okla., 1890, §7.

that *Bruen* cast aside.  *Id*. at 2154.  They are thus entitled to the same weight that *Bruen* accorded them:  none.

*          *          *

In the final tally, all the state has managed to muster to date are a few "outlier[s]" from the late nineteenth century that come nowhere close to establishing an "enduring American tradition" of disarming worshippers in the sanctuary.  That is unsurprising given what *Bruen* said about the American tradition of regulating the carrying of firearms in sensitive places.  While the Court acknowledged the historical tradition of prohibiting "'the carrying of firearms in sensitive places such as schools and government buildings,'" *id.* at 2133 (quoting *Heller*, 554 U.S. at 626), it made clear that no elephants lurk in this mousehole:  "[T]he historical record yields *relatively few* 18th- and 19th-century 'sensitive places' where weapons were altogether prohibited …." *Id.* (emphasis added).  And it yields zero evidence for the first century of the Nation's existence of blanket prohibitions on carrying firearms in places of worship.

Far more relevant, then, is *Bruen*'s admonishment that "expanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly."  *Id.* at 2133-34.  And even that is a charitable description of what New York has done here.  Setting aside the two sensitive places expressly acknowledged in *Bruen*—schools and government buildings, N.Y. Penal Law §265.01-e(2)(a), (f), (m)—S51001 includes (among other things) houses of worship, public parks, public transit, places of entertainment like theaters and stadiums, "any gathering of individuals to collectively express their constitutional rights," and all of the area "known as Times Square," *id.* §265.01-e(2)(c), (d), (n), (p), (s), (t).  Seemingly the *only* thing most of these places have in common is that they invite people to congregate; New York has not even paid any heed to whether

they are "isolated from law enforcement." *Bruen*, 142 S. Ct. 2133-34.  That does not reflect a remotely serious effort to account for our Nation's historical tradition of firearms regulation.

## II.    The Remaining Factors All Favor Injunctive Relief.

Plaintiffs will suffer irreparable injury absent an order permitting them to defend one another in accordance with their faith.  "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Moreover, if an injunction is not granted, Pastor Spencer and his New York flock will continue to be put to the unconstitutional choice of which of their fundamental rights to forego to exercise the other.  Should they choose to worship, they risk being victimized by violence with no means to protect themselves.  Pastor Spencer has endured credible violent threats, and the Church has been burglarized on previous occasions.  Just like in *Hardaway*, then, "there can be no question" of irreparable harm.  2022 WL 16646220, at *17.

Conversely, the public interest is not advanced by enforcing a law that tramples on constitutional rights.  Precisely because S51001 is underinclusive and excepts so many secular activities, there is little reason to think the public interest "would be imperiled if" the state had to choose from among those "less restrictive measures." *Roman Catholic Diocese*, 141 S. Ct. at 68. And because the public interest favors an injunction, so too do the equities. *Nken v. Holder*, 556 U.S. 418, 435 (2009) (balance-of-equities and public-interest "factors merge when the Government is the opposing party"); *see also Roman Catholic Diocese*, 141 S. Ct. at 66.  Just as in *Hardaway*, then, a preliminary injunction is in the public interest.  2022 WL 16646220, at *18.

## CONCLUSION

This Court should preliminarily enjoin Defendants from enforcing New York's ban on carrying firearms in houses of worship against the Plaintiffs.

Dated: November 8, 2022                     Respectfully submitted,

                                            /s/ Anjan K. Ganguly
DAVID J. HACKER                             ANJAN K. GANGULY
JEREMY DYS*                                 GANGULY BROTHERS, PLLC
KEISHA RUSSELL                              140 Allens Creek Road
RYAN GARDNER*                               Suite 220
FIRST LIBERTY INSTITUTE                     Rochester, NY 14618
2001 West Plano Parkway                     (585) 232-7747
Suite 1600
Plano, TX 75075                             ERIN E. MURPHY*
(972) 941-4444                              ANDREW C. LAWRENCE*
                                            TREVOR W. EZELL*
JORDAN E. PRATT*                            NICHOLAS M. GALLAGHER*
FIRST LIBERTY INSTITUTE                     CLEMENT & MURPHY, PLLC
227 Pennsylvania Avenue S.E.                706 Duke Street
Washington, D.C. 20003                      Alexandria, VA 22314
(972) 941-4444                              (202) 742-8900


*Applications for admission *pro hac vice*  *Counsel for Plaintiffs*
pending.

26