UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

HIS TABERNACLE FAMILY CHURCH, INC. and
MICHEAL SPENCER

      Plaintiffs,

  vs.            Case No. 6:22-cv-06486

STEVEN A. NIGRELLI, Acting Superintendent of the
New York State Police, in his official and individual
capacities; WEEDEN A. WETMORE, District Attorney
for the County of Chemung, New York, in his official
and individual capacities; and MATTHEW VAN
HOUTEN, District Attorney for the County of
Tompkins, New York, in his official and individual
capacities.

      Defendants.

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR
A PRELIMINARY INJUNCTION**

LETITIA JAMES
Attorney General of the State of New York
DANIEL R. MAGUIRE
Assistant Attorney General, of Counsel
Main Place Tower, Suite 300A
350 Main Street
Buffalo, New York 14202
Tel: (716) 853-8419

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 1

    A.    New York State Enacts the CCIA ................................................................... 1

    B.    This Court Enjoins Superintendent Nigrelli from Enforcing the Place of Worship
           Provision in the *Hardaway* Injunction .......................................................... 3

    C.    Plaintiffs File Complaint and Preliminary Injunction Motion Seeking to Enjoin
           Defendants from Enforcing the Place of Worship Provision ................................. 4

ARGUMENT .................................................................................................................. 5

POINT I      PLAINTIFFS HAVE NOT MET THEIR BURDEN FOR A PRELIMINARY
              INJUNCTION ............................................................................................. 5

    A.    Plaintiffs Cannot Establish a Clear or Substantial Likelihood of Success on the
           Merits ..................................................................................................... 6

         1.    Plaintiffs Can Only Bring a Disfavored Facial Challenge .......................... 6

         2.    The Place of Worship Provision Does Not Violate the Free Exercise
             Clause ............................................................................................ 7

              i.    The Place of Worship Provision Does Not Substantially Burden
                    Plaintiffs' Religious Practice ......................................................... 7

              ii.    The Place of Worship Provision Is Neutral and Generally
                    Applicable ............................................................................... 10

         3.    The Place of Worship Provision Does Not Violate the Establishment
             Clause ........................................................................................... 12

         4.    The Place of Worship Provision Does Not Violate the Second Amendment
             ................................................................................................... 14

    B.    Plaintiffs Have Not Shown Irreparable Harm ................................................. 23

    C.    The Balance of Equities and the Public Interest Weigh in Favor of New York's
           Mission to Protect its Citizens ................................................................... 23

CONCLUSION ............................................................................................................. 26

## **TABLE OF AUTHORITIES**

**Cases**

*Able v. United States*, 44 F.3d 128 (2d Cir. 1995) ........................................................... 5

*Alexander v. State*, 27 Tex. App. 533 (Tex. Ct. App. 1889)............................................ 19

*Andrews v. State*, 50 Tenn. 165 (Tenn. 1871)................................................................. 17

*Beal v. Stern*, 184 F.3d 117 (2d Cir. 1999) ...................................................................... 6

*Bill & Ted's Riviera, Inc. v. Cuomo*, 494 F. Supp. 3d  238 (N.D.N.Y. 2020)................................ 5

*Braunfeld v. Brown*, 366 U.S. 599 (1961) ........................................................................ 9

*C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752 (7th Cir. 2003) ..................... 11

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ................................................................. 7

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993)....................... 12

*Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d Cir. 2002)..................... 14

*Congregation Beth Yitzchok of Rockland, Inc. v. Town of Ramapo*, 593 F. Supp. 655 (S.D.N.Y. 1984)............................................................................................................ 9

*Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105 (2d Cir. 2003) ................................... 7

*D.C. v. Heller*, 554 U.S. 570 (2008) ................................................................... 2, 15, 16

*Diaz v. Pataki*, 368 F. Supp. 2d 265 (S.D.N.Y. 2005).................................................... 7

*Doe v. N.Y.U.*, 666 F.2d 761 (2d Cir. 1981) .................................................................... 6

*Donovan v. Tony & Susan Alamo Found.*, 722 F.2d 397 (8th Cir. 1983) ................... 10

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)............................................ 24

*Employment Division v. Smith* , 494 U.S. 872 (1990) ................................................... 10

*English v. State*, 35 Tex. 473 (Tex. 1873) ..................................................................... 17

*Erznoznik v. Jacksonville*, 422 U.S. 205 (1975) ............................................................ 6

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) .............................................. 20

*Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021) ........................................................ 10, 11

*Harris v. McRae*, 448 U.S. 297 (1980) ..................................................................................... 7

*Hill v. State*, 53 Ga. 472 (Ga. 1874)................................................................................... 17, 20

*Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 656 U.S. 171 (2012) . 12, 13

*Indig v. Vill. Of Pomona*, 2019 WL 6173425, at *8 (S.D.N.Y. Nov. 19, 2019)........................... 7

*Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments*, 852 F.3d 178 (2d Cir. 2017)................................................................................ 6

*Jimmy Swaggart Ministries v. Bd. Of Equalization*, 493 U.S. 378 (1990) .................................. 8

*Joglo Realties, Inc. v. Seggos*, 2016 WL 449140 (E.D.N.Y. Aug. 24, 2016)............................... 23

*Katz v. New York City Hous. Pres. & Dev.*, 2022 WL 3156178 (S.D.N.Y. Aug. 8, 2022) ........... 8

*Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022).............................................. 10, 11, 22

*L&M Bus Corp. v. Bd. Of Educ.*, 2018 WL 2390125 (E.D.N.Y. May 25, 2018).......................... 5

*Lemon v. Kurtzman*, 403 U.S. 602 (1971) ................................................................................. 13

*Libertarian Party of Conn. v. Lamont*, 977 F.3d 173 (2d Cir. 2020) .......................................... 5

*Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647 (S.D.N.Y. 2019) ................................... 24

Marianist Province of United States v. City of Kirkwood, 944 F.3d 996 (8th Cir. 2019)........... 10

*Maupin v. State*, 89 Tenn. 367, 17 S.W. 1038 (1890) ............................................................... 19

*Mazurek v. Armstrong*, 520 U.S. 968 (1997)............................................................................ 15

*McDonald v. City of Chicago*, 561 U.S. 742 (2010).................................................................... 2

*Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506 (2d Cir. 2005) ........................................... 15

*Newdow v. Peterson*, 753 F.3d 105 (2d Cir. 2014)...................................................................... 8

*Newdow v. United States*, 2013 WL 4804165 (S.D.N.Y. Sept. 9, 2013)....................................... 8

*Nken v. Holder*, 556 U.S. 418 (2009) ................................................................................... 5, 24

*NYSRPA v. Cuomo*, 804 F.3d 242 (2d Cir. 2015)..................................................................... 24

*Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105 (2d Cir. 2014) ...................... 24

*Our Lady of Guadalupe School v. Morrissy-Berru*, 140 S. Ct. 2049 (2020)......................... 12, 13

*Owens v. State*, 3 Tex. App. 404 (Tex. Ct. App. 1878) .................................................... 19

*People ex rel. Schneiderman v. Actavis PLLC*, 787 F.3d 638 (2d Cir. 2015) ........................... 5, 6

*Rainey v. State*, 8 Tex. App. 62 (Tex. Ct. App. 1880) ................................................. 19

*Range v. Attorney General of the United States*, 2022 WL 16955670(3d Cir. 2022) ........... 20, 25

*Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348 (2d Cir. 1990) ............................................................................. 9

*Redlich v. City of St. Louis*, 550 F. Supp. 3d 734 (E.D. Mo. 2021)....................................... 9

*Restaurant Law Ctr. v. City of N.Y.*, 360 F. Supp. 3d 192 (S.D.N.Y. 2019) ................................ 6

*Rweyemamu v. Cote*, 520 F.3d 198 (2d Cir. 2008) ....................................................... 13

*Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010) ......................................................... 24

*Skoros v. City of New York*, 437 F.3d 1 (2d Cir. 2006) ................................................ 7, 8

*St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94 (1952)................. 14

*State v. Pigg*, 85 Mo. App. 399 (Mo. Ct. App. 1900).................................................... 19

*Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725 (1997)................................................ 7

*Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917 (2d Cir. 1997)....................................... 23

*Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290 (1985)........................................ 10

*U.S. v. Decastro*, 682 F.3d 160 (2d Cir. 2012) ............................................................ 6

*United States v. Charles*, 2022 WL 4913900 (W.D. Tex. Oct. 3, 2022) .................................... 20

*United States v. Salerno*, 481 U.S. 739 (1987) ............................................................ 6

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)................................ 6

*We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) ....................................... 11, 14

*Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7 (2008) ......................................... 5, 24

v

*Zorach v. Clauson*, 343 U.S. 306 (1952) ...................................................................................... 22

**Statutes**

1786 Va. Laws 35 ............................................................................................................................ 18

1869-70 Tenn. Pub. Acts 23-24 ..................................................................................................... 18

1870 Ga. Laws 421 .................................................................................................................. 17, 20

1870 Tex. Gen. Laws 63 ........................................................................................................... 17, 18

1877 Va. Acts 305 ........................................................................................................................... 17

1889 Ariz. Sess. Laws 16 ............................................................................................................... 17

1889 Ariz. Sess. Laws 17 ............................................................................................................... 18

1890 Okla. Stat. 495-96 ........................................................................................................... 17, 18

2 Edw. 3, 320, ch. 3 (1328) ........................................................................................................... 18

26 Hen. 8 c. 6 § 3 (1534) .......................................................................................................... 17, 18

**Other Authorities**

Darrell A.H. Miller, Constitutional Conflict and Sensitive Places, 28 Wm. & Mary Bill Rts. J. 459, 462 (2019) ......................................................................................................................... 21

Eric Ruben and Saul Cornell, Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context, 125 Yale L.J. Forum 121, 132-33 (2015) .......................... 17

Defendant Steven A. Nigrelli, sued in his official and individual capacities as Acting Superintendent of the New York State Police, respectfully submits this memorandum of law, together with the Declaration of Patrick J. Charles, dated December 6, 2022 ("Charles Decl."), in opposition to Plaintiffs' motion for a preliminary injunction (ECF No. 13).

## PRELIMINARY STATEMENT

The Court should deny Plaintiffs' motion for a preliminary injunction for multiple reasons. *First*, Plaintiffs have not demonstrated a clear or substantial likelihood of success on the merits of their First or Second Amendment Claims. As to the First Amendment, the Place of Worship Provision is part of a neutral and generally applicable law that does not specifically target religious institutions or burden Plaintiff's professed religious practices. As to the Second Amendment, there is a robust and clear historical tradition of states prohibiting weapons in religious institutions, satisfying the *Bruen* inquiry. *Second*, Plaintiffs fail to establish imminent, irreparable harm —any harm to Plaintiffs absent an injunction is entirely speculative given there is no current threat of Defendants enforcing the Place of Worship Provision against persons tasked with the duty to keep the peace at Plaintiffs' places of worship. *Finally*, the balance of equities and the public interest weigh overwhelmingly in favor of New York's mission to protect all New Yorkers from the plague of gun violence that has swept the country.

## FACTUAL BACKGROUND

### A.     New York State Enacts the CCIA

On July 1, 2022, the New York State Legislature passed the CCIA. Governor Kathy Hochul promptly signed the CCIA into law. The bill was specifically designed "to align with the Supreme Court's recent decision in []Bruen." *See* Press Release, July 1, 2022, available at https://on.ny.gov/3BM6Hz7.

1

In *Bruen*, the Supreme Court found that a single provision of New York's gun licensing regime was unconstitutional: the provision that required an applicant to demonstrate "proper cause" to obtain a license to carry a concealed weapon. The Court held that requiring such a heightened, individualized need for self-defense to obtain a license violated the Second Amendment. *See Bruen* at 2123 n.1. The Court did not address any other provision of New York's gun licensing or related statutes.

The Sponsor's Memo for the CCIA makes it clear that the Legislature was set on complying with *Bruen* and "protect[ing] individuals' Second Amendment rights as determined by the Supreme Court," while at the same time enacting measures to "prevent[] death and injury by firearms." The legislation updated New York's licensing scheme to eliminate the "proper cause" requirement that was deemed unconstitutional by *Bruen*, to clarify the requirement of "good moral character," and to establish additional application and training requirements. Under this bill, applicants who successfully meet New York's conceal carry license applications requirements will receive their license. *See* S51001 State Senate Sponsor Memo.[1]

One important part of the CCIA, Penal Law § 265.01-e, enumerates a set of "sensitive locations" in which individuals generally may not possess "a firearm, rifle or shotgun." Penal Law § 265.01-e(1). The Supreme Court has repeatedly emphasized the constitutionality of "laws forbidding the carrying of firearms in sensitive places," and instructed that they are "presumptively lawful." *Bruen*, 142 S.Ct. at 2162 (Kavanaugh, J., joined by Roberts, C.J., concurring) (quoting *D.C. v. Heller*, 554 U.S. 570, 626-27 & n.26 (2008)); *accord McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010)). As relevant here, the list includes "any place of worship or religious observation." *Id.* § 265.01-e(2)(c) (the "Place of Worship Provision"). This

---

[1] https://www.nysenate.gov/legislation/bills/2021/S51001

2

law protects people at worship by making it a crime to bring a firearm into a church, synagogue, or other place of religious observation.  To help protect those within, the law contains exceptions for police officers, peace officers, registered security guards, active-duty military personnel, and other statutorily designated persons.  *See id*. § 265.01-e(3).

**B.     This Court Enjoins Superintendent Nigrelli from Enforcing the Place of Worship Provision in the *Hardaway* Injunction**

On October 13, 2022, two pastors in Erie and Niagara Counties and two-gun rights groups commenced an action against Superintendent Nigrelli, and the Niagara and Erie County District Attorneys, challenging the constitutionality of the Place of Worship Provision. Complaint, *Hardaway, Jr. v. Nigrelli*, (W.D.N.Y. No. 22-cv-00771-JLS), ECF No. 1.  Shortly thereafter, the plaintiffs moved for a preliminary injunction enjoining Superintendent Nigrelli and the Niagara and Erie County District Attorneys from enforcing the Place of Worship Provision.  Mot. for Prelim. Injunct., *Hardaway*, (W.D.N.Y. No. 22-cv-00771-JLS), ECF No. 9. On November 3, 2022, the Court granted plaintiffs' preliminary injunction motion and entered an Order providing that:

> ORDERED that Defendants and their officers, agents, servants, employees, and all persons in concert or participation with them who receive notice of this preliminary injunction, are enjoined, effective immediately, from enforcing all of N.Y. Pen. L. § 265.01-e(2)(c) (places of worship or religious observation) and their regulations, policies, and practices implementing it;
>
> ORDERED that this preliminary injunction shall remain in effect pending disposition of the case on the merits.

Decision and Order at 43-44, *Hardaway*, (W.D.N.Y. No. 22-cv-00771-JLS), ECF No. 52. (the "*Hardaway* Injunction").

Superintendent Nigrelli appealed the *Hardaway* Injunction to the Second Circuit on November 15, 2022.  Notice of Civil Appeal, *Hardaway v. Nigrelli*, (2d Cir. No. 22-2933), ECF No. 1.  With the appeal, Superintendent Nigrelli filed a motion to stay the *Hardaway* Injunction

pending his appeal.  Mot. to Stay, *Hardaway*, (2d Cir. No. 22-2933), ECF No. 23.  That stay

motion does not request a full stay of the *Hardaway* Injunction.  Instead, Superintendent Nigrelli

sought "a limited stay of the injunction which would allow firearms to be carried by other

persons who have been tasked with the duty to keep the peace at places of worship or religious

observation."  *Id.* at 29.

On December 7, 2022, the Second Circuit granted Superintendent Nigrelli's stay motion.

*Hardaway*, (2d Cir. No. 22-2933), ECF No. 54.  Consistent with Superintendent Nigrelli's stay

request, the Second Circuit provided that "[t]o the extent that the district court's order bars

enforcement of § 265.01(e)(2)(c) as it pertains to persons who have been tasked with the duty to

keep the peace at places of worship, such category is EXCEPTED from this order."  *Id.*

## C.    Plaintiffs File Complaint and Preliminary Injunction Motion Seeking to Enjoin Defendants from Enforcing the Place of Worship Provision

On November 3, 2022, Plaintiffs, a church with a principal location in Horseheads, New

York and its senior pastor, commenced this action against Superintendent Nigrelli and the

District Attorney Defendants seeking the same relief sought in *Hardaway*—a declaration that the

Place of Worship Provision violates the Constitution, thereby allowing Plaintiffs to determine

who may carry firearms in their church.  (*See* Compl. 24-25, ECF No. 1).  Five days later,

Plaintiffs filed their motion for a preliminary injunction.  (Mot. for Prelim. Injunct., ECF No.

13).  Through the motion, Plaintiffs seek an order:

> barring Defendants, in their official capacities, as well as their officers, agents,
> employees, attorneys, and all persons in active concert or participation with them
> who receive actual notice of the Order from implementing or enforcing S51001,
> codified at N.Y. Penal Law § 265.01-e, against [Plaintiffs], its members, or their
> agents and licensees.

*Id.*  Plaintiffs seek a preliminary injunction identical to the *Hardaway* Injunction.  The only

difference is the district attorneys the Plaintiffs seek to enjoin.

## ARGUMENT

## POINT I

## PLAINTIFFS HAVE NOT MET THEIR BURDEN FOR A PRELIMINARY INJUNCTION

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008).  The movant bears the heavy burden of establishing each of the following elements: (1) that they are likely to succeed on the merits, (2) that they are likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in their favor, and (4) that the injunction is in the public interest. *Id.* at 20.  The final two factors—the balance of the equities and the public interest—"merge when the Government is the opposing party."  *L&M Bus Corp. v. Bd. Of Educ.*, 2018 WL 2390125, at *13 (E.D.N.Y. May 25, 2018) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

In addition, the Second Circuit has "held the movant to a heightened standard" where, as here, an injunction is "mandatory" (*i.e.* altering the status quo rather than maintaining it).[2] *People ex rel. Schneiderman v. Actavis PLLC*, 787 F.3d 638, 650 (2d Cir. 2015).  In cases such as this one where a plaintiff asks the Court to enjoin a law passed by the Legislature and signed by the Governor, "[r]equiring such a heightened showing is consistent with the principle that 'governmental policies implemented through legislation . . . are entitled to a higher degree of deference and should not be enjoined lightly.'  *Bill & Ted's Riviera, Inc. v. Cuomo*, 494 F. Supp. 3d  238, 244 (N.D.N.Y. 2020) (quoting *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995)).

---

[2] In *Hardaway*, this Court concluded that the plaintiffs were relieved of the need to make a heightened showing because the "Constitution and the Bill of Rights are the status quo."  *Hardaway* Injunction, 12.  But that observation cannot resolve the issue in a case where the dispute concerns the meaning of the relevant provisions of the Constitution and the Bill of Rights.  The Court's flawed reasoning would destabilize settled expectation by making it easy to stay enforcement of a statute based on a mere allegation that the statute was unconstitutional.  *See Libertarian Party of Conn. v. Lamont*, 977 F.3d 173, 176-77 (2d Cir. 2020) (applying heightened scrutiny to constitutional challenge).

Plaintiffs must therefore show a "clear" or "substantial" likelihood of success on the merits and make a "strong showing" of irreparable harm, in addition to showing that the preliminary injunction is in the public interest.  *Actavis*, 787 F.3d at 650 (quoting *Beal v. Stern*, 184 F.3d 117, 123 (2d Cir. 1999) and *Doe v. N.Y.U.*, 666 F.2d 761, 773 (2d Cir. 1981)).  Plaintiffs cannot meet this standard.

## A.      Plaintiffs Cannot Establish a Clear or Substantial Likelihood of Success on the Merits

### 1.      Plaintiffs Can Only Bring a Disfavored Facial Challenge

Plaintiffs bring a "pre-enforcement" challenge to the Place of Worship Provision of the CCIA.  A long line of precedent within the Second Circuit establishes that any "pre-enforcement" challenge to a state law, defined as one brought "before [any plaintiffs] have been charged with any violation of law," can only be brought as a facial challenge.  *Jacoby & Meyers, LLP v. Presiding Justices of the First, Second, Third and Fourth Departments*, 852 F.3d 178, 184 (2d Cir. 2017); *accord Restaurant Law Ctr. v. City of N.Y.*, 360 F. Supp. 3d 192, 208 (S.D.N.Y. 2019).

A facial challenge to the provisions of a statute can succeed only if Plaintiffs "show that 'no set of circumstances exists under which the [statute] would be valid, *i.e.,* that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'" *U.S. v. Decastro*, 682 F.3d 160, 168 (2d Cir. 2012) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008)); *see also United States v. Salerno*, 481 U.S. 739 (1987)).  Moreover, it is black-letter law that the New York State courts must be given the opportunity to narrow the provisions of the CCIA, if necessary, during specific enforcement activities or judicial proceedings.  *See Erznoznik v. Jacksonville*, 422 U.S. 205, 216 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing

construction by the state courts"). Because of this, "[a] plaintiff making a facial claim faces an uphill battle because it is difficult to demonstrate that mere enactment of a piece of legislation violates the plaintiff's constitutional rights." *Cranley v. Nat'l Life Ins. Co. of Vt.*, 318 F.3d 105, 110 (2d Cir. 2003) (quoting *Suitum v. Tahoe Reg'l Plan. Agency*, 520 U.S. 725, 736 n.10 (1997)) (cleaned up); *see also Diaz v. Pataki*, 368 F. Supp. 2d 265, 274 (S.D.N.Y. 2005) (same).

> **2.     The Place of Worship Provision Does Not Violate the Free Exercise Clause**

Plaintiffs contend that the Place of Worship Provision violates the Free Exercise Clause of the First Amendment. The crux of Plaintiffs' argument is that the Place of Worship Provision is targeted at religious practice and is not a neutral law of general applicability. Plaintiffs' argument fails for two reasons. First, the Place of Worship Provision does not substantially burden a religious practice. Second, the Place of Worship Provision is a neutral, generally applicable law.

> **i.     The Place of Worship Provision Does Not Substantially Burden Plaintiffs' Religious Practice**

The Free Exercise Clause encompasses both "'freedom to believe and freedom to act' on one's beliefs." *Skoros v. City of New York*, 437 F.3d 1, 39 (2d Cir. 2006) (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940)). "When a plaintiff claims his rights under the Free Exercise Clause have been violated, he must demonstrate that the official conduct at issue operated coercively against him 'in the practice of religion.'" *Indig v. Vill. Of Pomona*, 2019 WL 6173425, at *8 (S.D.N.Y. Nov. 19, 2019) (quoting *Harris v. McRae*, 448 U.S. 297, 321 (1980)). Further, "[a]bsent some demonstration that the purpose of the defendants' challenged action was to impugn…or to restrict their religious practice…a Free Exercise claim will be sustained only if the government has placed a substantial burden on the observation of a central religious belief, without a compelling government interest justifying the burden." *Newdow v.*

*United States*, 2013 WL 4804165, at *4 (S.D.N.Y. Sept. 9, 2013), *aff'd sub nom. Newdow v. Peterson*, 753 F.3d 105 (2d Cir. 2014).  Put simply, to sustain a Free Exercise claim, either a defendant must have sought to impugn a plaintiff's religious beliefs or to restrict her religious practices, [3] or the government must have placed "'a substantial burden on the observation of a central religious belief' without 'a compelling governmental interest justif[ying] the burden.'" *Skoros*, 437 F.3d at 39 (quoting *Jimmy Swaggart Ministries v. Bd. Of Equalization*, 493 U.S. 378, 385-85 (1990).  "[A] substantial burden exists where the state 'put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Newdow*, 753 F.3d at 119.

Plaintiffs attempt to meet their burden of demonstrating that the Place of Worship Provision substantially burdens their religious practice by alleging that "Pastor Spencer believes that he has a religious duty as a Pastor to protect the flock that God has entrusted to his charge" and that he and his congregation "likewise share a conviction that the scriptures call on all members to use their individual 'gift[s]' and talents to love, serve, and protect on another as members of a single family united in Jesus Christ."  (Pls.' Mem. of Law, 5).  Plaintiffs contend that to fulfill these theological obligations, they must be permitted to carry firearms into church. *Id.*

Significantly, while Plaintiffs state that they would like to carry or permit congregants to carry firearms ***during*** their religious practice "to protect the flock that God has entrusted to his charge," they do not allege that carrying a firearm is ***itself*** an element of their religious practice. The act of carrying a firearm in church is thus attenuated from Plaintiffs' actual religious practice

---

[3] The Place of Worship Provision is not the sort of "targeted" law that the Free Exercise Clause prohibits.  A violative law is one that constitutes an "official expression[] of hostility to religion."  *Katz v. New York City Hous. Pres. & Dev.*, 2022 WL 3156178, at *4 (S.D.N.Y. Aug. 8, 2022) (upholding apartment occupancy limits against a claim that Plaintiffs' religious beliefs required them to have a large family).  Plaintiffs here make no allegation that the CCIA was passed out of "hostility" to religious beliefs, or is intended to delegitimize their practices.  To the contrary, the Place of Worship Provision was intended to ***protect*** religious worshippers and practice, not to exhibit hostility towards them.

and beliefs.  Because carrying a firearm is not an element of Plaintiff's religious practice, the Free Exercise Clause does not protect the conduct, and the Place of Worship Provision does not substantially burden Plaintiffs' religious practice.  *See Braunfeld v. Brown*, 366 U.S. 599, 605 (1961) (upholding Sunday closing laws where "the statute at bar does not make unlawful any religious practices of appellants; the Sunday law simply regulates a secular activity"); *Congregation Beth Yitzchok of Rockland, Inc. v. Town of Ramapo*, 593 F. Supp. 655, 659 (S.D.N.Y. 1984) (in a challenge to municipal regulations allegedly interfering with a synagogue's operation of a religious school, explaining that "where, as here, the law simply regulates a secular activity and, as applied to plaintiff, operates so as to make more practically difficult the practice of its religion…the burden on religion must be viewed as relatively less onerous"); *Rector, Wardens, & Members of Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348, 355 (2d Cir. 1990) ("The central question in identifying an unconstitutional burden is whether the claims has been denied the ability to practice his religion or coerced in the nature of those practices."); *Redlich v. City of St. Louis*, 550 F. Supp. 3d 734, 750 (E.D. Mo. 2021) (holding that food safety ordinance did not substantially burden plaintiff's ability to fulfill their religious obligation to share food).

Additionally, the Place of Worship Provision does not foreclose Plaintiffs' ability to protect worshippers at its church with armed individuals.  The Place of Worship provides alternative mechanisms for Plaintiffs to secure the safety of their congregation.  Specifically, the CCIA exempts police officers, peace officers, registered security guards, active-duty military personnel, and other statutorily designated persons from the prohibition on carrying firearms in sensitive locations, such as Plaintiffs' church.  *See* N.Y. Penal Law § 265.01-e(3)  If Plaintiffs

need to protect their church with armed individuals, they can have one or more such individuals present.[4]

Furthermore, at this time, any burden on religious worship is entirely fictional given the *Hardaway* Injunction and the District Attorney Defendants promise to not enforce the Place of Worship Provision while its constitutionality is sorted.  This will not change even if the Second Circuit grants a limited state of the *Hardaway* Injunction as that stay would still allow Plaintiffs to designate individuals with carry licensees to carry their firearms on church property.

>    ii.        **The Place of Worship Provision Is Neutral and Generally Applicable**

Assuming the Place of Worship Provision substantially burdens Plaintiffs' religious practice (it does not), the law must be examined to determine the level of scrutiny to apply.  A regulatory law that is both neutral and generally applicable passes constitutional muster under *Employment Division v. Smith*, even though it may require performance of an act—or abstention from conduct— in contradiction to an individual's religious beliefs.  494 U.S. 872, 879 (1990); *see also Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1877 (2021) (declining to overrule *Smith*); *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) (citing *Smith*).  A policy is not generally applicable "if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way, or if it provides a mechanism

---

[4] Although the statute does not require that such persons be paid to provide security, even if Plaintiffs were required to expend monetary resources to hire security guards, it would not make the Place of Worship Provision a substantial burden on Plaintiff's religious worship.  *See, e.g. Donovan v. Tony & Susan Alamo Found.*, 722 F.2d 397, 403 (8th Cir. 1983), *aff'd sub nom. Tony & Susan Alamo Found. v. Sec'y of Lab.*, 471 U.S. 290, 105 S. Ct. 1953, 85 L. Ed. 2d 278 (1985) (*citing Braunfeld v. Brown*, 366 U.S. 599, 605-606, 81 S.Ct. 1144, 1146-1147, 6 L.E.2d 563 (1961)) ("[T]he Supreme Court has squarely held that legislation otherwise legitimate does not violate the Free Exercise Clause merely because financial detriment results."); *Marianist Province of United States v. City of Kirkwood*, 944 F.3d 996, 1001 (8th Cir. 2019) ("We agree with other circuits that have concluded requiring a religious institution to use feasible alternative locations for religious exercise does not constitute a substantial burden.").

for individualized exemptions." *Kennedy*, 142 S. Ct. at 2422 (cleaned up; quoting *Fulton*).  A statute that is not a "neutral law of general applicability" is subject to strict scrutiny.  *Id.*

The initial burden to demonstrate that a statute is not a "neutral law of general applicability" is borne by Plaintiffs.  *See id.* at 2421.  Plaintiffs fail to meet that burden. Plaintiffs, in challenging Penal Law § 265.01-e(2)(c), largely ignore the existence of subsections e(2)(a)-(b) and (d)-(t), which prohibit the carrying of firearms in a variety of other sensitive locations, including but not limited to schools, public parks, homeless shelters, public transit, polling places, and theatres.  Instead, Plaintiffs focus largely on the comparison between the Place of Worship Provision and Private Property Provision (Penal law §265.01(d)(1), which allows private property owners to authorize visitors to carry a firearm on the premises.  (Pls.' Mem., 6-7).  This is the improper comparison.  The CCIA's list of sensitive locations includes multiple types of private facilities where the carrying of firearms is prohibited even if the private owner wants to allow them— *e.g.,* theatres, concert venues, stadiums, museums, private universities, private schools, bars, banquet halls, exhibits, and conference centers.  These facilities all create similar risks for gun violence (often busy, crowded, and dense locations where individuals are often seated or moving slowly) but exist for secular purposes.  That the CCIA does not treat houses of worship any differently from these secular locations is the proper comparison to determine whether or not the Place of Worship Provision is a neutral law of general applicability.  *See We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 284 (2d Cir. 2021) *cert. denied* 142 S. Ct. 2569 (2022) (upholding COVID-19 vaccination requirement without a religious exemption as "generally applicable" where it was not shown that the requirement failed to equally regulate comparable secular conduct); *C.L. for Urb. Believers v. City of Chicago*, 342 F.3d 752, 763 (7th Cir. 2003) (zoning provision that named churches as a land use requiring

specific approval did not violate the First Amendment where it was "just one among many and varied religious and nonreligious uses"). Under the test law out by *Smith* and its progeny, the Place of Worship Provision passes muster.[5]

3.      **The Place of Worship Provision Does Not Violate the Establishment Clause**

In addition to the Free Exercise Clause, Plaintiffs claim that the Place of Worship Provision also impermissibly encroaches on church autonomy in violation of the First Amendment's Establishment Clause. Specifically, Plaintiffs argue that the Place of Worship Provision impermissibly dictates what worshippers may possess in places of worship and how churches may protect worshippers in their sanctuaries. (Pls.' Mem. of Law, 16).

The Establishment Clause, along with the Free Exercise Clause, protects the right of churches and other religious institutions to decide matters of "'faith and doctrine' without governmental intrusion." *Our Lady of Guadalupe School v. Morrissy-Berru*, 140 S. Ct. 2049, 2060 (2020). "The independence of religious institutions in matters of 'faith and doctrine' is closely linked in what we have termed 'matters of church government.'" *Id.* (quoting *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC*, 656 U.S. 171, 186 (2012)). "This does not mean that religious institutions enjoy a general immunity from secular laws, but it does protect their autonomy with respect to internal management decisions that are essential to the institution's central mission." *Id.*

---

[5] Even if the Place of Worship Provision were not a neutral, generally applicable law, it would still be valid under the strict scrutiny analysis, under which "a law restrictive or religious practice must advance interests of the highest order and must be narrowly tailored in pursuit of those interests." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (cleaned up). New York indisputably has a compelling purpose of the highest order in the protection of its citizens from gun violence in houses of worship, and prohibiting firearms in such locations—with exceptions for police officers, security guards, and other authorized personnel—is narrowly tailored to advance that interest. As discussed*, infra*, not all gun violence takes the form of targeted mass shootings; spontaneous violence and accidental injuries and deaths inevitably resulting from ubiquitous weapons possession is also a problem that the government has the duty to address. For the First Amendment analysis, in a sensitive location such as a religious institution, there is no narrower way to prevent such violence then by ensuring that only trained individuals specifically tasked with protecting the community are armed.

Traditionally, the Establishment Clause has not been invoked to invalidate (or attempt to invalidate) statutes and regulations with incidental effects on religious practice—such challenges have been the providence of the Free Exercise Clause.  Instead, in modern jurisprudence, invocation of the Establishment Clause has largely arisen in disputes involving the hiring and firing of church personnel.  *See Hosanna-Tabor*, 565 U.S. at 171; *Our Lady of Guadalupe*, 140 S. Ct. at 2049.  This makes sense given that the Establishment Clause is concerned with forbidding truly "excessive government entanglement with religion."  *Rweyemamu v. Cote*, 520 F.3d 198, 208 (2d Cir. 2008) (quoting *Lemon v. Kurtzman*, 403 U.S. 602, 613 (1971)). "Entanglement may be substantive—where the government is placed in the position of deciding between competing religious views—or procedural—where the state and the church are pitted against one another in a protracted legal battle."  *Id.*

The Place of Worship Provision does not infringe upon Plaintiffs' right to decide matters of "faith and doctrine" or "church government."  As detailed above, *supra* Point I.A.2, Plaintiffs do not allege that carrying a firearm in church is ***itself*** an element of their religious practice that the Place of Worship Provision infringes upon.  Instead, they only allege that the Places of Worship Provision impermissibly restricts what worshippers may possess in houses of worship. Plaintiffs, however, have not demonstrated that a worshipper's possession of firearms during religious services is integral to Plaintiffs' "faith and doctrine."  This distinguishes the Places of Worship Provision from Plaintiff's hypothetical laws "forb[idding] the singing of hymns, or require[ing] all services to be conducted only in Latin, or mandate[ing] the pre-approval of a minister's sermons, or direct[ing] that communion be celebrated only with grape juice or not at

13

all," (Pls' Mem. of Law at 15-16)—all of which clearly restrain religious entities from practicing important matters of "faith and doctrine."[6]

Indeed, the Places of Worship Provision does not come close to approaching the type of entanglement between Church and State that has been found violative of the Establishment Clause. *See e.g., Commack Self-Service Kosher Meats, Inc. v. Weiss*, 294 F.3d 415 (2d Cir. 2002) (New York fraud law for kosher food violated Establishment Clause because "(1) it takes sides in a religious matter, effectively discriminating in favor of Orthodox Hebrew view of dietary requirements; (2) require the State to take an official position on religious doctrine; and (3) create an impermissible fusion of governmental and religious functions by delegating civic authority to individuals apparently chosen according to religious criteria"); *St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 116 (1952) (houses of worship have the "[f]reedom to select clergy" without "state interference").

**4.      The Place of Worship Provision Does Not Violate the Second Amendment**

Plaintiffs claim that the Place of Worship Provision violates their Second Amendment right to bear arms.  Plaintiffs, however, have not met their burden under *Bruen* to establish this claim.  And, in any event, New York's provision is consistent with a long and robust history of government prohibitions on firearms in sensitive places, and in places of worship specifically.

As the movants, "Plaintiffs bear the initial burden of establishing a likelihood of success on the merits."  *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir.), *cert. denied*, 142 S. Ct. 2569 (2022).  The burdens of proof on the underlying claims will inform the necessary

---

[6] That Plaintiffs failed to demonstrate that their possession of firearms during religious services is integral to their "faith and doctrine" also distinguishes this case from the cases Plaintiffs cite to demonstrate that the Supreme Court has enforced the Establishment Clause to prevent state interference with religious doctrine.  (*See* Pls. Mem. of Law, 14-15).

showing at this stage.  *See id.*  As relevant here, only when a challenger shows that "the Second Amendment's plain text covers an individual's conduct" must the government then demonstrate that its regulation is nonetheless "consistent with this Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2126, 2129-30.  The first step entails an analysis of "the Second Amendment's text, as informed by history."  *Id.* at 2127; *see also Heller*, 554 U.S. at 595.

Because sensitive places are those where, historically, carrying weapons was "altogether prohibited," *Bruen*, 142 S. Ct. at 2133, these locations fall outside the textual "scope of the Second Amendment," *Heller*, 554 U.S. at 626.  A challenger thus bears an initial burden to show that a location designated as "sensitive" in fact falls within the Second Amendment's ambit.  In both *Heller* and *Bruen*, the challengers—and the Court—"canvassed the historical record" in depth for evidence supporting their textual interpretations before shifting the burden to the government to respond. 142 S. Ct. at 2127; *see also* Br. for Pet'rs at 25-40, *Bruen*, 142 S. Ct. 2111 (No. 20-843). But whatever this step-one burden entails here—a question that *Bruen* left open—plaintiffs' submission does not even attempt to satisfy it, alone compelling the denial of a preliminary injunction against the Place of Worship Provision.

To meet their burden, Plaintiffs simply assert that "[w]hen Pastor Spencer and other law abiding citizens attend the Church carrying a firearm, they unquestionably "bear arms" outside the home."  (Pls.' Mem. of Law, 18, ECF No. 13-3).  According to Plaintiffs, "New York's ban on carrying firearms in houses of worship thus indisputably constrains activity that "the Second Amendment's plain text covers."  (*Id.*).  These assertions fail to meet "the requirement for substantial proof" for an interlocutory injunction.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *accord Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 510 (2d Cir. 2005).  Indeed, *Bruen* "assume[d] it settled" that certain areas are "'sensitive places' where arms carrying could

15

be prohibited consistent with the Second Amendment." 142 S. Ct. at 2133. Moreover, far from presumptively invalid, *Heller* declared that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" were "presumptively *lawful*." 554 U.S. at 626-27 & n. 26 (emphasis added); *see also* Charles Decl. ¶¶ 13-16 (explaining the early history of sensitive place regulations).[7] And, in particular, plaintiffs tender no evidence or argument to demonstrate that the Second Amendment right of "carrying handguns **publicly** for self-defense," Bruen, 142 S. Ct. at 2130 (emphasis added), textually extends to the **private** property at issue here. *See GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1260-61 (11th Cir. 2012).

In any event, the Place of Worship Provision satisfies the *Bruen* "historical tradition" test. For this purpose, the Supreme Court explained that reasoning by analogy, comparing modern regulations to historical analogues, would be required and appropriate. *Bruen*, 142 S. Ct. at 2132. Here, review of such analogues reveals that the historical record contains a broad and well-established body of laws restricting the carrying of weapons in religious institutions. The robust record of state laws restricting firearms in religious institutions establishes that such regulations are deeply rooted in American society. *See generally* Charles Decl..

In the years directly following the passage of the Fourteenth Amendment,[8] multiple states and territories passed laws explicitly and directly prohibiting the carrying of firearms in religious

---

[7] The Court re-emphasized the constitutionality of such laws in *Bruen*, declaring that "we are [] aware of no disputes regarding the lawfulness of such prohibitions." 142 S. Ct. at 2133. This sentiment was critical to achieving a majority: writing for himself and Chief Justice Roberts, Justice Kavanaugh emphasized that "the Second Amendment allows a variety of gun regulations," before excerpting *Heller*'s sensitive places language in full, including the statement that such measures are "presumptively lawful," then writing, "with those additional comments, I join the opinion of the Court." *Id.* at 2162 (Kavanaugh, J., concurring).

[8] The Supreme Court in *Bruen* disclaimed that it was weighing whether the period around 1791 (when the Second Amendment was ratified) or around 1868 (when the Fourteenth Amendment, incorporating the Second Amendment against the states, was ratified) is more relevant to the historical analysis. *Bruen*, 142 S. Ct. at 2138. Rather, the Court considered laws passed during both periods. *Id.* at 2136-56.

institutions.[9]  *See*  1870 Tex. Gen. Laws 63, Charles Decl. ¶ 18 & Ex. H; 1870 Ga. Laws 421, Charles Decl. ¶ 18 & Ex. I; Charles Decl. ¶ 17 n.5 & Ex. J (1883 act increasing fines); 1877 Va. Acts 305, Charles Decl. ¶ 18 & Ex. K; 1889 Ariz. Sess. Laws 16, Charles Decl. ¶ 18 & Ex. L; 1890 Okla. Stat. 495-96, Charles Decl. ¶ 18 & Ex. M ("It shall be unlawful for any person, except a peace officer, to carry into any church or religious assembly . . . any of the weapons designated in sections one and two of this article.").[10]  In addition to these state statutes, municipalities across the nation also enacted prohibitions on firearms in places of worship. Charles Decl. ¶ 17 & Exs. E, G (describing the prohibitions of weapons in places of worship enacted in Charlotte, NC; Columbia, MO; Webb City, MO; and Stockton, KS).

In addition to these statutes passed in the wake of Reconstruction, state courts at the time also made clear that governments could prohibit firearms in religious institutions – and often opined that doing so was imperative.  *See Andrews v. State*, 50 Tenn. 165, 182 (Tenn. 1871); *English v. State*, 35 Tex. 473, 478-79 (Tex. 1873);[11]  *Hill v. State*, 53 Ga. 472, 475 (Ga. 1874). And in 1878, the Missouri Supreme Court upheld the constitutionality of the state's law prohibiting concealed firearms in, *inter alia*, "any church or place where people have assembled for religious worship," describing the law as "nothing more than a police regulation, made in the

---

[9] Similar laws have existed for centuries.  *See, e.g.*, 26 Hen. 8 c. 6 § 3 (1534) (no one may bring a "handgun" or "any other manner of weapon," to "any town, church, fair, market, or other congregation" within Wales).  Attached hereto as Exhibit A.

[10] Notably, these statutes are ***in addition*** to the substantial number of states that did not need to pass laws specifically prohibiting weapons in places of worship during this time period, because they already had on their books broad prohibitions of public carry.  *See, e.g.*, Charles Decl. ¶ 17 n.4 (listing numerous municipalities' 19th-century prohibitions of public carry); *id.* at ¶ 18 (describing Tennessee's 1689 prohibition on the carrying of dangerous weapons into "any election…fair, race course, ***or other public assembly of the people***."); Eric Ruben and Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 Yale L.J. Forum 121, 132-33 (2015) (noting that states including Massachusetts, Wisconsin, Maine, Michigan, Virginia, Minnesota, Oregon, and Pennsylvania passed laws beginning in the 1830s broadly regulating public carrying of firearms).

[11] The Supreme Court, in *Bruen*, described *English* as an "outlier" on the question of whether it evinced a historical tradition of a "proper cause" requirement for public carry. However, the Court did not speak on the utility of *English* on the question of sensitive place restrictions, and in tandem with the other cited cases and statutes, it is unquestionably aligned with the public consensus at the time.

interest of peace and good order, perfectly within the power of the legislature to make." *State v. Reando* (Mo. 1878) (the court also noted that similar laws had been upheld by the courts of Georgia, Louisiana, Alabama, Arkansas, and Texas), Charles Decl. ¶ 17 n.5 & Ex. N.

History also supports prohibitions on firearms in places where people gather in large crowds and confined places, like places of worship. Such prohibitions extended back to English law, which included general prohibitions on carrying weapons in fairs or markets, and also appeared in American law after the founding and into the Reconstruction period. See 2 Edw. 3, 320, ch. 3 (1328) (No man may "go no ride armed by night nor by day, in Fairs, Markets . . ."); 26 Hen. 8 c. 6 § 3 (1534) (no one may bring a "handgun" or "any other manner of weapon," to "any town, church, fair, market, or other congregation" within Wales); 1786 Va. Laws 35, Maguire Decl. ¶ 3, Ex. A ("in fairs or markets"); 1869-70 Tenn. Pub. Acts 23-24, *Id*., ¶ 4, Ex. B (no person may carry a "deadly or dangerous weapon" when attending "any fair"). Likewise, statutes enacted during the Reconstruction period further recognized that places involving large gatherings of people were particularly vulnerable, and that deadly weapons did not belong there. *See, e.g.*, 1869-70 Tenn. Pub. Acts 23, *Id*. ("fair, race course, or other public assembly of the people"); 1870 Tex. Gen. Laws 63, *Id*., ¶ 5, Ex. C ("a ball room, social party or other social gathering composed of ladies and gentlemen"); 1890 Okla. Stat. 495-96, Id., ¶ 6, Ex. D ("any circus, show or public exhibition of any kind, or into any ball room, or to any social party or social gathering"); 1889 Ariz. Sess. Laws 17, Id., ¶ 7, Ex. E (any "place where persons are assembled for amusement . . , or into any circus, show or public exhibition of any kind, or into a ball room, social party or social gathering").

And case law interpreting the statutes cited above demonstrates that the presence of the public was understood as the reason for the locations' sensitivity. *See Rainey v. State*, 8 Tex. App.

18

62, 63 (Tex. Ct. App. 1880) ("The evident intent and purpose of the law is to protect the several assemblies mentioned in the article . . . from intrusion by any person . . . going into them and carrying or having about his person any of the arms mentioned"); *see, e.g., Owens v. State*, 3 Tex. App. 404, 406 (Tex. Ct. App. 1878) (sustaining indictment against person who "did unlawfully and willfully go into a ball-room with a pistol about his person, the said ball-room being at Mrs. Simpson's, where an assembly was then and there congregated for social purposes."); *Alexander v. State*, 27 Tex. App. 533, 537 (Tex. Ct. App. 1889) (sustaining conviction where "defendant went into a place where persons were assembled for amusement, carrying about his person a pistol"); *Maupin v. State*, 89 Tenn. 367, 17 S.W. 1038, 1039 (1890) ("[t]he mill was a public place, -a place to which customers were constantly invited and daily expected to go.  In such a place a man . . . may not lawfully carry pistols concealed about his person."); *Wynne v. State*, 123 Ga. 566 ("A barbecue on the 4th of July, at which people assembled to the number of 400 or 500, is a 'public gathering'" within the meaning of the Georgia law); *State v. Pigg*, 85 Mo. App. 399, 402 (Mo. Ct. App. 1900) (sustaining conviction "for going into the dwelling house of Josiah Jones, where there was a social gathering, having about his person a deadly weapon").

These laws recognize that the presence of groups of people, often in confined spaces, renders a location uniquely vulnerable to firearm violence.  In many cases the nature of such places may render armed self-defense impracticable – it may not be possible to practice armed self-defense with precision in a crowded theater or stadium.  *See Owens*, 3 Tex. App. at 407 (need for self-defense "affords no excuse in my wearing deadly weapons to church, or in a ball-room, or other places mentioned where . . . the lives of innocent people there assembled [would be] placed in jeopardy or sacrificed.").

In granting the *Hardaway* Injunction, this Court improperly minimized this significant historical tradition of restricting carrying weapons in places of worship.  Instead, the Court appeared to demand a substantial number of mirror-image prohibitions, beginning at the Founding and continuing over time. *See Hardaway* Injunction, 31-32.  This test does not faithfully honor *Bruen's* requirements for analyzing sensitive places.  *See Range*, 2022 WL 16955670, at *16 ("[R]eading *Bruen* robotically would require the Government in an as-applied challenge [ ] to find any analogy specific to the crime charged….That's absurd) (quoting *United States v. Charles*, No. 22-CR-153, 2022 WL 4913900, at *9 (W.D. Tex. Oct. 3, 2022).  For one thing, the Supreme Court endorsed several sensitive places—"e.g., legislative assemblies, polling places, and courthouses"—based on the existence of "18th- and 19th-century" laws prohibiting carrying weapons there.  142 S. Ct. at 2133.  *Bruen* thus suggests that statutes and decisions from the 19th century can equally inform the Second Amendment's scope.  *See also, e.g., Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011) ("[T]he Second Amendment's scope as a limitation on the States depends on how the right was understood when the Fourteenth Amendment was ratified.").

For another thing, whereas this Court in issuing the *Hardaway* Injunction declined to rely on what it described as "a handful" of statutes, even the categories of "sensitive place" that *Bruen* specifically endorsed, such as courthouses, depend on these same sources for their historical underpinnings.  *See, e.g.,* 1870 Ga. Laws 421, TD Ex 43 ("to any court of justice"); 1883 Mo. Laws 76, TD Ex 44 ("into any court room during the sitting of court"); *Hill*, 53 Ga. at 478 ("[t]he right to go into a court-house and peacefully and safely seek its privilege, is just as sacred as the right to carry arms, . . .").  Accordingly, laws that *Bruen* deemed valid would fail

this Court's rigid test for sensitive places, which indicates that this Court misapprehends that decision.

The applicable standard does not demand tracking down and tallying up nearly identical precursor statutes until some unspecified threshold is reached. Rather, the core question is whether the Second and Fourteenth Amendment's ratifiers could naturally have concluded that States possessed the authority, consistent with the Constitution, to prohibit weapons in particular areas if the legislative need and will arose. Directly on-point precursor laws—which New York has adduced here—can answer that question in the affirmative. But even in the absence of historical twins, a comparison of "how and why" old and new "regulations burden a law-abiding citizen's right to armed self-defense" can sustain a modern law. *Bruen*, 142 S. Ct. at 2132-33. Indeed, New York's Place of Worship Provision aligns with a recognized purpose of sensitive places, which is to promote the exercise of other fundamental rights (*i.e.* free exercise of religion, freedom of speech, the fundamental right to vote, access to the courts or assemblage in the public square). In other words, sensitive places are such because "they produce the kinds of public goods protected by other constitutional rights," to allow "them to effectively produce the public good and political culture that we also consider valuable." Darrell A.H. Miller, Constitutional Conflict and Sensitive Places, 28 Wm. & Mary Bill Rts. J. 459, 462 (2019).[12] "Lawmakers throughout Western history have attempted to preserve the special institutional features of places of worship by banning weapons from them and their vicinity." *Miller*, 467-470. Moreover, places of worship share a key trait with polling places, legislative assemblies, and courts, in that all are locations where calm reflection should prevail, but which are subject to a risk of violence between factions with opposing viewpoints. Restricting guns in these places establishes a legal

---

[12] https://scholarship.law.wm.edu/wmborj/vol28/iss2/9/

deterrent that aims to minimize that risk.  Meanwhile, the CCIA permits a law enforcement

officer, or a trained and registered security guard, to offer armed protection in any such location,

including a place of worship. Correctly understood, the Second Amendment does not dictate that

parishioners *must* be able to serve this function while congregating to pray.

In the face of the evidence that the United States has a robust historical tradition of

excluding firearms from houses of worship, Plaintiffs point to colonial laws from 1632 onward

that took the opposite tack, *requiring* citizens to carry weapons in houses of worship.  Pl's Memo

of Law, 20-21.  Plaintiffs' reliance on these laws not only fails, however, but undermines their

own point.  First, the earliest of these statutes long pre-date the adoption of the Constitution, the

Second Amendment, or the Fourteenth Amendment, and are thus of limited or no utility.

Second, many of these laws were enacted for the explicit purpose of enforcing slavery and

protecting against slave uprisings. Charles Decl. ¶ 21-22.  And third, the remainder of these laws

were intended to further readiness of militias.  *Id.* ¶ 23.  Insofar as these colonial enactments

might have imposed a requirement for colonists to come to church armed, Plaintiffs do not

explain how these laws would have survived the later adoption of the Establishment Clause,

under which the government "'may not coerce anyone to attend church'" at all.  *Kennedy v.*

*Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2429 (2022) (quoting *Zorach v. Clauson*, 343 U.S. 306,

314 (1952)).  In all, these colonial enactments are thus of limited worth in establishing a

legitimate "historical tradition."  And to the extent that these laws do retain any relevance, it is to

demonstrate that, from the earliest days of settlement of what would become the United States, it

was considered within the government's power to regulate the carriage of firearms in religious

institutions.  Charles Decl. ¶¶ 21-22.

**B.      Plaintiffs Have Not Shown Irreparable Harm**

In the Second Circuit, the "presumption of irreparable harm arising from a constitutional

deprivation is not automatic." *Joglo Realties, Inc. v. Seggos*, 2016 WL 449140, at *16

(E.D.N.Y. Aug. 24, 2016).  Instead, the Second Circuit has held that it "often will be more

appropriate to" consider the nature and extent of the alleged injuries to the plaintiff absent

injunctive relief.  *Time Warner Cable v. Bloomberg L.P.*, 118 F.3d 917, 924 (2d Cir. 1997).

Here, there is no current risk of irreparable harm requiring this Court's intervention given

that (1) the CCIA's sensitive place provisions contain exceptions for multiple classes of persons,

permitting, *inter alia*, active and retired police officers, peace officers, and security guards to

carry firearms in sensitive locations;  Penal Law § 265.01-e(3); (2) Superintendent Nigrelli is

presently enjoined from enforcing the Place of Worship Provision as to individuals with carry

licenses who have been tasked with keeping the peace at houses of worship, and (3) the District

Attorney Defendants have sworn not to enforce the provision while the courts determine its

constitutionality (*See* Aff. of Weeden A. Wetmore, ¶¶ 6-7, ECF No. 41; Aff. of Matthew Van

Houten, ¶ 8, ECF No. 40-1).  Plaintiffs argue that "if an injunction is not granted, Pastor Spencer

and his New York flock will continue to be put to the unconstitutional choice of which of their

fundamental rights to forego to exercise the other."  (Pls.' Mem. of Law, 25).  No such threat

exists.  During the pendency of this proceeding, there is nothing preventing Plaintiffs from

engaging or designating an appropriate person to keep the peace in their houses of worship.

**C.      The Balance of Equities and the Public Interest Weigh in Favor of New York's
         Mission to Protect its Citizens**

Finally, the balance of equities and considerations of the public interest weigh heavily

against Plaintiffs.  "[A] plaintiff seeking a preliminary injunction must demonstrate not just that

they have some likelihood of success on the merits and will suffer irreparable harm absent an

injunction, but also that the balance of the equities tips in his favor and an injunction is in the public interest." *Otoe-Missouria Tribe v. N.Y.S. Dep't of Fin. Svcs.*, 769 F.3d 105, 112 n.4. (2d Cir. 2014) (cleaned up). "These factors merge when the Government is the opposing party." *Make the Rd. N.Y. v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (citing *Nken*, 556 U.S. at 435). Further, the reviewing court must ensure that the "public interest would not be disserved" by the issuance of the injunction. *Salinger v. Colting*, 607 F.3d 68, 80 (2d Cir. 2010) (citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)).

Here, "it is beyond cavil" that there is a "substantial, indeed compelling, governmental interest[] in public safety and crime prevention." *NYSRPA v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015). In addressing the equities, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation marks and citation omitted). Here, any prejudice to Plaintiffs from the denial of a preliminary injunction is outweighed by the benefit to the public. The State certainly is not ignorant of the history of attacks on houses of worship that Plaintiffs recite, and do not doubt that Plaintiffs' fear of violence is genuine, but they have not provided evidence to show that their proposed solution – permitting all congregants to carry firearms in houses of worship – will enhance congregants' safety. While Plaintiffs have an understandable fear of mass shootings, pre-planned mass shootings are not the only form of violence that can affect congregants; in addition, broad legal carrying of deadly weapons in dense congregate settings can result in spontaneous, unplanned violence even by otherwise law-abiding citizens, or in accidental shootings leading to injuries or deaths. For example, when one of the parties is

armed, a dispute over cell phone use in a movie theater can escalate into unnecessary death.[13]  Or a shouting match at a bowling alley can turn into a shooting.[14]  Or at a club.[15]  Or in grocery stores and bars.[16]  And, even at places of worship.[17]

Mass shootings are emblematic of the epidemic of violence plaguing the United States, but day-to-day violence between individuals, often spontaneous and in the heat of the moment, kills Americans daily as well.[18]  Likewise, a substantial number of gun-related injuries and deaths are caused by accidental shootings.[19]  It is the duty of the government to decide how to balance these threats.  *See Range v. Attorney General of the United States*, No. 21-2835, 2022 WL 16955670 at *n.28 (3d Cir. Nov. 16, 2022) ("[d]eference to state legislatures not only accords with longstanding national tradition, but also respects state legislatures' unique ability to channel local concerns and values into criminal law").  In seeking relief in the form enjoining the Place of Worship Provision, Plaintiffs focus on only half this equation, ignoring the public consequences that are equally or more likely to result from the unchecked carrying of deadly

---

[13] *See* https://www.nytimes.com/2022/02/26/us/curtis-reeves-murder-trial-acquitted.html. The shooter was acquitted of second-degree murder because a jury determined that he acted in self-defense in response to a bag of popcorn being thrown at him.

[14] *See* https://www.pleasantonweekly.com/news/2022/07/16/three-people-shot-at-granada-bowl-in-livermore; https://www.npr.org/2019/01/05/682499047/three-dead-after-fight-escalates-into-shooting-at-california-bowling-alley.

[15] *See* https://abc6onyourside.com/news/local/triple-shooting-columbus-refugee-road-weyburn-road-9-5-2021.

[16] *See* https://abcnews.go.com/US/wireStory/argument-leads-fatal-shooting-checkout-line-grocery-82708061.

[17] *See* https://www.washingtonpost.com/news/acts-of-faith/wp/2016/05/05/parishioner-shot-to-death-in-church-during-hymns-was-only-armed-with-his-bible-police-say/. ("'It is clear the shooter brought a gun to a crowded church, he introduced that gun into a verbal altercation that turned into a fistfight and then fired the gun twice, aiming at the vital part of the body, killing the victim,' Montgomery County District Attorney Kevin Steele said[.]").

[18] *See* https://www.everytown.org/issues/mass-shootings/ (noting that between 2009 and 2020, 1,363 people were killed in mass shootings in the U.S.); https://www.gunviolencearchive.org/ (noting that every year between 2014 and 2020, there were between approximately 12,000 and 19,000 total willful, malicious, or accidental gun deaths in the U.S.).

[19] *See* https://injepijournal.biomedcentral.com/articles/10.1186/s40621-019-0220-0.

weapons in sensitive locations.  This balancing of equities requires that Plaintiffs' request for a preliminary injunction be denied.

In seeking relief in the form of enjoining the Place of Worship Provision, Plaintiffs focus only on half of this equation, ignoring the public consequences that are equally or more likely to result from the unchecked carrying of deadly weapons in sensitive locations. This balancing of the equities requires that Plaintiffs' request for a preliminary injunction be denied.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction, or, in the alternative, hold the motion in abeyance pending resolution of the *Hardway* appeal.

Dated:  December 7, 2022
   Buffalo, New York

           LETITIA JAMES
           Attorney General of the State of New York
           Attorney for Defendants
           BY: */s/ Daniel R. Maguire*
           Daniel R. Maguire
           Assistant Attorney General of Counsel
           Main Place Tower, Suite 300A
           350 Main Street
           Buffalo, NY 14202
           (716) 853-8419
           Daniel.Maguire@ag.ny.gov