UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

MICHAEL SPENCER and
HIS TABERNACLE FAMILY
CHURCH, INC.,

                    Plaintiffs,                            22-CV-6486 (JLS)

        v.

STEVEN A. NIGRELLI,
WEEDEN A. WETMORE, and
MATTHEW VAN HOUTEN,

                    Defendants.

———————————————————

## DECISION AND ORDER
## (PRELIMINARY INJUNCTION)

As recounted in *Hardaway v. Nigrelli,* No. 22-CV-771, 2022 WL 16646220

(W.D.N.Y. Nov. 3, 2022), eight days after the Supreme Court struck down New

York's unconstitutional "proper cause" requirement for conceal-carry licenses, the

State responded with even more restrictive legislation, barring all conceal-carry

license holders from vast swaths of the State.  As in *Hardaway,* the complaint and

motion in this case focus solely on one aspect of the new legislation, namely, the

portion making it a felony for such a license holder to possess a firearm at "any

place of worship or religious observation."

Plaintiffs argue that this exclusion is a "direct assault on First Amendment

rights"—in addition to running afoul of the Second Amendment as this Court

recognized in *Hardaway.*  Dkt. 13-3, at 1.  They posit that "New York now puts its

citizens to an impossible choice: Forfeit your First Amendment right to gather for religious worship or forfeit your Second Amendment right to armed self-defense." *Id.*

Ample Supreme Court precedent addressing the individual's freedoms under the First and Second Amendments to the Constitution dictate that New York's new place of worship exclusion is unconstitutional. As in *Hardaway,* the State fails the Second Amendment test set forth in *Bruen.* And it fares no better with respect to Plaintiffs' claims under the Free Exercise and Establishment Clauses of the First Amendment. Thus, and for the further reasons set forth below, Plaintiffs' motion for a preliminary injunction enjoining Defendants' enforcement of this place of worship exclusion is granted.

## BACKGROUND

Pastor Michael Spencer filed this lawsuit on November 3, 2022, joined by His Tabernacle Family Church, Inc. (the "Church"). Dkt. 1. Plaintiffs sue three Defendants in their official capacities, namely, the superintendent of the New York State Police and the District Attorneys of Chemung County and Tompkins County. *See id.*

Pastor Spencer, who is licensed under New York law to carry a concealed firearm, "believes that, as the Church's pastor, he has a moral and a religious duty to take reasonable measures to protect the safety of his congregation." *Id.* at ¶¶ 41-42. Consistent with his "view of the Christian scriptures and what they say about a pastor's role," he "regularly carried a concealed firearm on the Church's New York

campuses" before the houses of worship exclusion went into effect. *Id.* ¶ 43.  In

addition, to "ensure the ability to protect the Church and its worshippers in case of

violent confrontation, Pastor Spencer allowed churchgoers to carry concealed

firearms at both of the Church's New York campuses before" the exclusion was

enacted. *Id.* ¶ 45.

Plaintiffs allege that the place of worship exclusion "is a compendium of

constitutional infirmities" that infringes on Pastor Spencer's and the Church's

"rights to freely engage in religious exercise, to exercise autonomy over the Church's

internal affairs, and to carry firearms to ensure the safety of all persons on the

Church's premises." *Id.* ¶ 55.  Plaintiffs seek declaratory judgment, monetary

damages, and injunctive relief. *Id.* at 24-25.[1]

The relevant portion of the new statute adds to the Penal Law, as relevant

here:

> § 265.01-e Criminal possession of a firearm, rifle or shotgun in a
> sensitive location. 1. A person is guilty of criminal possession of a
> firearm, rifle or shotgun in a sensitive location when such person
> possesses a firearm, rifle or shotgun in or upon a sensitive location, and
> such person knows or reasonably should know such location is a
> sensitive location. 2. For the purposes of this section, a sensitive location
> shall mean: ... (c) any place of worship or religious observation . . . .[2]

---

[1] Unless noted otherwise, page references refer to the number that appears in the
footer of each page of the document.

[2] Section § 265.01-e(3) provides that the restrictions set forth in § 265.01-e(1)-(2) do
not apply to, among others, "law enforcement who qualify to carry under the federal
law enforcement officers safety act," persons who are "police officers" as defined in
the criminal procedure law, persons who are "designated peace officers," as well as
"security guards" and "active-duty military personnel." See § 265.01-e(3).

Plaintiffs moved for a preliminary injunction seeking to enjoin Defendants from enforcing the houses of worship exclusion. *See* Dkt. 13. Plaintiffs' motion included a Declaration from Pastor Spencer (Dkt. 13-1), as well as a Declaration from Charlene Pruitt, who is a Church congregant. *See* Dkt. 13-2.

Spencer is "the senior pastor, president, and CEO" of the Church, which is a "nondenominational Christian church with campuses in Horseheads and Ithaca, New York, and another campus in Mansfield, Pennsylvania." Dkt. 13-1, ¶ 2.[3] In that role, Pastor Spencer has "the authority to determine which personal items members and visitors may bring with them onto the Church's premises." *Id.* ¶ 7. Pastor Spencer believes that he has "a moral and religious duty to take reasonable measures to protect the safety of those who enter the Church." *Id.* ¶ 22. He also believes that "the Bible calls on the Church" to "love, serve, and protect each other." *Id.* ¶ 23. These religious beliefs are "shared by the Church." *Id.* ¶¶ 22, 23.

Pastor Spencer holds a "current and valid" license to carry concealed firearms under New York law. *Id.* ¶ 8. Prior to the enactment of the houses of worship exclusion, Pastor Spencer "regularly carried a concealed pistol" on Church campuses. *Id.* ¶ 24. In addition, the Church has "teams of church members who volunteer to oversee church security." *Id.* ¶ 15. Pastor Spencer also "allowed security volunteers and other churchgoers with New York carry licenses to carry their own concealed firearms." *Id.* Pastor Spencer "carried, and allowed others to carry, concealed firearms at church to ensure protection of the Church and its

---

[3] Spencer primarily pastors at Horseheads, which is the Church's main campus.

worshippers in the case of violent confrontation." *Id.*

Unfortunately, Pastor Spencer "regularly receive[s] suspicious and threatening mail." *Id.* ¶ 34. He has "received at least two death threats" that prompted the involvement of law enforcement. *Id.* On one occasion, an individual sent Pastor Spencer a Facebook message conveying a desire that "someone execute[]" Pastor Spencer and his wife. *Id.* ¶ 35. In addition, the Church "has experienced several other security threats, including multiple occasions of burglary and vandalism." *Id.* ¶ 38. Spencer desires "to carry [his] concealed pistol" and "allow others to carry their concealed firearms on the Church's New York campuses" because he believes that "such concealed carry will protect" worshippers from violence. *Id.* ¶ 29. He also believes that "such concealed carry effectuates" the Church's "religious beliefs" that they "must protect the physical safety of the flock." *Id.*[4]

Since the State "enacted and began enforcing" the houses of worship exclusion, Pastor Spencer "expected the Church's security volunteers to comply with the law" and he, himself, "stopped carrying" his "pistol onto the Church's New York campuses." *Id.* ¶ 26. But for the "enactment and enforcement" of the houses of worship exclusion, Pastor Spencer "would carry" concealed firearms "on the Church's New York campuses" and "would permit other licensed churchgoers to do the same." *Id.* ¶ 31.

---

[4] No one has contested the sincerity of this belief. And Spencer testified credibly throughout his testimony.

Declarant Charlene Pruitt is a member of the Church. Dkt. 13-2, ¶ 3. She attends services "at the Church's main campus in Horseheads, New York." *Id.* Pruitt holds a license to carry concealed firearms that is "current and valid" under New York law. *Id.* ¶ 4. Before "New York enacted and began enforcing" the houses of worship exclusion, Pruitt "regularly carried a concealed pistol on the Church's Horseheads campus." *Id.* ¶ 6. Specifically, she "volunteered to help oversee security at the church." *Id.* ¶ 9. This included performing numerous tasks such as "watch[ing] over the children's wing while legally armed," and keeping "watch for security incidents during church services, classes and special events." *Id.* ¶ 10. When volunteering, Pruitt "typically [has] a radio so that [she] can inform church staff of any security issues." *Id.*

Like Pastor Spencer, Pruitt believes that she has "a moral and religious duty to take reasonable measures to protect the safety of those who enter the Church." *Id.* ¶ 14. She also believes "that the Bible calls the Church" to "love, serve, and protect one another." *Id.* ¶ 15. Her "desire to continue carrying a concealed pistol at the Church stems from these religious beliefs" as well as her desire to provide protection from "the kind of violence that has impacted other houses of worship across the country." *Id.* ¶ 16. She believes that "someone planning to harm or kill" her "fellow churchgoers will not be deterred by" the houses of worship exclusion, and "may in fact be emboldened by the ban because it leaves" the "Church defenseless against those bent on doing violence to people of faith." *Id.* ¶ 17.

The Court received submissions from the parties.[5]  And the Court held a hearing.[6]

## ANALYSIS

### I.  PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

#### A.  Preliminary Injunction Standard

Generally, a party seeking preliminary injunctive relief "must show (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest."  *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018).  Where, like

---

[5] Defendant Van Houten submitted an affirmation where he stated, through counsel, that he has "no intent to enforce the statute now at issue in this case." Dkt. 40, ¶ 3.  Van Houten also included an affidavit where he stated that, as the "chief prosecutor for Tompkins County," he made the "policy decision" that the "Tompkins County District Attorney's Office would not prosecute cases where a lawful gun owner was charged with possession of a firearm in a church or place of worship so long as that individual was otherwise acting in a law-abiding manner." Dkt. 40-1, ¶¶ 4-6.  Defendant Wetmore submitted an affidavit where he stated that, in his "discretion, [he] will not be taking any action to enforce the provision of New York Penal Law § 265.01-(e)(2)(c)." Dkt. 41, ¶ 6.  Defendant Steven A. Nigrelli submitted a Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction.  Dkt. 43.  The State's submission included a Declaration from Patrick J. Charles with exhibits (Dkt. 43-1), and a Declaration form Attorney Daniel R. Maguire with exhibits.  Dkt. 43-2 – 43-7.  With the Court's permission, Everytown for Gun Safety filed an *amicus curiae* brief.  Dkt. 51.  Plaintiffs then submitted a reply brief.  Dkt. 52.

[6] At the request of the State (*see* Dkt. 53), Pastor Spencer testified at the hearing, similar to his declaration.  No other witness was called.

here, the preliminary injunction "would stay government action taken in the public interest pursuant to a statutory or regulatory scheme," the moving party "must satisfy the more rigorous prong of 'likelihood of success'" at step two. *Bronx Household of Faith v. Bd. of Educ. of City of N.Y.*, 331 F.3d 342, 349 (2d Cir. 2003).

The standard may be further heightened if "(i) an injunction would alter, rather than maintain, the status quo, or (ii) an injunction will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995). If either scenario applies, a plaintiff must show "a clear or substantial likelihood of success on the merits" at step two. *See N. Am. Soccer League*, 883 F.3d at 37 (internal quotations and citation omitted); *Tom Doherty Assocs.*, 60 F.3d at 35.

When deciding whether an injunction is mandatory and would alter the status quo, the status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014) (per curiam)) (internal quotations omitted). The court also considers whether the injunction would "command[] some positive act"—rather than prohibit some act—by the defendant. *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (quoting *Tom Doherty Assocs.*, 60 F.3d at 34). An injunction that enjoins a defendant from enforcing a regulation "clearly prohibits, rather than compels, government action by enjoining the future enforcement." *Id.* at 90.

8

Moreover, the heightened standard does not apply to "any [request for an] injunction where the final relief for the plaintiff would simply be a continuation of the preliminary relief." *Tom Doherty Assocs.*, 60 F.3d at 34. Instead, the heightened standard applies when the injunction "will render a trial on the merits largely or partly meaningless, either because of temporal concerns"—like a case involving a live, televised event scheduled for the day the court granted preliminary relief—"or because of the nature of the subject of the litigation"—like a case involving disclosure of confidential information. *Id.* at 35. If a preliminary injunction "will make it difficult or impossible to render a meaningful remedy to a defendant who prevails on the merits at trial," then the heightened standard applies; "[o]therwise, there is no reason to impose a higher standard." *Id.*

In this case, Plaintiffs request that this Court "preliminarily enjoin Defendants from enforcing" the houses of worship exclusion "against Pastor Spencer and His Tabernacle Church, Inc." Dkt. 13-3, at 3. This request seeks to prohibit Defendants from enforcing the new houses of worship exclusion; it does not seek an order requiring Defendants to act. In other words, Plaintiffs seeks to restore the status that existed before implementation of the houses of worship exclusion. They therefore seeks a prohibitory—not a mandatory—injunction. As stated in *Hardaway*, the Constitution and the Bill of Rights represent the status quo—not

2022 legislation on the books for a few months.[7]  *See Hardaway,* No. 22-CV-771, 2022 WL 16646220, at *6.

And relief remains available to Defendants if they prevail at trial on the merits.  If Defendants prevail, the Court could vacate any injunctive relief and allow them again to enforce the houses of worship exclusion.

Thus, the standard remains that Plaintiffs must demonstrate: (1) irreparable harm; (2) a likelihood of success on the merits; and (3) that a preliminary injunction is in the public interest.  *See N. Am. Soccer League,* 883 F.3d at 37; *Bronx Household of Faith,* 331 F.3d at 349.

## B.  Likelihood of Success on the Merits

Plaintiffs are likely to succeed on the merits.

### 1.  Free Exercise Clause

The First Amendment to the Constitution provides that "Congress shall make no law . . . prohibiting the free exercise" of religion.  U.S. Const. amend. I.[8] Plaintiffs argue that, by "prohibiting the exercise of a fundamental constitutional right in places of worship while permitting its exercise on other private property—and by denying to religious leaders the authority it reserves to other private property owners to permit firearms," the State "treats comparable secular

---

[7] The Court recognizes that courts should not lightly enjoin enforcement of laws. The law at issue here, however, is at odds with higher law, namely—the Constitution.  The Court notes here too that Plaintiffs would meet the heightened standard in any event—even if it applied.

[8] The Free Exercise Clause applies to the States under the Fourteenth Amendment. *Cantwell v. Connecticut,* 310 U.S. 296, 303 (1940).

activity more favorably than religious exercise and discriminates on the basis of religion." Dkt. 13-3, at 1. For this reason, and as set forth below, the houses of worship exclusion violates Plaintiffs' right to free exercise of religion guaranteed by the First Amendment.

The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly." *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022). It also does "perhaps its most important work by protecting the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Id.* (internal citation omitted). Under Supreme Court precedent, "a plaintiff bears certain burdens to demonstrate an infringement of his rights under the Free Exercise [Clause]." *Id.* If the plaintiff carries these burdens, "the focus then shifts to the defendant to show that its actions were nonetheless justified and tailored consistent with the demands of our case law." *Id.*

Specifically, "a plaintiff may carry the burden of proving a free exercise violation" by "showing that a government entity has burdened his sincere religious practice pursuant to a policy that is not 'neutral' or 'generally applicable.'" *Id.* at 2421-22 (citation omitted). Should a plaintiff make such a showing, the Court must find a First Amendment violation "unless the government can satisfy 'strict scrutiny' by demonstrating its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest." *Id.* at 2422 (quoting *Church*

*of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993)).[9]

Plaintiffs are likely to succeed on the merits of their Free Exercise Clause claims.

### a. The Houses of Worship Exclusion Burdens Plaintiffs' Sincere Religious Practices

Plaintiffs satisfy this initial burden because, on this record, the houses of worship exclusion burdens their sincerely held religious practices. Pastor Spencer believes that he has "a moral and religious duty to take reasonable measures to protect the safety of those who enter the Church." Dkt. 13-1, ¶ 22. He explained that the "Bible often refers to religious leaders as 'shepherds' and tasks them with caring for and protecting their 'flocks.'" *Id.* He therefore believes that "providing for the physical safety of the Church—the body of Christ—is [his] religious act and duty as a pastor." *Id.* He also believes that "the Bible calls on the Church—as members of a single family united in Jesus Christ—to love, serve, and protect one another." *Id.* ¶ 23. These beliefs are "shared by the Church." *Id.* ¶¶ 22, 23.

Consistent with these religious beliefs, Pastor Spencer "regularly carried a concealed pistol" on Church campuses and allowed "security volunteers and other churchgoers with New York carry licenses" to do the same. *Id.* ¶ 24. In short, he

---

[9] At oral argument, Plaintiffs argued that, under the Supreme Court's decision in *Tandon v. Newsom*, __ U.S. __, 141 S.Ct. 1294 (2021), they need not demonstrate a burden on a sincerely held religious practice to prevail here. According to Plaintiffs, *Tandon* instructs that, because the Houses of Worship provision—on its face—targets religious activity, strict scrutiny automatically applies. The State disagreed. The Court need not resolve the issue of whether a threshold showing of a burden on a sincerely held religious belief is required. As discussed below, that requirement—if it exists—is met because the houses of worship exclusion does burden Plaintiffs' sincerely held religious practices.

"carried and allowed others to carry" concealed firearms at church "to ensure protection of the Church and its worshippers in case of violent confrontation" in accordance with their religious beliefs. *Id.* He would have continued to do so "but for the enactment and enforcement" of the place of worship exclusion. *Id.*

The State argues that the place of worship exclusion "does not foreclose Plaintiffs' ability to protect worshippers at [the] [C]hurch with armed individuals." Dkt. 43, at 9. The statute, it explains, "provides alternative mechanisms for Plaintiffs to secure the safety of their congregation" such as permitting certain categories of people—such as police officers and registered security guards—to carry at Church without violating the place of worship exclusion. *Id.* This does not relieve the burden the new law places upon Plaintiffs' religious practices.

Pastor Spencer testified that members of the Church's security team of congregants protect the congregation pursuant to a calling from God. Hired outside security, Spencer believes, is not an adequate substitute because such individuals would be working for a paycheck—not acting pursuant to a spiritual calling. For this reason, he believes hired security would be far less effective than the organic security team at protecting the flock. But it does not ultimately matter whether he is correct that hired security—armed or not—would effectively protect the congregation. Pastor Spencer and Church members have a religious belief that they, themselves, must protect the flock. Indeed, religious beliefs "need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 531

(quoting *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 714 (1981)).

In any event, the Church congregation includes—at most—only a handful of police officers or other individuals who might fit into a statutory exception.  Even if these individuals were to volunteer to provide security at the Church, they could not conceivably protect the approximately 800 individuals who worship at the Church throughout each week—given that they have day jobs and "work a lot of hours." And to the extent the Church hired private security guards or police officers to protect the congregation, the financial burden would necessarily reduce the amount of ministry the Church could perform.  This is precisely the sort of meddling in religious practices that courts find time and again violates the Free Exercise Clause.  *See, e.g., Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d Cir. 2014) (enjoining, at the request of Orthodox Jewish organizations, enforcement of city ordinance prohibiting any person from performing direct oral suction as part of circumcision without first obtaining signed written consent from one of the child's parents as violative of the Free Exercise Clause).  Further, like in *Church of the Lukumi Babalu Aye*, the State has not "questioned the sincerity" of Plaintiffs' religious beliefs.  *See* 508 U.S. at 531.

On these facts, Plaintiffs have demonstrated that the State, by enacting the houses of worship exclusion, has burdened their sincere religious practices.

14

     *b. The Houses of Worship Exclusion Is Not "Neutral" or "Generally Applicable"*

The place of worship exclusion is neither neutral nor generally applicable and, therefore, must satisfy strict scrutiny. *See Kennedy*, 142 S.Ct. at 2422 ("Failing either the neutrality or general applicability test is sufficient to trigger strict scrutiny").

A law is not neutral "if the object of [the] law is to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye, Inc.* 508 U.S. at 533. To determine the object of a law, the court "must begin with its text, for the minimum requirement of neutrality is that a law not discriminate on its face." *Id.* Here, the houses of worship exclusion is not facially neutral. Under its plain text, it restricts concealed carry in "any place of worship or religious observation." N.Y. Pen. L. § 265.01-e(2)(c). There is no "secular meaning discernable from the language or context." *Church of the Lukumi Babalu Aye, Inc,* 508 U.S. at 533. The law therefore "lacks facial neutrality." *Id.*

Even if the place of worship exclusion did not discriminate on its face, the Court's inquiry would not "end with the text of the law[] at issue." *Id.* at 534. Facial neutrality "is not determinative." *Id.* The Free Exercise Clause "protects against governmental hostility which is masked, as well as overt." *Id.* Thus, the Court "must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders" (internal citation omitted). Here, the place of worship exclusion is directed at religious activity. Careful drafting ensured that carrying of concealed weapons for religious reasons at place of worship is

prohibited, while the same carrying in numerous other circumstances remains permissible.  For these reasons, the place of worship exclusion is not a "neutral" law.

Nor is it generally applicable.  The general applicability requirement prohibits the government from, "in a selective manner[,] impos[ing] burdens only on conduct motivated by religious belief." *Church of the Lukumi Bablu Aye, Inc.*, 508 U.S. at 543.  A government policy "will fail the general applicability requirement if it 'prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way,' or if it provides 'a mechanism for individualized exemptions.'" *Kennedy,* 142 S.Ct. at 2422 (quoting *Fulton v. City of Philadelphia, Pennsylvania*, 141 S.Ct. 1868, 1876 (2021).  *See also Cent. Rabbinical Cong. of U.S. & Canada*, 763 F.3d at 197 (A law is "not generally applicable if it is substantially underinclusive such that it regulates religious conduct while failing to regulate secular conduct that is at least as harmful to the legitimate government interests purportedly justifying it").  Here, the State's prohibition on concealed carry "was not applied in an evenhanded, across-the-board way." *Kennedy*, 142 S.Ct. at 2423.  It specifically targets carrying of firearm motivated by religious beliefs while permitting concealed carry in relation to numerous secular activities.

The State argues that Plaintiffs fail to demonstrate that that the statute is not a neutral law of general applicability because they "largely ignore the existence of subsections e(2)(a)-(b) and (d)-(t), which prohibit the carrying of firearms in a variety of other sensitive locations including, but not limited to, schools, public

parks, homeless shelters, public transit, polling places, and theatres." Dkt. 43, at 11. This argument fails. The Supreme Court instructs that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Tandon*, 141 S.Ct. at 1296 (emphasis in original). It is "no answer that a State treats some comparable secular businesses or other activities as poorly as or even less favorably than the religious exercise at issue." *Id.*

Whether "two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Id.* The State asserts that it has a "purpose of the highest order in the protection of its citizens from gun violence." Dkt. 43, at 12n.5. It explains that the statute prohibits carrying of firearms in locations that create "risks for gun violence" because they are "often busy, crowded, and dense locations where individuals are often seated or moving slowly." *Id.* at 11.

But other private property owners—such as proprietors of hair salons, retail stores, shopping malls, gas stations, office buildings, garages, and countless other private actors hosting secular activities—may decide for themselves whether to permit the carrying of firearms on their property. *See* N.Y. Pen. L. § 265.01-d(1) (prohibiting carry of firearm on private property only where property owner has not expressly permitted it). *See also Roman Cath. Diocese of Brooklyn v. Cuomo*, 141

S.Ct. 63, 66 (2020) (such secular establishments are appropriate comparators for houses of worship).

In sum, on this record, Plaintiffs have demonstrated that the State permits countless other private actors hosting secular activities to do what a house of worship may not. The houses of worship exclusion is not a neutral law of general applicability.

### c.  *The State Fails to Satisfy Strict Scrutiny*

Faced with Plaintiffs' showing that the houses of worship exclusion burdens their sincerely held religious practices pursuant to a policy that is not neutral or generally applicable, the State must demonstrate that the exclusion survives strict scrutiny—which is "the most rigorous of scrutiny." *Church of the Lukumi Babalu Aye, Inc.*, 508 U.S. at 546. It has not.

To satisfy strict scrutiny, the government must show that "its restrictions on the plaintiff's protected rights serve a compelling interest and are narrowly tailored to that end." *Id.* at 2426. The standard is "not watered down[,] but really means what it says." *Id.* (internal citations omitted). Thus, a law that "targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny *only in rare cases.*" *Id.* (emphasis added).

The State argues that it "indisputably has a compelling purpose of the highest order in the protection of its citizens from gun violence in houses of worship." Dkt. 43, at 12n.5. Plaintiffs concede that the State "has a compelling

interest in preventing violent crime." Dkt. 13-3, at 9.  The State, however, fails to establish that the houses of worship exclusion is narrowly tailored to advance that interest.  It argues that "in a sensitive location such as a religious institution, there is no narrower way to prevent" gun violence than "by ensuring that only trained individuals specifically tasked with protecting the community are armed."  The Court disagrees.

In an analogous case, the Supreme Court explained that "narrow tailoring requires the government to show that measures less restrictive of the First Amendment activity could not address its interest in reducing [gun violence]." *Tandon*, 141 S.Ct. at 1296-97.  Where "the government permits other activities to proceed with precautions, it must show that the religious exercise at issue is more dangerous than those activities even when the same precautions are applied.  Otherwise, precautions that suffice for other activities suffice for religious exercise too."  *Id.*

The State allows a broad swath of private property owners to decide whether to permit the otherwise-lawful carrying of firearms on their property.  There is no evident justification for the view that secular business owners are more qualified than religious leaders to determine whether to allow armed self-defense on their property.  Moreover, a bad-intentioned armed person looking to attack worshippers will not be deterred in the by the fact that the State can now add unlawful carry in a "sensitive location" to the slew of criminal charges that would stem from such an attack.  The houses of worship exclusion is therefore not narrowly tailored to

advance the State's interest in protecting citizens from gun violence. The State fails
to satisfy strict scrutiny.

In sum, Plaintiffs have demonstrated, on this record, that the State has
burdened their sincere religious practice pursuant to a policy that is not "neutral" or
"generally applicable," and the State fails to demonstrate that its course was
justified by a compelling state interest and was narrowly tailored in pursuit of that
interest. Plaintiffs are likely to prevail on the merits of their claims under the Free
Exercise Clause.

2. Establishment Clause

The First Amendment to the Constitution also provides that "Congress shall
make no law respecting an establishment of religion." U.S. Const. amend. I.[10]
Plaintiffs argue that, by dictating how individuals may attend worship services, the
houses of worship exclusion encroaches on church autonomy in violation of the
Establishment Clause. Dkt. 13-3, at 14. According to Plaintiffs, the State "has
purported to dictate what churches may permit during religious worship itself—a
matter that strikes at the very core of church autonomy." *Id.* at 3-4. Albeit a closer
question, Plaintiffs are nevertheless likely to succeed on the merits of their
Establishment Clause claim.

The First Amendment "protects the right of religious institutions 'to decide
for themselves, free from state interference, matters of church government as well

_____

[10] This "mandate has been made 'wholly applicable to the States by the Fourteenth
Amendment.'" *Montesa v. Schwartz*, 836 F.3d 176, 195 (2d Cir. 2016) (quoting *Sch.
Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 215 (1963)).

as those of faith and doctrine.'" *Our Lady of Guadalupe Sch. v. Morrissey-Berru*,

140 S.Ct. 2049, 2055 (2020) (quoting *Kedroff v. Saint Nicholas Cathedral of Russian

Orthodox Church in North America*, 344 U.S. 94, 116 (1952)).  The "independence of

religious institutions in matters of 'faith and doctrine' is closely linked to

independence in what we have termed 'matters of church government.'"  *Id.* at 2060

(quoting *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 565 U.S.

171, 186 (2012)).  This "does not mean that religious institutions enjoy a general

immunity from secular laws, but it does protect their autonomy with respect to

internal management decisions that are essential to the institution's central

mission."  *Id.*

 The State argues that the houses of worship exclusion "does not infringe upon

Plaintiffs' right to decide matters of 'faith and doctrine' or 'church government'"

because Plaintiffs "do not allege that carrying a firearm in church is itself an

element of their religious practice."  Dkt. 43, at 13.  According to the State,

Plaintiffs only allege that the houses of worship exclusion "impermissibly restricts

what worshippers may possess in houses of worship."  *Id.*  This argument fails.  As

discussed above, Pastor Spencer and members of the Church's security team

provide armed security to the congregation because they sincerely believe that God

has called them to do so.  The new law, in effect, forces them to disregard this

spiritual calling and, notably, dictates that protection of the Church may only be

provided by a *different* group of people—*i.e.*, individuals fitting into a statutory

exemption.  The Supreme Court instructs that "a component" of a church's

"autonomy is the selection of the individuals who play certain *key roles*." *Our Lady of Guadalupe Sch.,* 140 S.Ct. at 2060 (emphasis added).  The Establishment Clause protects Plaintiffs' conduct.  Indeed, the place of worship exclusion encroaches on matters "closely linked" with the Church's right to determine how best to conduct its own affairs.  *Our Lady of Guadalupe*, 140 S.Ct. at 2061.

The Supreme Court instructs that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy,* 142 S.Ct. at 2428 (quoting *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 576 (2014)). The "line that courts and governments must draw between the permissible and the impermissible has to accord with history and faithfully reflect the understanding of the Founding Fathers." *Id.* (internal quotations and alterations omitted).  An "analysis focused on original meaning and history, [the Supreme] Court has stressed, has long represented the rule rather than some exception within the Court's Establishment Clause jurisprudence." *Id.* (internal quotations and alterations omitted).

On this record, the State fails to demonstrate that the houses of worship exclusion is consistent with the nation's "historical practices and understandings." *Kennedy,* 142 S.Ct. at 2428; *Galloway*, 572 U.S. at 576.  Plaintiffs argue that, "[o]ver the decades, the Supreme Court has enforced the Establishment Clause's guarantee of church autonomy to prevent state interference with religious doctrine and the line between orthodoxy and heresy, rules for church governance (or "ecclesiology"), appointing, removing, and fixing the authority of church leaders, the admission and

22

discipline of church members, and other matters." Dkt. 13-3, at 14-15 (collecting

Supreme Court cases). Yet the State makes no attempt to demonstrate that the

regulation is consistent with this Nation's historical tradition in this area. *See*

*generally,* Dkt. 43.

Plaintiffs are likely to prevail on the merits of their the Establishment Clause

claim.

3. Right to Keep and Bear Arms

Lastly, as this Court determined in *Hardaway,* the houses of worship

exclusion violates the right of individuals to keep and bear arms in public for self-

defense. That right was enshrined in the Second Amendment to the Constitution,

ratified in 1791: "A well regulated Militia, being necessary to the security of a free

State, the right of the people to keep and bear Arms, shall not be infringed." U.S.

Const. amend. II.

a. *Applicable Supreme Court Precedent*

On three recent occasions, the Supreme Court explored this right and

supplied the framework that resolves the issues on this motion pertaining to the

right of individuals to keep and bear arms in public for self-defense. A thorough

understanding of the Supreme Court's *Heller, McDonald,* and *Bruen* opinions is

essential. This Court discussed them at length in *Hardaway,* No. 22-CV-771, 2022

WL 16646220, at *7-14.

Most relevant here, *Bruen* held that the Second and Fourteenth Amendments

"protect an individual's right to carry a handgun for self-defense *outside the home.*"

*Bruen,* 142 S.Ct. at 2122 (emphasis added).  Most gun owners "do not wear a holstered pistol at their hip in their bedroom or while sitting at the dinner table. Although individuals often 'keep' firearms in their home, at the ready for self-defense, most do not 'bear' (*i.e.*, carry) them in the home beyond moments of actual confrontation.  To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections."  *Bruen,* 142 S.Ct. at 2134-35.

The Court continued, "[m]oreover, confining the right to 'bear' arms to the home would make little sense given that self-defense is 'the *central component* of the [Second Amendment] right itself.'"  *Id.* (quoting *District of Columbia v. Heller*, 554 U.S. 570, 599 (2008)).  *See also McDonald*, 561 U.S. at 767, 130 S.Ct. 3020.  After all, "the Second Amendment guarantees an 'individual right to possess and carry weapons in case of confrontation,' *Heller*, 554 U.S. at 592, 128 S.Ct. 2783, and confrontation can surely take place outside the home."  *Id.* at 2135.  *"Many Americans hazard greater danger outside the home than in it.  The text of the Second Amendment reflects that reality.*  The Second Amendment's plain text thus presumptively guarantees petitioners Koch and Nash a right to bear arms in public for self-defense."  *Id.* (citation omitted) (emphasis added).

*Bruen* set forth the relevant test: "when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, *the government must demonstrate that the regulation is consistent with this Nation's historical tradition*

*of firearm regulation.* Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command." *Id.* at 2126 (citation and internal quotation omitted) (emphasis added). In other words, "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2127.

> b. *Application of the* Bruen *Test in this Case*

In this case, tracking *Bruen,* Spencer is an ordinary, law-abiding citizen to whom the Second Amendment applies. *Id.* at 2134.[11] He seeks to carry firearms for the purpose of defending himself and the Church as he goes about his daily life. As it did for the petitioners in *Bruen,* the Second Amendment's plain text thus presumptively guarantees Spencer's right to "bear" arms for self-defense outside of his own home.

Further, the State fails to demonstrate that the houses of worship exclusion is consistent with this Nation's historical tradition of firearm regulation. This Court explained in *Hardaway* that the houses of worship exclusion finds no analogy in *Bruen*'s recognized sensitive places. *See Hardaway,* No. 22-CV-771, 2022 WL 16646220, at *14. The same analysis and conclusion are appropriate here.

Nor is there an American tradition supporting the houses of worship exclusion. As it did in *Hardaway,* the State cites to a handful of enactments in an attempt to meet its "burden" to demonstrate a *tradition* of accepted prohibitions of

---

[11] The same holds for non-party Pruitt as well, and as to countless others.

firearms in place of worship or religious observation.  *Bruen*, at 2135, 2138, 2150, 2156.  *See* Dkt. 43, at 17.  This Court has explained that the notion of a "tradition" is the opposite of one-offs, outliers, or novel enactments.  "Tradition" requires "continuity."  *See generally Bruen*, 142 S.Ct. at 2135-56; *Washington v. Glucksberg*, 521 U.S. 702, 723 (1997); *Tradition*, The American Heritage Dictionary of the English Language (5th ed. 2011).  These enactments are of unknown duration,[12] and the State has not met is burden to show *endurance* (of any sort) *over time*.[13]

Nor can the State demonstrate constitutionality of the houses of worship exclusion by identifying prohibitions on carrying firearms "in places where people gather in large crowds and confined places."  *See* Dkt. 43, at 18.  *Bruen* squarely rejected this approach.  *See Bruen,* 142 S.Ct. at 2134 ("[E]xpanding the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly").  In effect, such an approach would "exempt cities from the Second Amendment and would eviscerate the general right to publicly carry arms for self-defense."  *Id.*

As a result, the Court is left—as it was in *Hardaway*—with a handful of seemingly spasmodic enactments involving a small minority of jurisdictions governing a small minority of population.  And they were passed nearly a century

---

[12] As *Bruen* noted, courts are "not obliged to sift the historical materials for evidence to sustain" the challenged statute; "that is [the State's] burden." *Bruen*, at 2150.

[13] A few additional municipal enactments of similar vintage (*see, e.g.*, Dkt. 43, at 17) do not alter the result.

after the Second Amendment's ratification in 1791. These outlier enactments also contrast with colonial-era enactments that, in fact, *mandated* such carry at places of worship. *See generally* Benjamin Boyd, *Take Your Guns to Church: The Second Amendment and Church Autonomy,* 8 LIBERTY UNIV. L. REV. 653, 699 (2014). The State's proffered enactments are far too remote, far too anachronistic, and very much outliers—insufficient, then, in the search for an American tradition.[14]

In sum, for the reasons discussed above and in this Court's *Hardaway* decision, no proper analogy to sensitive places exists in this case. And the Nation's history does not countenance such an incursion into the right to keep and bear arms across all houses of worship across the state. The right to self-defense is no less important and no less recognized at these places. The Constitution *requires* that individuals be permitted to use handguns for the core lawful purpose of self-defense. *McDonald,* 561 U.S. at 767. And it protects that right *outside the home and in public. Bruen,* 142 S.Ct. at 2021. As in *Bruen,* where the Court stated that, "[n]othing in the Second Amendment's text draws a home/public distinction with respect to the right to keep and bear arms," *id.* at 14, nothing there casts outside of its protection houses of worship. New York's exclusion violates "the general right to

---

[14] The *amicus curiae* argues—as it did in *Hardaway*—that a small number of state laws is sufficient so long as there is not overwhelming evidence of an enduring tradition to the contrary. *See* Dkt. 51, at 7-9. This turns the test and its burden on their heads. The *Bruen* Court itself rejected several outliers and was looking for a "broad tradition" of states "meaningfully restrict[ing] public carry." *Bruen,* 142 S.Ct. at 2156.

publicly carry arms for self-defense." *Id.* It, too, is one of the policy choices taken

"off the table" by the Second Amendment. *Heller*, 554 U.S. at 636.

For these reasons, New York's houses of worship exclusion "violates the

Fourteenth Amendment in that it prevents law-abiding citizens with ordinary self-

defense needs from exercising their right to keep and bear arms." *Bruen*, 142 S.Ct.

at 2156. Plaintiffs are likely to succeed on the merits of their Second Amendment

claim.

### C.     Irreparable Harm Absent Preliminary Injunctive Relief

Plaintiffs argue they will suffer irreparable harm absent a preliminary

injunction. Dkt. 13-3, at 25. They maintain that, "if an injunction is not granted,

Pastor Spencer and his New York flock will continue to be put to the

unconstitutional choice of which of their fundamental rights to forego to exercise the

other." *Id.* If they "choose to worship, they risk being victimized by violence with

no means to protect themselves." *Id.* Plaintiffs have established irreparable harm.

Irreparable harm is "certain and imminent harm for which a monetary award

does not adequately compensate." *Wisdom Imp. Sales Co., L.L.C. v. Labatt Brewing*

*Co., Ltd.*, 339 F.3d 101, 113 (2d Cir. 2003). Irreparable harm exists "where, but for

the grant of equitable relief, there is a substantial chance that upon final resolution

of the action the parties cannot be returned to the positions they previously

occupied." *Brenntag Int'l Chem., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir.

1999). The "denial of a constitutional right ordinarily warrants a finding of

irreparable harm." *A.H. by & through Hester v. French*, 985 F.3d 165, 184 (2d Cir. 2021).

Here, absent a preliminary injunction, Plaintiffs' constitutional rights are being violated. They are forced to give up their Second Amendment right to armed self-defense outside the home. The "right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. D.C.*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016). One cannot regain that peace of mind or readiness after the fact. *See Heller*, 554 U.S. at 595 (noting that the Second Amendment permits an individual to protect himself when "the intervention of society" on his behalf "may be too late to prevent an injury"). Indeed, the "Second Amendment protects . . . intangible and unquantifiable interests." *Ezell v. City of Chicago*, 651 F.3d 684, 698 (7th Cir. 2011). Infringements "of this right cannot be compensated by damages." *Id. See also Antonyuk*, 2022 WL 3999791, at *36 (concluding that the plaintiff has "shown the adverse factual consequences" that he will suffer if an injunction is not issued, namely, "diminished safety in all the locations that he currently carries his concealed handgun that he will not be able to carry it").

Further, the Supreme Court has held that the loss of "First Amendment freedoms, for *even minimal periods of tim*e, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn,* 141 S.Ct. at 67 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)) (emphasis added). *See also A.H. by & through Hester*, 985

F.3d at 184 ("The denial of a constitutional right ordinarily warrants a finding of irreparable harm, *even when the violation persists for 'minimal periods' of time*.") (emphasis added).  Here, too, Plaintiffs suffer irreparable injury each time they are forced to give up their First Amendment freedoms.

The State argues that "there is no current risk of irreparable harm requiring this Court's intervention" because: (1) the statute "exempts multiple classes of persons" permitting—among others—active and retired police officers, peace officers, and security guards to carry firearms in sensitive locations; (2) Defendant Nigrelli is "presently enjoined from enforcing the Place of Worship Provision as to individuals with carry licenses who have been tasked with keeping the peace at houses of worship;" and (3) the District Attorney Defendants have "sworn not to enforce the provision while the courts determine its constitutionality."  Dkt. 43, at 23.  These arguments fail.

As discussed, the Church congregation includes—at most—only a handful of police officers or other individuals who could, potentially, fit into a statutory exception.  And these individuals' capacity to provide protection—even if they were to volunteer their services—would fall woefully short of the amount needed to protect several hundreds of individuals who worship at the Church throughout each week.  Further, on December 7, 2022, the Second Circuit stayed the preliminary injunction issued by this Court in *Hardaway*—except with respect to "persons who have been tasked with the duty to keep the peace at places of worship."  *See Hardaway v. Nigrelli*, Order, No. 22-2933, Dkt. 53 (2d Cir. Dec. 7, 2022).  Pastor

Spencer testified that he unaware of what the contours of that exception may be. Lastly, although the District Attorney defendants promise not to prosecute plaintiffs, *see* Dkt. 40-1, 41, they cannot bind their successors, and nothing prevents them from changing their minds at any time.

In sum, there "can be no question that the challenged restrictions, if enforced, will cause irreparable harm." *See Roman Cath. Diocese of Brooklyn,* 141 S.Ct. at 67. Plaintiffs satisfy the irreparable harm element.

### D.    Public Interest

The Court must consider whether a preliminary injunction is in the public interest. *See Bronx Household of Faith*, 331 F.3d at 349. The State argues that it has a compelling interest in "public safety and crime prevention." Dkt. 43, at 24 (quoting *NYSRPA v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015)). But the State does not show that the lawful carrying of firearms in houses of worship has resulted in an increase in handgun violence, or that public safety would be impaired if this exclusion is enjoined.

A preliminary injunction would, however, serve the public interest of fostering self-defense in houses of worship across the state. The public has a significant interest in the "strong sense of the safety that a licensed concealed handgun regularly provides, or would provide, to the many law-abiding responsible citizens in the state too powerless to physically defend themselves in public without a handgun." *Antonyuk*, 2022 WL 3999791, at *36. This is particularly true in light of the violent attacks on houses of worship in recent history, as well as the

31

numerous threats of violence that have been specifically directed toward Pastor Spencer and the Church.  *See* Dkt. 13-1, ¶¶ 34-38.  And a preliminary injunction fosters the First Amendment rights discussed above.  A preliminary injunction is in the public interest.

## II.    SECURITY

Federal Rule of Civil Procedure 65(c) requires the Court to consider whether it should require plaintiffs to post security and, if so, in what amount.  *See Dr.'s Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) ("Rule 65(c) gives the district court wide discretion to set the amount of a bond, and even to dispense with the bond requirement [in certain situations].").

On these facts, the Court will not require Plaintiffs to post security because a bond requirement does not fit the fact-pattern and interests involved in this case. *See Dr.'s Assocs.*, 107 F.3d at 135-36 (affirming district court's decision not to require security where the district court "found that [defendants] would not suffer damage or loss from being forced to arbitrate in lieu of prosecuting their state-court cases"); *see also Clarkson Co. v. Shaheen*, 544 F.2d 624, 632 (2d Cir. 1976) (Because no request for a bond was ever made in the district court, and because, under Fed. R. Civ. P. 65, "the amount of any bond to be given upon the issuance of a preliminary injunction rests within the sound discretion of the trial court.")

III. **SCOPE**

The State argues that Plaintiffs can only bring a facial—rather than an as-applied—challenge to the houses of worship exclusion, which would succeed only if Plaintiffs "show that 'no set of circumstances exists under which the [statute] would be valid, i.e., that the law is unconstitutional in all of its applications,' or at least that it lacks a 'plainly legitimate sweep.'" Dkt. 43, at 6 (quoting *United States v. Decastro,* 682 F.3d 160, 168 (2d Cir. 2012)). The argument fails.

Plaintiffs have shown, at a minimum, that the houses of worship exclusion lacks a "plainly legitimate sweep" in that it forces individuals to give up their First Amendment freedoms as well as their rights to armed self-defense outside the home. *See Decastro,* 682 F.3d at 168 (to prevail on a facial challenge, a plaintiff "would need to show that no set of circumstances exists under which the statute would be valid, *i.e.,* that the law is unconstitutional in all of its applications, or at least that it lacks a plainly legitimate sweep") (internal citation omitted). And it bears noting that neither the parties nor the Court's imagination has identified a plainly legitimate sweep.

IV. **STAY PENDING APPEAL**

The factors "relevant to granting a stay pending appeal are the applicant's 'strong showing that he is likely to succeed on the merits,' irreparable injury to the applicant in the absence of a stay, substantial injury to the nonmoving party if a stay is issued, and the public interest." *Uniformed Fire Officers Ass'n v. de Blasio,* 973 F.3d 41, 48 (2d Cir. 2020) (citing *Nken v. Holder,* 556 U.S. 418, 434 (2009)). The

33

first two factors "are the most critical, but a stay is not a matter of right, even if irreparable injury might otherwise result, it is an exercise of judicial discretion, and the party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* (internal citation and quotation marks omitted).

Here, a stay pending appeal is not warranted solely under these factors. As discussed above, Plaintiffs' constitutional rights are being violated absent a preliminary injunction. The State has not established irreparable injury in the absence of a stay. The balance of hardships and public interest weigh in favor of Plaintiff, also as discussed above. Finally, it is *Plaintiffs* who have demonstrated that they are likely to succeed on the merits. As in *Hardaway,* legislative enactments may not eviscerate the Bill of Rights. Every day they do is one too many. *Hardaway*, No. 22-CV-771, 2022 WL 16646220, at *19.

Nevertheless, as discussed among the Court and the parties at the hearing, and as jointly proposed by Plaintiffs and the State (*see* Dkt. 55):

(1)  This preliminary injunction will be stayed pending appeal, consistent with Defendant Nigrelli's representation at the December 19, 2022, status conference that the stays entered by the Second Circuit in *Antonyuk v. Hochul*, No. 22-2908, and *Hardaway v. Nigrelli*, No. 222933 permit Plaintiffs to designate individuals otherwise authorized by law to carry a firearm to do so on church premises for the purposes of keeping the peace, without regard to whether they fall within any of the exceptions set forth in N.Y. Penal Law §265.01e(3);

(2)  Plaintiffs and Defendant Nigrelli agree to follow an expedited briefing schedule in the Second Circuit, with appellants' opening brief to be filed 45 days from the date of this Court's order granting a preliminary injunction, appellees' brief to be filed 45 days after appellants' opening brief, and appellants' reply brief to be filed 14 days after the appellees' brief; and

(3)  Defendant Nigrelli will consent to any request by Plaintiffs to have an appeal in this case heard together with *Antonyuk* and *Hardaway*.

## CONCLUSION

For the above reasons, the Court GRANTS Plaintiffs' motion for a preliminary injunction as follows: it is

ORDERED that Defendants, in their official capacities, as well as their officers, agents, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of the Order, are enjoined, effective immediately, from implementing or enforcing S51001, codified at N.Y. Penal Law §265.01-e, against Pastor Spencer, the Church, its members, or their agents and licensees;

ORDERED that this preliminary injunction shall remain in effect pending disposition of the case on the merits;

ORDERED that no bond shall be required; and

NEVERTHELESS, it is

ORDERED that this preliminary injunction is stayed pending appeal, consistent with Defendant Nigrelli's representation at the December 19, 2022,

status conference that the stays entered by the Second Circuit in *Antonyuk v. Hochul*, No. 22-2908, and *Hardaway v. Nigrelli*, No. 222933 permit Plaintiffs to designate individuals otherwise authorized by law to carry a firearm to do so on church premises for the purposes of keeping the peace, without regard to whether they fall within any of the exceptions set forth in N.Y. Penal Law §265.01e(3).


SO ORDERED.

Dated:     December 29, 2022
           Buffalo, New York

                                         _____
                                         JOHN L. SINATRA, JR.
                                         UNITED STATES DISTRICT JUDGE