```
              UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF NEW YORK


MICHEAL SPENCER,                      Docket Number:
HIS TABERNACLE FAMILY            6:22-CV-06486-JLS
CHURCH, INC.,                *
                             *
          Plaintiffs,        *
                             *
                             *         Buffalo, New York
          v.                 *         December 22, 2022
                             *
                             *         9:33 a.m.
                             *
STEVEN A. NIGRELLI, Acting             PRELIMINARY INJUNCTION
Superintendent of the New              HEARING
York State Police, in his
official and individual
capacities,
WEEDEN A. WETMORE, District
Attorney for the County of
Chemung, New York, in his
official and individual
capacities,
MATTHEW VON HOUTEN, District
Attorney for the County of
Tompkins, New York, in his
official and individual
capacity,                    *
                             *
          Defendants.        *
                             *
* * * * * * * * * * * * * * *


              TRANSCRIPT OF PROCEEDINGS
     BEFORE THE HONORABLE JOHN L. SINATRA, JR.
          UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiffs:          CLEMENT & MURPHY, PLLC,
                             By ERIN E. MURPHY, ESQ.,
                                TREVOR W. EZELL, ESQ.,
                                And
                                NICHOLAS M. GALLAGHER, ESQ.,
                                Via telephone,
                             706 Duke Street,
                             Alexandria, Virginia  22314.
```

```
 1                                    And
                                      GANGULY BROTHERS, PLLC,
 2                                    By ANJAN KUMAR GANGULY, ESQ.,
                                      140 Allens Creek Road,
 3                                    Suite 220,
                                      Rochester, New York  14618.
 4                                    And
                                      FIRST LIBERTY INSTITUTE,
 5                                    By JORDAN E. PRATT, ESQ.,
                                         Via telephone,
 6                                    1331 Pennsylvania Avenue, NW,
                                      Suite 1410,
 7                                    Washington, DC  20004.

 8
      For Defendant Nigrelli:         OFFICE OF THE NEW YORK STATE
 9                                    ATTORNEY GENERAL,
                                      By DANIEL R. MAGUIRE, ESQ.,
10                                    Main Place Tower
                                      350 Main Street,
11                                    Suite 300A,
                                      Buffalo, New York  14202.
12
      For Defendant Wetmore:          CHEMUNG COUNTY LAW DEPARTMENT,
13                                    By JEFFREY D. WALKER, ESQ.,
                                         Via telephone,
14                                    167 Lake Street,
                                      Elmira, New York  14902.
15

16    For Defendant Van Houten:       TOMPKINS COUNTY ATTORNEY,
                                      By WILLIAM J. TROY, III,
17                                       Via telephone,
                                      125 East Court Street,
18                                    Ithaca, New York  14850.

19
      The Courtroom Deputy:           KIRSTIE L. HENRY
20

21    Court Reporter:                 BONNIE S. WEBER, RPR,
                                      Notary Public,
22                                    Robert H. Jackson Courthouse,
                                      2 Niagara Square,
23                                    Buffalo, New York  14202,
                                      Bonnie_Weber@nywd.uscourts.gov.
24

25            Proceedings recorded by mechanical stenography,
                  transcript produced by computer.
```

1

2                    (Proceedings commenced at 9:33 a.m.)

3

4            **THE CLERK:**  All rise.

5            The United States District Court for the Western

6    District of New York is now in session.  The Honorable John

7    Sinatra presiding.

8            **THE COURT:**  Please be seated.

9            **THE CLERK:**  The Court advises parties and listeners

10   that they are strictly prohibited from recording these

11   proceedings in whole or in part by any device.

12           Court calls Spencer and others versus Nigrelli and

13   others, case number 22-CV-6486.  This is a date set for a

14   preliminary injunction hearing.

15           Counsel for the plaintiffs, please state your

16   appearances for the record.

17           **MS. MURPHY:**  Erin Murphy from Clement & Murphy for the

18   plaintiffs.

19           **MR. EZELL:**  Trevor Ezell, also Clement & Murphy for

20   the plaintiffs.

21           **MR. GANGULY:**  Anjan Ganguly for plaintiffs.

22           **THE CLERK:**  Also appearing for plaintiffs by

23   teleconference are Jordan Pratt and Nicholas Gallagher.

24           And counsel for the State defendant, please state your

25   appearance.

 1          **MR. MAGUIRE:**  Daniel Maguire from the Attorney

 2  General's Office.

 3          **THE CLERK:**  And also appearing by teleconference are

 4  Jeffrey Walker on behalf of Chemung County Defendant Wetmore and

 5  William Troy on behalf of Tompkins County Defendant Van Houten.

 6          **THE COURT:**  All right.  I think I have everybody.

 7  Good morning.

 8          **MS. MURPHY:**  Good morning.

 9          **MR. MAGUIRE:**  Good morning.

10          **MR. EZELL:**  Good morning, Your Honor.

11          **THE COURT:**  Give me just a second to pull everything

12  and put it in the right place.

13          We're going to have Micheal Spencer on the stand.

14  Does anyone need to do anything or address anything or preview

15  anything before we do that?

16          Ms. Murphy?

17          **MS. MURPHY:**  I don't think so.

18          **THE COURT:**  Mr. Maguire?

19          **MR. MAGUIRE:**  I don't think so, Your Honor.

20          **THE COURT:**  So let's have him up on the stand.

21          Please remain standing.

22

23                      **MICHEAL SPENCER,**

24  witness on behalf of the **PLAINTIFF,** having first been duly

25  sworn, testified as follows:

1

2          **THE COURT:**  Please be seated.

3          **THE CLERK:**  Can you please state your name and spell

4   it for the record.

5          **THE WITNESS:**  Micheal Spencer, M-I-C-H-E-A-L

6   S-P-E-N-C-E-R.

7          **THE COURT:**  Okay.  Mr. Ezell --

8

9              **DIRECT EXAMINATION BY MR. EZELL:**

10

11   **BY MR. EZELL:**

12   Q.   Who do you do for work, Mr. Spencer?

13   A.   I am a pastor of His Tabernacle Family Church in

14   Horseheads, New York.

15   Q.   How long have you worked as a pastor, sir?

16   A.   We launched the church in 1998, of February.

17   Q.   Okay.  And is that when you began working in religious

18   ministry, or were you in a different role before that?

19   A.    No.  I've been in ministry since -- full-time ministry

20   since 19, I believe, 87.

21   Q.   How did you first decide to become a pastor?

22   A.   It definitely wasn't a choice, so -- I was going to be a

23   game warden, but I ended up trying to get a day off from school

24   and going to this Bible college, just to get out, and ended up

25   knowing that I needed to be there at that period of time.

 1   Q.   Why is that?  What -- explain the shift from game warden to

 2   pastor.

 3   A.   I think it's a -- I'm not sure how the Court understands,

 4   but it's the aspect of a spiritual experience to where you just

 5   know in your heart of hearts that's where you belong.

 6   Q.   Can you describe for the Court any training you

 7   participated in to prepare yourself for ministry as a pastor?

 8   A.   Sure.  I went to Zion Bible Institute in Providence, Rhode

 9   Island and completed my certification there, and then went right

10   into ministry.

11       And once you are in ministry, you don't really have the

12   freedom to break off and just go to another college, so I did

13   the rest of my education via correspondence.

14   Q.   Okay.  And you said you started His Tabernacle Church in

15   1998?

16   A.   1998, with five people at the Horseheads Holiday Inn and

17   Suites.

18   Q.   Okay.  Can you talk a little about how the church has grown

19   since your beginnings in a Holiday Inn?

20   A.   Sure.  It's been a tremendous growth for our community and

21   in our community.  We were at the Holiday Inn for about a year

22   and a half, just a little over a hundred folks, and then we had

23   to leave there.  We outgrew it.

24       So we rented a building in Horseheads' Hanover Square, and

25   we were there one year, outgrew that.  And then we had to -- we

1    were -- an absolute miracle, we were able to purchase a building

2    as a nonprofit without a denominational backing.

3        After two and a half years, we renovated that and outgrew

4    that in three and a half years.

5        Moved to the Broad Street School, used their -- their

6    facility, and we were there for, I believe, three years, and

7    then ended up building a building that's about 31,000 square

8    feet in Horseheads.

9    Q.    Is that the current main campus for your Horseheads

10   location, this last building you just mentioned?

11   A.    Yes, it is.

12   Q.    Okay.  Do you have any other locations where you conduct

13   worship services or other ministry activities through the

14   church?

15   A.    Yes.  We have different churches that work with us, as well

16   as we have two His Tabernacle Family Churches.  So we have one

17   in Ithaca, New York, and we have one in Mansfield, Pennsylvania.

18   Q.    Okay.  Pastor, what is His Tabernacle Church, Inc.?

19   A.    It's a 501(c)(3) nonprofit organization --

20   Q.    Okay.

21   A.    -- registered in New York.

22   Q.    And what's your role in that nonprofit organization?

23   A.    I'm the senior pastor and CEO in the business side.

24   Q.    Okay.  Pastor, when did you first become a firearm owner?

25   A.    I believe I was pastoring in Newfield, so that's up near

1  Ithaca, New York, and applied for my pistol permit -- I'm going

2  to guess, near 2000 -- I mean -- excuse me, 19 -- well, 19 --

3  so, wow, so it was -- I think it was 1992, 1993.  Judge

4  Friedlander was the judge in Ithaca at that period.

5  Q.   Okay.  So you first obtained a carry license in New York in

6  '92?

7  A.   Yeah.  I applied for the carry permit.  Judge Friedlander,

8  as I've learned, had took extra -- extra steps and wrote on the

9  pistol permit, "hunting and fishing."

10  Q.   Okay.

11  A.   Or hunting and -- I think that was pretty much it that was

12  on there.

13  Q.   Do you have a license to carry a firearm in other states

14  besides New York?

15  A.   I had obtained one for Utah.  And during the COVID

16  scenario, it had expired and I had not had an opportunity to

17  renew that one.

18       And then Pennsylvania as well.  Pennsylvania had the same

19  scenario with the COVID rules and regulations for nonresidents,

20  and I recently reobtained that.

21  Q.   Okay.  Why did you want to obtain a firearm and firearm

22  licenses?  What prompted that?

23  A.   All the way back in '92?

24  Q.   Yeah.

25  A.   I think, ultimately, I've always been brought up around

1   weapons, but I, at the same time, believe in the Constitution,

2   and, at the same time, I like to protect my family and where I'm

3   at.

4   Q.    Pastor, what is the International Defensive Pistol

5   Association?

6   A.    The IDPA is an organization that is -- it's fun.  It's a

7   competition, and it simulates personal protection and scenarios

8   of such.

9   Q.    Okay.  Can you describe for the Court what one of these

10  competitions looks like?  I mean, are you running, stopping,

11  shooting?  Is it a timed contest?  What does one of these look

12  like?

13  A.    It's a timed contest and, really, you are competing, I

14  guess, with other people, but for me, I was competing against

15  myself.

16        And so one of the scenarios was you were in a pickup truck

17  and your weapon was in the glove compartment, and when they hit

18  the time button, then you had to grab your weapon, the door was

19  open.

20        You had, I believe it was one friendly and one combatant,

21  and you had to dispatch the combatant and go -- then go through

22  the course.

23  Q.    How do you -- how do you -- how is it scored?  How do you

24  receive points, or how are you ranked based on --

25  A.    How are you ranked is the correct hits, and then demotion

 1   of points would be if you hit the friendly or do something in a

 2   wrong position.

 3   Q.   And did the competition test for other scenarios besides a

 4   confrontation in a vehicle?

 5   A.   Oh, yeah.  I mean, it was pretty much everything.  I mean,

 6   they had you use your off-hand in one of the competitions and

 7   other competition -- just different scenarios.

 8        It's made for the reality of what you might actually deal

 9   with in a self-protection, self-defense.

10   Q.   Do you a rough idea how many of these IDPA competitions

11   you've participated in over the years?

12   A.   It was one strong year that I was there with my

13   brother-in-law, he challenged me.  So we just decided to have

14   fun.  But it was a one season, so I want to say I did probably

15   five or six of them.

16   Q.   Okay.  Have you ever placed?  I don't know if they do that

17   at these --

18   A.   I always did the amateur.

19   Q.   What's that?

20   A.   I always did the amateur.

21   Q.   Okay.

22   A.   As long as I beat my brother-in-law, it was good.

23   Q.   How did you fare next to your brother-in-law?

24   A.   I fared well.

25   Q.   Okay.  Pastor, how did you first become a Christian?

1    A.    Grew up in a Christian home.  Probably the week after I was

2    born, I was in church, so -- I always say it this way:  I was on

3    the pew, under the pew, beside the pew, and as a child, I pewed

4    in the pew.

5         You know, just grew up in the body of Christ.  Gave my

6    heart to Jesus March 13th, 1983, at approximately 11:31, when my

7    youth pastor confronted me to stop playing games with God and

8    get right or get out.

9         So I made a choice that day to give my heart to Jesus,

10   serve him, and then I went and visited that Bible college and

11   just knew that that was my purpose in life.

12   Q.    Will you talk a little bit about how you understand the

13   scriptures?

14   A.    Sure.

15   Q.    What their role is in your life, as a Christian?

16   A.    Well, as a Christian and as a pastor, the word of God is

17   God's word.  It's not just a religious writ.  It is literally

18   God's spoken to us.

19        When you study apologetics, when you study hermeneutics,

20   when you study how -- how the presentation of the word was

21   given, when you look at the manuscripts and you see the

22   validation of it.

23        Also, Jesus said He is the word that became flesh and dwelt

24   among us.  We also know that Jesus said that:  I am the way, the

25   truth, and the life.  No man comes to the father but by me.

1    We also know that the scripture says that Jesus said:  The

2    words that I speak, they are spirit, which, in the Greek, is

3    pneuma, which is spirit.

4    And life, Zoe, is the Greek word which means not just life

5    here on earth, but life with God.

6    Q.   Can I take a step back, Pastor?  So you mentioned

7    apologetics, hermeneutics earlier.

8    Can you just explain what those are for the Court and even

9    for my own purposes?

10   A.   Sure.  Apologetics is learning to defend the scripture.  It

11   is a tremendous onslaught to discredit the scripture as just

12   another book that's out there.

13   But when you study apologetics and, you know, it was over

14   1500 years writing, there were over 40 authors, they were

15   written -- it was written in three different continents, three

16   different languages, yet there are only 11 verses that are in

17   controversy.

18   And with the 24,000 manuscripts of the New Testament alone,

19   there is no other book that is compared to its validity.

20   Q.   Okay.  So is that --

21   A.   That's apologetics.

22   Q.   -- apologetics?

23   What about hermeneutics, Pastor?  What's that discipline

24   kind of describe or entail?

25   A.   Hermeneutics is the discipline of correctly interpreting

1   the scripture.  So you have historical-grammatical exegesis,

2   which literally means the literal interpretation of the

3   scripture.

4       And/or you have what is called spiritualization, which is

5   the practice of taking a scripture and saying whatever you want

6   it to mean for this period of time in your life.

7   Q.   And where did you -- was your studies in those areas during

8   your time at Bible college, or have you continued to do other

9   studies in those areas?

10  A.   I continued to move forward, and so I earned a doctorate in

11  theology, correspondence with Freedom Bible College.  It was

12  then transferred over to Destiny College International out of

13  Florida, an ACI accreditation.

14  Q.   Pastor, can you speak a little bit to the role scripture

15  plays specifically in your role of pastoring the church?

16      Sort of how you -- I mean, how you use it materially day to

17  day, what that looks like in your work?

18  A.   Well, you either believe it or you don't.  God's word is

19  either God's word or it's not God's word.  So if you believe

20  it's God's word, then you live God's word.

21      Now, nobody is perfect, but what I mean by that is that you

22  take the principles and you apply them to everyday life so that

23  you can please God, number one, but also be a testimony in the

24  community that God is alive, as you should be the walking word.

25  Q.   So I assume -- and correct me if I get some of this wrong,

1   but I assume in -- so you'll often give a sermon on a Sunday,

2   right?

3       Is scripture a part of that preparation process for you?

4   A.   It is the preparation.

5   Q.   Okay.

6   A.   I mean, no scripture means you just read from the newspaper

7   or you made up your own concepts.

8   Q.   What about some of the other things you do in your role as

9   pastor?

10      How does scripture implicate those different tasks that you

11  are involved in throughout the week?

12  A.   I lead according to scripture.  You know, even when you

13  start talking about the different -- different styles of

14  structure within a company, you have your mom-and-pop shop, you

15  have your business, and then you have your corporate.

16      And even the -- how -- majority of corporations actually

17  run out of scripture and they don't even know it.

18      And it was back with Moses and his father-in-law, his

19  father-in-law taught him corporate structure.  And so even -- I

20  think there is only two churches in the United States that don't

21  run by that structure.

22  Q.   What about -- do you ever -- I'm sorry, go ahead.

23  A.   Yeah.  I'm good.

24  Q.   In your role as pastor of the church, do you have occasion

25  to pastor some of your congregant -- or, sorry, counsel some of

1  your congregants?

2  A.   Definitely.  Less now, since the church has gotten larger,

3  but I've counseled people.  And I -- I've always put it this way

4  to my staff:  Your opinion means nothing.

5       Your opinion was generated from your personal experiences.

6  The people don't need your opinions; they need the word.

7       So allow -- and you're only -- and my staff's directive,

8  you are only allowed to give them scripture, not your personal

9  opinion.

10 Q.   Okay.  Pastor, why do you feel compelled to carry a firearm

11 in church or to allow others to do so at His Tabernacle?

12 A.   Well, we live in a very, very different world.  And at His

13 Tabernacle, we definitely saw some transitions when we went on

14 television.

15      And being one of the largest churches in the county, it

16 definitely is an attention grabber, positive and negative.

17      And so, you know, the scripture is very clear about my job.

18 My job is to -- and it's found in the Book of Effusions, Chapter

19 4, and the Bible says that Jesus gave gifts to men; the apostle,

20 the profit, the pastor, the teacher, and the Evangelist.

21      And they have the jobs to equip the saints for the work of

22 ministry, to bring them to unity, and to bring them to maturity.

23      So my job is to not only teach, train, and develop the body

24 of Christ, but also, when you do a study on shepherds -- and I'm

25 called an undershepherd in the scripture -- as a shepherd, their

1   shepherd had a staff.

2       The staff had a large loop on one end and was elongated.

3   And one portion was to work with the sheep, but the other

4   portion was to protect from invaders to keep the sheep safe.

5       And there were wolves back in those days, and the shepherd

6   would have to protect the sheep.  We know that story with David

7   where he killed lions and he killed bears to protect the sheep.

8       So it's important not only to train and develop and to

9   equip the saints for the work of the ministry so that they

10  fulfill their purpose on the planet, but also part of my job is

11  also to make sure that it's a safe environment to do that.

12  Q.   Can you talk, Pastor, about what you believe scripture says

13  about the congregation's -- your congregation's obligations to

14  one another?

15  A.   Well, I mean, we're called the body of Christ, so what's

16  happened, simply, is that -- it's in Romans, Chapter 12, as well

17  as First Corinthians, Chapter 12 -- that, as the body of Christ,

18  we are fitly formed together.  One's a hand, one's an ear, one's

19  a nose, one's a toe.

20      I don't know if you've ever done a study on the small toe,

21  but it's a really important.  It's your balance, yet it's an

22  unseemly portion, the scripture says, you know, an unseemly

23  member.  You don't see it, but without it, you're not balanced.

24  So everybody has a job and responsibility.

25      Also, the scripture calls us the household of faith.  And

1    in every household, everybody has a different responsibility.

2        So one might be taking out the garbage -- and I -- my

3    children are all grown up.  I do miss that part of them mowing

4    the lawn and taking out the garbage -- but everybody has a part

5    in a family, and they have responsibility in a family.

6        And so as the church, as the body of Christ, we train the

7    people, very clearly, is you have to establish and find your

8    purpose in life in ministry, not just in the world.

9        Scripture says:  What shall it profit a man if he gains the

10    whole world and loses his own soul?  And what will a man give in

11    exchange for his soul.

12        So, realistically, you could have all the money in the

13    bank, like Steve Jobs, but when you die, you take nothing with

14    you.

15        And so fulfilling your purpose is one of the greatest

16    priorities of our time here on the earth, and that's my job to

17    help people establish that.

18        And everybody is very different.  I think that's what I

19    love it about it.  We're all different.  We all have different

20    responsibilities.

21    Q.    So, Pastor, you talked a little bit about the way you see

22    scripture forming -- or informing your role as pastor over your

23    congregation and how congregants relate to one another.

24        What does the Bible say about guns?

25    A.    Well, the Bible doesn't say anything about guns.  They

1    didn't have guns back then.

2        But they had different other -- like I was talking, the

3    shepherd.  The shepherd had a staff and they usually carried a

4    sword.

5        Because some of the problems were within, he would hook

6    them.  One of the great understandings is whenever you had a

7    sheep that just would not -- would not submit, would always run

8    off, the shepherd would go and grab that sheep and break its

9    leg.

10       And it would break its leg because he knew if it kept going

11   into the woods, it would end up being consumed by a wolf or get

12   killed or get lost.

13       He would break the leg, bind it up, fix it, and then carry

14   that sheep over his shoulder for a month until the wound was

15   healed.  And that bond that was generated, would make it so that

16   that sheep would not just run off any longer.

17       The other part of that is, well, Jesus said sheep in

18   wolves -- wolves in sheep's clothing, but we also know that

19   there were definite enemies against sheep, and they were always

20   congregated together.  So the shepherd's job was to make sure

21   that they were safe.

22   Q.   Well, Pastor, what would you say -- so there are some who

23   say that Christianity is the religion of peace, maybe commands

24   passivism.

25       Is that your view?  And if not, why not?

1  A.    I believe it's a ministry of peace, and God is peace, but,

2  at the same time, not everybody is peaceful.  And we live,

3  definitely, in a different world than we've ever lived in

4  before, and the threats are not the same.

5  Q.    What would you say to someone who says:  Pastor Spencer, I

6  don't get it, why you've got to carry a gun in church.  I read

7  the Bible, and it says if someone strikes, you turn the other

8  cheek.  I'm not sure why you've got to strap up to go to church.

9  A.    Well, I think that understanding, again, hermeneutics,

10 being a part of that is understanding -- the turning of the

11 other cheek was when somebody came after you and was confronting

12 you concerning your faith and your walk with God personally.

13      I believe there are about 18 to 19 church shootings a year

14 in America, and none of them are walking in and dealing with it

15 on a personal faith value.

16      It's either there is a -- a mental -- how do I say it

17 correctly -- they are mentally challenged, or they have great

18 hatred, and it has nothing to do with confronting you about your

19 faith with Jesus.

20      There is just God haters out there and people that are

21 vindictive and nasty, so I hope I answered that properly for

22 you.

23 Q.    Pastor, why don't we talk about the church's policy with

24 respect to carrying before and after this law.

25      So when did you first start carrying at the church, or any

1   of your campuses, I guess?

2   A.   I mean, I've -- I've carried -- since I've received my

3   permit, I carry.

4   Q.   Okay.  So --

5   A.   I didn't carry every day.  I carry -- I don't carry on

6   Sundays, because I have a team that carries on Sundays, and I

7   want to focus on my job, you know, and they are -- they take

8   care of the business within the house --

9   Q.   Okay.

10  A.   -- so that I can do my responsibility in preaching the

11  gospel on a Sunday morning.

12  Q.   So you mentioned earlier there was sort of an uptick in

13  security concerns after the church started televising its

14  services, but you were carrying before that; is that -- just so

15  I have the timeline right.

16  A.   Yes.  Yeah.

17  Q.   Okay.  When did you first allow others in the church to

18  carry firearms?

19  A.   I think you need to qualify that.  I've never stopped

20  anybody from carrying a weapon in the church if -- if they were

21  part of the congregation.

22       We don't know they are carrying, because if they are

23  carrying, it's concealed, and we don't have rules against them

24  not carrying.

25       The safety security team -- I believe it was way back in

 1  about 2002, that a young man came to me and it was his

 2  heart's -- it was in his heart -- again, being part of the body

 3  of Christ, if you hate children, you shouldn't do children's

 4  ministry.  If you can't sing, you are not called to the choir.

 5      So the gifts that God gives you are innate, they are

 6  gnawing.  And so he came and he said:  I just really feel that

 7  God wants me to -- protect is -- was his word.

 8      It was:  Protect the anointing or protect the presence of

 9  God, so that nothing would happen in the church that would draw

10  attention away from God during the service.

11      And so way back then, we sent him to T.D. Jakes', which is

12  the Potter's House in Dallas, Texas for training, and the people

13  that were with him sent him for training.

14      And we brought in Kenneth Copeland's right-hand man, and he

15  taught him Krav Maga and taught him special -- on how to -- even

16  with weapons and protection and so on and so forth.  So our

17  gentlemen are trained.

18  Q.  Can I take a step back real quick?  So you didn't formally

19  announce that firearms were permitted on the campuses, then; is

20  that right?

21  A.  No.

22  Q.  Okay.  You just never said one way or -- you never said

23  they were prohibited?

24  A.  Well, they have a right to.

25  Q.  Okay.

1  A.    If they have a carry permit, they have a right to be there.

2  Q.    And, Pastor, I think you may have touched on this earlier,

3  but do you know which members of your congregation, before this

4  law was passed, elected to carry firearms to church?

5  A.    No.  I mean, I'm not running around asking anybody who

6  carries or who doesn't carry.

7  Q.    Okay.  Let's talk about -- you mentioned the security team

8  earlier.  Can we talk about that, briefly?

9        Do you pay these individuals?

10 A.    No.  They believe it's their call.  They believe that

11 that's part of their res- -- that's -- they believe that that's

12 what they're called to do in the church, so I don't pay any of

13 them.

14 Q.    Okay.  How big is the security team right now?

15 A.    Oh, I want to say at least ten to 12.

16 Q.    And is that across both campuses or is that just the main

17 campus?

18 A.    That's the main campus.

19 Q.    Okay.  Do you know how many folks you have working in that

20 ministry at the Ithaca campus?

21 A.    I'm going to guesstimate at four.

22 Q.    Okay.

23 A.    It's a smaller congregation.

24 Q.    Okay.  Pastor, have any of your church members who've

25 previously volunteered on the security team accidently

 1  discharged one of their weapons while on church property?

 2  A.   Absolutely not.

 3  Q.   Have any of those volunteers spontaneously attacked other

 4  congregants while on church property?

 5  A.   Absolutely not.

 6  Q.   If I broaden it, has any congregant at your church ever

 7  attacked another congregant with a weapon, with a firearm?

 8  A.   No.

 9  Q.   Okay.  Pastor, after New York enacted the law that you are

10  challenging here, what, if anything, did you communicate to the

11  congregation?

12  A.   Nothing.

13  Q.   Okay.  So you didn't have, like, a town hall or something

14  like that to discuss the new law?

15  A.   No.

16  Q.   Okay.  Did you receive any feedback on it, whether positive

17  or negative, from some church members?

18  A.   The safety security team, mainly, they were concerned.  You

19  know, they know at that point, they were -- they were

20  emasculated in part of their responsibility.

21  Q.   Okay.  Pastor, let's talk a little bit about the actual

22  structure of the church property, so let's focus on just the

23  Horseheads campus for now.

24       Do you know what the maximum capacity is for the whole

25  building?

 1  A.   Not the whole building.  I do know the sanctuary itself is

 2  800.

 3  Q.   Okay.

 4  A.   I mean, we have many rooms.  We have two wings, 40 by 190.

 5  Q.   Okay.

 6  A.   And each room is different sized to house children on

 7  one -- one whole wing is just the children's wing, and then the

 8  other wing is the adult learning and offices.

 9       But we've grown and had, I think, 23 babies last fall --

10  something was going on -- and we had to actually take some of

11  the offices and make them nurseries.

12  Q.   What are the rough attendance numbers for a Sunday morning

13  in the sanctuary at the main campus?

14       If -- I don't know if the attendance -- I'm sure it

15  fluctuates, but, roughly, how many folks do you have in there?

16  A.   Between 650 and 725, 750 on a Sunday morning.  And that's

17  in two services, though.

18  Q.   Okay.  That's across two services.  And is that including

19  the entire population of people that come through the building,

20  or is that just adults in the --

21  A.   That's adults and children, but that does not include

22  another hundred-plus that come during the week that are not

23  there during the Sunday service.

24  Q.   Okay.

25  A.   So that diversity.  I don't allow them to double-tap,

1   double-count.

2   Q.   Okay.  What's the square footage of the sanctuary, do you

3   know?

4   A.   I think it's, like, one -- I want to say, like, 130 by 80.

5   Q.   Do you know the square footage of the Horseheads building,

6   the whole building?

7   A.   Almost 31,000.

8   Q.   Okay.  Before New York enacted the law you are challenging

9   here, did you allow carry throughout the entire building or was

10  it just limited to the sanctuary?

11  A.   With whom?

12  Q.   So before this law was enacted, you said that you didn't

13  have any restriction on congregants carrying in church if they

14  wanted to.

15       Did that sort of policy apply across the building, or was

16  it only to certain parts -- portions of the campus?

17  A.   Well, I mean, they carried anywhere.  The issue, though,

18  that is -- on a Sunday morning, our children's wing is locked

19  down.

20       So even to work with kids, it's a seven-page application,

21  back -- you know, police background checks, have to have written

22  references; no two -- no two relatives can be in the same room

23  together, no children are allowed to be taken even to the

24  bathroom alone.

25       I mean, we have massive protection.  Kids are priority.

 1   They are checked in by barcodes, and that wing on a Sunday

 2   morning, one of our safety security team is there.  And if you

 3   do not have a lanyard, then you do not go down, even staff.

 4   Q.    Okay.  So we've talked a little about how you use the

 5   building.  Can you just help me get a sense of what a Sunday

 6   morning looks like?

 7        You said there's multiple services.  What time are you guys

 8   starting the services on Sunday?  When do you wrap up for the

 9   day?  What's it look like?  What's Sunday morning look like?

10   A.    Sunday is very busy.  There is about 120 volunteers to make

11   a service run.

12        And so we a gather them all together at 8:00 a.m., and we

13   have a time of encouragement and prayer, and then they all do

14   their thing, whether it's greeting at the front door or meeting

15   guests or they are ushers or they're part of the worship family

16   or the full worship band or they're part of the media team

17   getting live stream ready and/or the recording for television.

18        Myself, I go out to the driveway.  We have about a 400-foot

19   driveway.  I believe that, as their pastor, it's so important

20   for them to be greeted, and so I'm in the driveway every

21   Sunday -- every Sunday morning but lightning.  I won't do

22   lightning.

23        But minus 5 degrees, snow, I'm out in the driveway waving

24   at everybody, and there is a safety security team guy with me

25   out there, and we brave the storm to let the people know they

 1   are loved.

 2   Q.    And what's going on in the -- did you say the service

 3   starts at 9:00?

 4   A.    The service starts at 9:00, and we also have -- the second

 5   one's at 11:00.

 6   Q.    Okay.  And what's happening in these other wings, these

 7   other rooms, while the main service is happening?

 8   A.    While the main service is happening, again, the children,

 9   they all have their own children's ministry.

10        So they are being trained who God is.  It's not just Sunday

11   school stories, but they are being trained how -- my philosophy

12   of ministry is generational leadership.

13        So I believe in raising up generations of young men and

14   young women to do ministry, to do God's work, to fulfill their

15   purpose on the earth.

16        And so we start the children right off, while they are very

17   young, teaching them how to pray, teaching them about Jesus,

18   teaching them all the different principles that Christ taught.

19   That's one wing.

20        The other wing is pretty much empty.  We do have the safety

21   security team, they are stationed around the entire building and

22   also outside.  They are in the parking lot as well.

23        We're also moving large sums of money, and the safety

24   security team completely oversee that, the moving of the

25   finances, and then putting it into the safe.

1  Q.    What about the rest of the week?  What does the rest of the
2  week at the church look like?
3  A.    We're a teaching church, so there is different ministries
4  all through the week.
5        So, like, Monday night, there is classes; Tuesday nights is
6  worship practice; Wednesday night is men's ministry; and then we
7  bus in up to a hundred children under the age of 12 every week
8  from the city.  The church pays for it, and we feed them, clothe
9  them, and give them teaching about -- about Christ.
10       We're trying to make sure that we don't lose the next
11 generation.  They are not churched.
12       You know, we are finding children under the age of 30 have
13 never been in church before.  They don't do weddings in churches
14 anymore, they don't do funerals in churches anymore.
15       So we have a whole generation that no longer is being
16 taught who God is, and the evidence of that is very, very clear
17 in our communities.
18 Q.    Pastor, maybe you can just pick an example from -- it
19 sounds like you've got different things going on during the
20 week, but can you give me a sense of what -- how people are
21 conducting themselves and using the building while they are
22 there?
23       So are they conducting themselves the way they normally
24 would during a Sunday service, where they're maybe seated and
25 receiving instruction, or are they doing other kinds of

1  activities?

2  A.   Well, even our -- our services are very -- not seated the

3  whole time.

4       I mean, for worship, we worship probably about 30,

5  35 minutes.  We have probably 75 to a hundred that love to come

6  to the alter and worship around the alter, so there's people

7  gathered around the alter.

8       The lights are dimmed.  We have a very strong -- I don't

9  know if a light show is the correct verbiage, but we have a

10  strong stage presentation.

11       So the lights are dimmed in the main sanctuary.  There are

12  people standing.  There are people sitting.  There are people up

13  around the alter worshiping.

14       And when that is accomplished or completed, then I go up

15  and end the worship service, and then we do what's called meet

16  and greet.

17       So for the next, I think it's four minutes, they are

18  walking around telling at least five people, "Hi, how are you?"

19  Meeting new people.  So it's very busy.

20       And then when it's time to preach, they are seated.  The

21  offering itself, they actually aren't -- aren't -- they do not

22  give their offering in their chair.

23       We actually have people come to the front of the alter.

24  The Bible said that they brought their offerings to the Lord.

25       So we actually have the offering cylinders near the front,

1   and people bring their offerings.  So there is lines of people

2   during the offering time.

3   Q.    Pastor, do you -- so you mentioned some -- one wing of the

4   church is sort of staff offices.

5         Do you work out of the church during the week?

6   A.    Yes.  I've an office at the church.

7   Q.    Okay.  And some of these other ministries at the church,

8   are they -- so you talked about activities like men's Bible

9   study, this program for young children that you bring in.

10        Are your other ministries doing their administrative work

11  in those office during the week?

12  A.    Yes.  And if you don't mind me finishing -- I kind of

13  babbled a little bit.  I apologize.

14        Thursday nights are our family night.  So there is a

15  ministry for all ages.  Our teenagers are very much a priority

16  to us, so we bus in about another 50 young men from the age of

17  12 to 18, young men and women from Elmira, who normally would

18  not go to church.

19        So the youth ministry is doing phenomenal.  They have,

20  like, 80 teenagers, and they are shooting towards a hundred now,

21  of being able to -- but that is -- I mean, they are in their own

22  room.

23        And then there is women's Bible study.  There is another

24  Bible study in another room.  Then I teach what's called a Rock

25  Solid Faith, which is our foundations class in the sanctuary.

1      So, literally, the entire building is saturated with
2   people.
3   Q.   So if we set aside for purposes of this question the
4   different, I'll call them events, that you are having in the
5   building, so some of these -- you know, study or learning
6   opportunities that you were just mentioning, what's the number
7   of people that are in the building throughout the week just
8   working at their desks or preparing for ministry, that kind of
9   thing?
10  A.   Oh, working -- I think we have 15 -- 15 employees.
11  Q.   Okay.  So full-time staff, who are there in an office --
12  A.   Yeah.  They're in offices and they are working.  So we have
13  an administration.  We have an individual that does all of our
14  media and our marketing.
15      We have another young adults pastor in the Bible Institute
16  that we have there, they oversee that.
17      And then we have a connections minister.  And then we
18  have -- the Ithaca campus has an office there as well as in
19  Ithaca.
20      And then we have our financial department, which
21  encompasses two people.  And then we have the youth, which have
22  probably six to eight, and most of them are volunteers.  All but
23  two are volunteers -- young people.
24      And then my office.  And then we have a -- another office
25  in the back that deals with calling folks that just seem to have

1    gone missing, and we are concerned about them, so we call them.

2    Q.   Okay.  Pastor, do you lock the doors during the service?

3    A.   No.  I don't believe it's legal.  You can't lock the doors

4    while a service is happening.

5    Q.   Do you lock them at other times?

6    A.   The only time we're allowed to lock the doors is when

7    nobody is in the building.  That's the law.

8    Q.   So who is -- who is able to come to the church?

9    A.   Well, I mean, we're on TV, so you're getting everybody and

10   anybody.  I mean, you don't -- you don't know who is walking

11   through the doors.

12   Q.   So you don't have, like, a limitation on someone who is a

13   registered member with the church or something?  Only those

14   folks can walk through our doors?

15   A.   No.  Again, like I said, I'm on ABC, NBC, and CBS every

16   single week in our local region, and I invite them to church

17   every single Sunday.

18   Q.   Okay.  Pastor, can you talk about some of the threats

19   you've received while working in church ministry?

20   A.   They have been definitely interesting.  You learn very

21   quickly that not everybody loves God.  And you know at times,

22   it's really not against you personally because, honestly, they

23   don't know me; they've never met me, to where I've had -- there

24   was this one young man.

25        He was very interesting.  He grew up in the church,

1  actually.  He was about six-foot-seven, six-foot-eight.  Went to

2  Buffalo State, I believe, and smoked some weed that was laced.

3       He came to my office on a Sunday morning.  And because he

4  grew up in the church, I, of course, met with him before church.

5       We were sitting there, and he looks at me and he says:  "I

6  am the god Aries, and you are no longer allowed to say the name

7  Jesus."

8       And I said:  "Well, we both know that that's not going to

9  occur."  And like I said, during the worship service, the people

10 can sit, stand, or be near the front.

11      Well, he stood right at the alter.  And being as tall as he

12 is, our alter is about four feet high, when the worship was

13 over, I came out and just, you know, started praying.

14      And I -- I looked -- I said the name of Jesus, looked down

15 at that kid, and he looked at me like -- he goes -- he gave me

16 that look.

17 Q.   Can you describe for the court reporter what you are doing,

18 sir?

19 A.   He -- he looked me in the eyeballs and caught my eyes and

20 bounced his head back and forth, reminding me what he said in

21 the office, that I was not allowed to say the name Jesus.

22      And whenever -- the alter is probably 60 feet long, so I

23 walked the whole thing.  He walked with me.  And every time I

24 said the name Jesus, he gave me that same look.

25      After, he went back to his chair.  And during the sermon

1   was so irritated that he stood up and was going to make a very

2   large scene.

3        And the safety security team took him out and called the

4   police, and he was taken to the BSU unit in Elmira.  That was

5   one.

6        I've had so many, I mean, we -- I mean, I've had so many.

7   My neighbor, which is in the declaration I made, I had never met

8   him.  I lived in the woods.  Like, in the woods.

9        There is no cell phone there.  They had dial-up up till two

10  years ago.  So I lived in the woods, and our neighbor was across

11  the street.  I had never met him.

12       My wife -- my belated wife knew the mother from growing up

13  in a different church.  And one Sunday he showed up at church.

14  I was -- he came down, he wanted to meet me.  He came down.  It

15  was nice.  I -- he was my neighbor.

16       So I said hello to him.  His name was Tim.  And we sat

17  there and talked, and he said:  Yeah.  I know your wife and I

18  know your sister-in-law and dah-deh-dah-deh-dah (phonetic).

19       I don't know what happened, but the next few weeks after

20  that, something irritated him.  And my son and daughter-in-law,

21  with their two children and two dogs, moved into my house while

22  they sold their house and were buying a new one.

23       My daughter-in-law walked out to take the dogs to the

24  bathroom, and he stood on his lawn F-ing her off.  "I'm going to

25  get you people.  I'm going to come after you people.  I'm going

1   to kill your dogs."

2        My daughter-in-law was very, very bothered.  Went back into

3   the house, of course.

4        And then what brought it to a horrible climax, my wife and

5   I, during the spring were -- the lawn -- lawn furniture, pillows

6   and stuff were in the upper part of the barn, so I went up to

7   the upper part of the barn.

8        The grandchildren were there, the family was there.  It was

9   the summer and I was throwing down the bags, and Tim was across

10  the street F-ing us off the whole time.  "I'm going to F-ing get

11  you.  I'm going to get you."  And we just ignored him.

12       And all of a sudden, we heard some gunshots.  And my wife

13  at that very -- grabbed our grandchildren, ran into the house,

14  because we didn't really know what was going on.  And I went

15  into the house and we called the police.

16  Q.   Did you eventually talk with law enforcement about this

17  incident?

18  A.   Yeah.  The State Police came and, you know, they were very

19  gracious -- it takes a long time to get there because it was so

20  far out.

21       One other thing that Tim did before he did that, he was

22  actually in the church service, and our safety security team was

23  really -- they were just heightened, because it's their gift.

24  It's what they are called to do, as part of their purpose in the

25  church.

1      And so they were so heightened that they actually sat

2  around Tim during that church service, and in that, you know,

3  "I'm going to beat him up.  I'm going to stab him," you know,

4  he's making threats from the chair while I was preaching.

5      Not loud enough for anybody to hear except for the safety

6  security team that was posted around him.

7      And then the last event, which I'll go back to here, the

8  police went and ended up coming back.  They went up very slowly.

9  The mother had screamed:  Get back in the house.

10     We never saw the gun.  We just heard it go off.  And

11 because we didn't see the gun, the police couldn't do anything.

12 Q.   Okay.

13 A.   I told them that I had -- because of his heightened

14 intensity, had put cameras around the house.  And then she asked

15 if I had a weapon, and I said yes, and she said that was good.

16 Q.   And will you remind me which government -- which

17 governmental body these law enforcement officers were employed

18 by?

19 A.   It was the New York State Police.  There was two of them.

20 Q.   Okay.  What did you discuss with the New York State Police

21 officers after this incident?

22 A.   She simply said to me -- I guess, they were balancing out

23 his meds or something, and that it was smart that I had

24 protection.

25     So it was -- and it was -- it was smart.  We live so far

1    out, man, that if something -- if he had done something, shoot,

2    we would have been in trouble.

3    Q.    Pastor, we discussed earlier that you work at the church

4    campus during the week, right?

5    A.    Yeah.

6    Q.    Is it -- is it -- is the location of the church publicly

7    available anywhere?

8    A.    It's on the Internet.  It's on all social media.  It's

9    announced on Sundays.

10         You know, we -- we -- the reach of the TV program from

11   Elmira goes to Wellsboro, Pennsylvania, almost to -- all the way

12   to Binghamton, to Cortland, New York, to Alfred University area.

13   So the draw and the touch is large.

14   Q.    Do you think that if -- if a neighbor like this one wanted

15   to come find you at work, he would have any difficulty doing so?

16   A.    Absolutely not.  I mean, it's public knowledge.

17         **MR. EZELL:**  That's all I have, Your Honor.

18         **THE COURT:**  All right.  Let's take a five-minute

19   recess and stretch our legs.  And we'll be back out, let's say,

20   10:30 sharp.  All right?

21         **MR. EZELL:**  Perfect.

22         **THE COURT:**  Okay.

23       (Recess at 10:22 a.m., until 10:30 a.m.)

24         **THE COURT:**  Okay.  Mr. Maguire --

25         **MR. MAGUIRE:**  Thank you, Your Honor.

1

2                    **CROSS EXAMINATION BY MR. MAGUIRE:**

3

4    **BY MR. MAGUIRE:**

5    Q.   I'm hoping to be fairly quick here.  We've covered a lot of

6    what I already wanted to cover.  I want to start by asking you

7    some questions about your Pennsylvania license.

8         When did you first obtain a Pennsylvania carry license?

9    A.   My wife and I went cross country, so I think it was '12.

10   Q.   2012?

11   A.   I believe so.

12   Q.   And you mentioned that at some point in time it lapsed?

13   A.   Yes.  During COVID.  What happened during COVID is you

14   weren't allowed as a nonresident to reapply if it -- if it went

15   past.

16   Q.   Do you recall when it lapsed?

17   A.   It had to be during COVID, so I went down and just

18   reobtained it from Wellsboro, Pennsylvania.  It's not a real

19   difficult thing.

20   Q.   Do you currently own any firearms?

21   A.   Absolutely.

22   Q.   Can you tell me what you own?

23   A.   I can't tell you all that I own.  I will tell you I have a

24   Super Blackhawk .44 Magnum.  I have -- I would have to look at

25   my permit.

1    I have a SIG 934 -- 9-3-4, I believe, which is a

2    9-millimeter, which is the one I mainly carry.

3    I have a Walther PPQ, which I use for the IDPA

4    competitions.  Those are the main ones that I -- that I use.

5    Q.   Are those the main ones that you also carry outside your

6    home?

7    A.   Only the one I usually carry is the SIG 9-3-4.

8    Q.   Do you have a gun safe at His Tabernacle Church, at the

9    Horseheads campus?

10   A.   Not at the church.  The -- if the safety security team is

11   carrying, it's their personal weapons, so they take them home

12   every day.

13   Q.   What about when you carry at the church, do you keep the

14   gun on you at all times when you're carrying at His Tabernacle?

15   A.   I keep a paddle holster, so I keep a paddle holster.

16   Q.   Can you explain to me what a paddle holster is?

17   A.   Sure.  It's a larger holster, so it doesn't, what they

18   call, pattern.  And so it usually fits on my side, and the

19   weapon fits inside of that and it stays in there the entire

20   time.

21   And they've made it so that it is nonirritating the

22   majority of the time.  So you can sit, you can stand, you move

23   and many times you don't even -- you are not sitting back with a

24   conscious understanding that you are still even carrying because

25   it just becomes a part of you.

1   Q.   So when you are at His Tabernacle Church and you are

2   carrying, you are always wearing this paddle holster?

3   A.   Correct.

4   Q.   You mentioned that there's multiple campuses of His

5   Tabernacle?

6   A.   Yes, sir.

7   Q.   Can you explain kind of the relationship between the

8   different campuses?

9   A.   Sure.  We have different -- we have His Tabernacles, and

10  then we have pastors that work with us.  So the pastors that

11  work with us are in different states.

12       There is one in Indiana; there is one in West Virginia;

13  there is one in New Jersey; there are four in Mexico; there is

14  one in Uganda.

15       But the actual His Tabernacles, there are two of them.  One

16  in Ithaca, New York, and one in Mansfield, New York.

17  Q.   Talking about the Ithaca and Mansfield and the main campus

18  of His Tabernacle, do all those parishes share the same

19  religious beliefs and have the same beliefs about what the

20  scriptures provide for?

21  A.   Absolutely.

22  Q.   Are they led by different pastoral teams?

23  A.   We have -- the Ithaca one is run by my son.  Grew up in my

24  home.  Went to Bible college in Florida, and finished his

25  college degree in South Africa.

1      And he and his bride took Ithaca when it was, like, 12

2  people.  So he has -- and the doctrine is the same standards.

3      Mansfield now is a live stream campus, so it has a live

4  worship team, a pastor on -- on premises.  But when the sermon

5  is preached, it is preached on a screen.

6  Q.   There is no in-person worship at Mansfield?

7  A.   There is in-person worship and live band.

8  Q.   Okay.  Just so I understand correctly.

9  A.   That's all right.

10 Q.   So during worship services at Mansfield, there are people

11 in the pews?

12 A.   Yeah.  There are people in the pews.  And like all the

13 other campuses, many times they come to the front to worship or

14 they're -- they, you know, stay in their seats.

15     Some of them sit, so there is no dictated positioning

16 physically of how they have to worship.

17 Q.   Do you ever preach at Mansfield?

18 A.   I do.

19 Q.   How often do you preach -- well, we can talk about Ithaca

20 and Mansfield.

21     How often are you preaching at Ithaca?

22 A.   I have to give you some background, just for understanding.

23 My wife was diagnosed three and a half years ago with terminal

24 cancer.

25     And so for the last three years, I have spent an enormous

 1  amount of time, even up here at Roswell, and in Rochester, going

 2  and working through her -- her physical problem.

 3      And so my pastoral -- going from campus to campus ceased

 4  for a while, and she perished last year.  And so getting back on

 5  my feet, I've started going back once a month to the different

 6  campuses.

 7      I was just in Indiana -- I was just in Indiana two weeks

 8  ago, and I was supposed to be at our Mexico churches three weeks

 9  ago, but I actually got the flu.

10      So I'm traveling at least once a month to the different

11  campuses that we oversee.

12  Q.   Thank you.

13      How many current parishioners/members are there of His

14  Tabernacle -- or, then, what do you call them?  I used the term

15  parishioner --

16  A.   And we actually -- we eliminated the terminology

17  "membership", because the group that we have in church are from

18  so many different denominations.

19      So we have Catholics; we have Presbyterians; we have

20  Lutherans; we have people from the Baptist background; we have

21  people that have never been in church a day in their life.

22      So we eliminated membership mindset because many people

23  will use membership as their cue to go to heaven.  It's only

24  Jesus that gets you to heaven.  And so, ultimately, we have on

25  campus, during a week, up to a thousand diverse people.

1    Right now in America, the average American goes to church

2    once every three weeks.  So we have a full thousand people that

3    call it their home, but on a given Sunday, 650 to 725 in the

4    building.  And then another hundred diverse people during the

5    weekday that aren't there on Sundays.

6    Q.   When people attend His Tabernacle, do they fill out any

7    sort of registration form?

8    Is there -- what I'm asking is:  Is there a way that you

9    are able to look through your records and know the names of the

10   individuals attending His Tabernacle?

11   A.   Absolutely.

12   Q.   And can you tell me how that process works?

13   A.   Sure.  It's a -- when a guest comes, they are taken to the

14   guest relation desk.  They are given a gift.  They fill out

15   their information.

16   At that point in time, on Monday morning, we then send out

17   a letter to them, thanking them for being with us, and then they

18   receive a text message, if they provided that.

19   We find anybody under 40 does not want a phone call.  They

20   find that creepy.  So we will send them a text message, which

21   they enjoy.

22   And then what happens is on a Sunday, we have a group of

23   people that, as part of their ministry, they take attendance.

24   We also obtained attendance from people that registered

25   their children.  We also take attendance by -- we take a video

 1  shot of the entire congregation in case we missed people.  And

 2  then we also -- if people give, then that is also part of the

 3  attendance record.

 4  Q.   When people fill out the registration form, do they list

 5  their employment?

 6  A.   No.

 7  Q.   With respect to the individuals attending His Tabernacle,

 8  are there any current law enforcement members attending?

 9  A.   There are two gentlemen that are -- I -- one works in the

10  courts in Steuben County, I think, and the other gentleman works

11  in the jail in the Schuyler County.

12       And then we have a gentleman who is part-time police

13  officer, and I'm not sure which -- which town he works with.

14  Q.   Do you have any retired police officers or law enforcement

15  that attend His Tabernacle?

16  A.   One of my pastors is a retired police officer, and he is

17  also a seated judge in Horseheads.

18  Q.   What about active-duty personnel?

19  A.   Meaning --

20  Q.   Military.

21  A.   Prior or?

22  Q.   Current active-duty military personnel attending.

23  A.   They don't attend -- we don't have a base near us, so you

24  might get a reserve person, but the majority of them are

25  often -- when they come home, they come to church.

 1  Q.   We spoke a little bit about the number of people that are

 2  attending His Tabernacle.

 3       Do you know what each of those individuals do for

 4  employment?

 5  A.   No.  I know some, but the majority, no.

 6  Q.   Based on that, it's possible that there may be more current

 7  law enforcement attending His Tabernacle than we just mentioned?

 8  A.   Strangely enough, the law enforcement people are usually

 9  very easy to find or they are talked about.  Not in a negative

10  fashion, but they are identified by the others.

11       So at this point, I do not believe there are any other than

12  what I stated.

13  Q.   Are any of -- well, let me ask you this one:  Are you aware

14  if there are any individuals that have security licenses that

15  are attending His Tabernacle?

16  A.   I -- I don't know what -- you mean, like, a security guard?

17  Q.   There is a -- let me rephrase.  Yes.  That is what I'm

18  talking about.

19  A.   I don't know if people have security guard stuff.  I don't

20  know anybody in the church that works as a security guard.

21  Q.   Okay.  We talked about the current law enforcement and the

22  retired police officers or law enforcement.

23       Are any of those individuals part of the security team that

24  we talked about?

25  A.   Just the two.  Just the two -- one -- the gentleman that

1  works in the court leads our team, and the gentleman in Schuyler

2  County is on the team as well.

3  Q.    Do all members of the security team possess New York carry

4  licenses?

5  A.    I don't know.  I know that, like, the ones that work do.  I

6  do know some of them do.  Like, the Pruitts (phonetic) both have

7  carry permits.  The Burbanks both have carry permits.  I

8  don't -- I'm not sure of the others.

9  Q.    Do you know prior to the enactment of the law we're

10  discussing here today, whether all members of the security team

11  carry at His Tabernacle, prior to the passage of this recent

12  law?

13  A.    I know that the folks that had the permits, like the ones I

14  just gave you, they did.

15  Q.    Can you tell me what it means for a church to be

16  nondenominational like His Tabernacle?

17  A.    Sure.  It means that we accept everybody and that we don't

18  have a mainline denomination overseeing us.

19        It doesn't mean that we don't have authority over us.  My

20  bishop is Bishop Rick Thomas out of Margate, Florida.  He's my

21  main oversight, and I'm responsible to him.

22  Q.    Can you describe for me how that oversight works?

23  A.    Sure.  As a bishop, he has a right to sit me down; he has a

24  right to take the church away.  And he is the one that appoints

25  the next one that is going to take over.

 1  Q.   When you started -- well, let me ask you this:  Is there an

 2  entity or organization that Bishop Thomas is affiliated with?

 3  A.   His church, and then, I believe, he has a board as well.

 4  Q.   What's the name of his church?

 5  A.   Abundant Life.

 6  Q.   And where is it located?

 7  A.   Margate, Florida.

 8  Q.   How often do you speak with Bishop Thomas?

 9  A.   Actually, every week, pretty much.  And he's coming up --

10  I'm getting married next week.  He's going to fly up and do my

11  wedding.

12  Q.   Congratulations.

13  A.   Thank you, sir.

14  Q.   When you speak with him, do you discuss theological

15  beliefs?

16  A.   Not usually, because we're on the same page, theologically.

17  So our base education is pretty solid, and we usually discuss

18  issues that I have; ministerial issues, campus issues.

19  Q.   Have you ever discussed with him the carrying of firearms

20  at His Tabernacle?

21  A.   No, I have not.

22  Q.   Are there other churches under Bishop Thomas?

23  A.   There are pastors, but not churches.

24  Q.   Can you explain how that works a little bit?

25  A.   Sure.  There is always different levels of accountability.

1        If, as a bishop, you are over a church -- like he is over

2   us -- then that means he has the right to appoint and dismiss.

3   Not all churches give that right to the bishop.

4        They will give the pastoral right to the bishop, which

5   means the bishop has a right to pull the pastor, but not replace

6   him at the church.

7   Q.   Understood.

8        Is there someone above Bishop Thomas?

9   A.   His board.

10  Q.   His board.

11       Who -- with respect to His Tabernacle, who is the ultimate

12  decision-maker there in terms of business decisions?

13       Like, if you are deciding whether or not to build a new

14  church building, who would make that decision?

15  A.   The trustee board.  In New York State, it's a demanded

16  increment of three.

17  Q.   There are presumably certain -- are there certain decisions

18  that can be made without the trustee board at His Tabernacle?

19  A.   The trustee board deals with only finances.  I then have a

20  staff.  We do staff meetings Tuesdays at 10:00 a.m., and we deal

21  with spiritual issues in the staff.

22       Other business issues, I can make decisions up to a certain

23  amount of finances without the trustees' approval.

24  Q.   As an example to -- when making the decision to be -- to

25  have His Tabernacle as a plaintiff in this lawsuit, was that

 1  decision made by the trustee board?

 2  A.   It doesn't need to be.  It was not a financial issue.

 3  Q.   That decision was made by you?

 4  A.   Correct.

 5  Q.   You are aware that on July 1st, 2022, or thereabouts, New

 6  York passed the Concealed Carry Improvement Act that we're here

 7  to talk about today?

 8  A.   I was quickly let known by the safety security team.

 9  Q.   What did they tell you?

10  A.   They said this law that was enacted on September 1, they

11  are no longer going to be allowed to carry concealed.

12  Q.   Did you ever discuss whether the law contained certain

13  exceptions for individuals who would be allowed to concealed

14  carry at His Tabernacle?

15  A.   I didn't delve into the law much, except for when they told

16  me that.  I just knew at that point, it put my congregation in a

17  dangerous position.  So that's when I contacted First Liberty.

18  Q.   After the law was put into effect, did you make any

19  inquiries into whether or not you could hire armed security for

20  His Tabernacle?

21  A.   Well, I mean, I don't know if you know what that means.

22  That is -- that means funds are going out of the church.

23       And a lot of people don't -- because many people are from

24  different spiritual backgrounds or church backgrounds, our

25  church runs simply on what we call tithe and offerings.

1      So what that means is people free -- freely give from their

2  paycheck a tithe, which is a tenth, which is in the scripture.

3  It's Malachi, Chapter 3.

4      If they don't give their tithe, then there is no money.  We

5  don't have a beer tent.  We don't do Bingo.  If people don't

6  give, there is no money.

7      And so even -- even now, it's -- we're $38,000 negative in

8  our general fund because -- I'll give you an example.  I had a

9  young family call me this last week, and they said:  Pastor,

10  we're in a very bad spot.  We have always given.  We've always

11  given, but inflation, the price of gasoline in New York State,

12  the price of groceries in New York State has gone up so much

13  that what we give God every week, now we have to make a choice

14  to put that groceries and gasoline on a credit card or pay our

15  tithe.

16      Wow.  So I believe what you are asking is have I inquired

17  on -- on hiring.  Dear Lord, I'm hoping people still give.

18  Q.   Following the passage of the CCIA, did you make any

19  announcements or inquiries at the church to see if there were

20  any individuals still permitted to carry, who would agree to

21  carry at His Tabernacle?

22  A.   No.  I don't make any announcements from the pulpit that

23  are governmental.  I don't make political statements from my

24  pulpit.

25      I feel if someone is going to leave the church, they are

1   not going to leave because I'm politically based, but that they

2   are going to leave because I've offended them with the gospel.

3   Q.   How do you communicate, for example, certain administrative

4   to the guests and members?

5   A.   I don't make any announcements according to administrative

6   decisions.  They are made to a department head.

7   Q.   I can give an example, and maybe that will help.

8   A.   Sure.

9   Q.   So for example, the church sometimes has special events?

10  A.   Yes.

11  Q.   How do you disseminate that information that you're going

12  to be having a special event to all the members and guests?

13  A.   In today's world, we use social media.  Sometimes we will

14  cut a TV commercial and throw it on.  But the majority of the

15  time, it's social media.

16  Q.   Is there a bulletin that gets distributed at the end of

17  worship services?

18  A.   No.

19  Q.   I'm going to ask you a couple questions about your

20  experience carrying a firearm prior to the CCIA's enactment.

21       I'm not going to preface it every time I say that because

22  I -- we're talking about this time period, but that's the time

23  period I'm talking about.

24  A.   Okay.

25  Q.   Prior to the passage of the CCIA, you carried a firearm at

1  His Tabernacle, correct?

2  A.   Correct.

3  Q.   Did you carry a firearm every time you went to His

4  Tabernacle?

5  A.   I won't say every time.  I think that nobody does

6  everything every time, but I carried the pistol.

7  Q.   We talked earlier, one time you didn't carry is you usually

8  don't carry while you're preaching, correct?

9  A.   I don't carry while I'm preaching.

10  Q.   Are your worship services, are they only on Sundays?

11  A.   The main worship service is on Sundays.

12  Q.   Do you carry your firearm when you are not -- when you are

13  going to be preaching, does that mean you don't carry a firearm

14  to church on those days?

15  A.   Weekdays, I always carry.  I'm not going to use the word

16  always.  The majority of the time.  You know, sometimes I've

17  just forgotten.

18       But, you know, the majority of the times, I would carry my

19  weapon because down the administrative hallway, anybody can show

20  up.

21       I think it was two months ago, a very strange man walked in

22  the front doors, walked down the whole hallway.  Nobody knew who

23  he was.

24       He walked the entire circumference of the inside of the

25  church, because we have no safety security team during the week

1  because they work regular jobs.

2      I mean, they are volunteers.  This is what they believe

3  their ministry is.  So we didn't know who he was.  And all of a

4  sudden, he disappeared.

5      I remember one night, I got done counseling at 9:30 to

6  10:00 o'clock at night -- I do premarital counseling after I

7  teach Rock Solid Faith on Thursdays.

8      And, I don't know, they should have turned all the lights

9  off.  They didn't turn the lights off.  So I had to go to the

10 children's wing to turn the lights off.

11     I'm walking down that wing, and the hair on the back of my

12 head stood straight up.  I just knew somebody was there.  I

13 didn't see him.  I didn't hear him.

14     Turned the lights off -- and I was carrying that night.

15 Turned all the lights off and left.

16     And a man -- we have cameras -- a man stepped out from one

17 of the rooms in the camera on the children's wing, after I had

18 left and went out the back door.

19 Q.  Just speaking on Sundays, do you preach at -- there is two

20 services on Sundays?

21 A.  Yes, sir.

22 Q.  Do you preach at both services?

23 A.  Majority of the time.

24 Q.  And what time are the two services, again?

25 A.  9:00 and 11:00.

1   Q.   So you start at 9:00.  How long do services usually last?

2   A.   An hour and a half.

3   Q.   Hour and a half.

4        So you get a half-hour break in between?

5   A.   Um-hum.

6   Q.   You testified earlier that you don't carry when you're

7   preaching?

8   A.   Correct.

9   Q.   So on Sundays when you go to preach, you do not carry a

10  firearm at His Tabernacle, correct?

11  A.   Correct.  I don't need to because the safety security team

12  is there, and they are very well trained and placed in strategic

13  spots.  We live in a very different world.

14  Q.   We talked about some of the other events that you have

15  going on during the weekday.  Bible study-type events.

16       Do you participate in those usually?

17  A.   No.  I'm -- the great part about a church being the size

18  that it is, I don't have to participate with the majority of the

19  things that happen there.  I'm there on Thursdays for Rock Solid

20  Faith teaching.

21  Q.   Do you carry during Rock Solid Faith teaching?

22  A.   I don't need to because one of the safety security teams is

23  always shadowing me.

24  Q.   Is that person carrying?

25  A.   Yes.

1  Q.    Who is -- does that person change, or is it always the same

2  person?

3  A.    It does change, but I have a consistent gentleman.  His

4  name is David Pruitt.  He is not a police officer, has no

5  background as a police officer.

6        He was prior Marine, but he is literally just donating his

7  time.  And when he can't be there because of work or a prior

8  commitment, then one of the other team members will try to fill

9  in.

10       I have had times when -- because they are all volunteers,

11 there's just no way for them to always be there.  I have had

12 times when I've not had somebody there.

13 Q.    We talked about the period of time when your Pennsylvania

14 license had lapsed.  Do you remember that?

15       Were you sometimes still going down to Mansfield during

16 that period of time?

17       I know -- it seemed like there was maybe some overlap when

18 your wife was ill.

19 A.    I really didn't go down often.  It was very, very rare.  I

20 had an actual pastor -- at that point in time, it wasn't live

21 streamed.

22       I actually had a live pastor there who preached every

23 Sunday and oversaw the entire campus, so I didn't even need to

24 go down at that point.

25 Q.    When you say live streamed -- we had talked about that

1  earlier -- does that mean on Sundays at Mansfield, they are

2  doing a live stream of you preaching from Horseheads?

3  A.    Correct.

4  Q.    I understand now.  Thank you.

5       Now, I'm going to ask you a couple of questions after the

6  CCIA's passage.

7       Following the CCIA's passage -- we talked about that

8  September 1st date -- did you stop carrying a firearm when you

9  went to His Tabernacle?

10 A.    Yes.  And I've not carried a firearm there since.

11 Q.    Are you aware of an order this Court issued -- let me ask

12 you this first:  Are you aware of a case called Hardaway versus

13 Nigrelli that was brought by a different group of pastors

14 challenging this portion of the Concealed Carry Improvement Act?

15 A.    I heard about them, but my perspective wasn't the Second

16 Amendment.  My perspective was the First Amendment.

17 Q.    You are aware of that case, though?

18 A.    I haven't followed the case.  I just know that they were in

19 that case.

20 Q.    Are you aware of an order this Court issued on

21 November 3rd, 2022, in that case that prohibited Superintendent

22 Nigrelli from enforcing the Concealed Carry Improvement Act

23 places of worship provision?

24 A.    My staff told me about -- the safety security team did let

25 me know that they were able to carry at that point in time.

1    Q.    Did you begin carrying after that decision?

2    A.    I did not.  Like I -- I will reiterate.  I have not carried

3    since that law in our church at all, not once.

4    Q.    After the passage of the CCIA, did you call the Chemung

5    County district attorney, Weeden Wetmore?

6    A.    I did not.

7    Q.    Do you know if any member of your security team called

8    Mr. Wetmore?

9    A.    I don't believe so, but, again, that is just assumption.

10   None of them told me they had.

11   Q.    We talked a little bit about the order that this court

12   issued in Hardaway versus Nigrelli.

13         Are you aware of a subsequent order that was issued by the

14   Second Circuit?

15   A.    No.

16         **MR. MAGUIRE:**  Give me one second.  I'm just going to

17   grab something.

18   **BY MR. MAGUIRE:**

19   Q.    There are other members of the pastoral team at His

20   Tabernacle, correct?

21   A.    Yes.

22   Q.    Do you know if any of them have carry licenses?

23   A.    Some of them do.

24   Q.    Do all of them?

25   A.    No.

```
 1   Q.   Do you know if the individuals that have carry licenses
 2   carried their weapons at His Tabernacle prior to the passage of
 3   the CCIA?
 4   A.   I assume.  One is my son; I know he has.
 5   Q.   Is that Chad?
 6   A.   No.  That would be Cody.
 7   Q.   Cody.
 8        So Cody has a concealed carry license?
 9   A.   Right.
10   Q.   And prior to the passage of the CCIA, he carried a firearm
11   at His Tabernacle?
12   A.   Correct.
13   Q.   Do you know if his --
14   A.   I don't know how often.  Again, I'm not patting them down;
15   and when you use a paddle holster, you can't tell.  You can't
16   tell who is carrying or not carrying.  It's called printing.
17   You don't want to print.
18   Q.   You testified a second ago that not all individuals that
19   are members of your pastoral team have a carry license, correct?
20   A.   Correct.
21   Q.   And not all of them carry at church, correct?
22   A.   Correct.
23   Q.   As the senior pastor, when those individuals do not carry
24   or have not done the work to get a carry license, do you feel
25   they are failing their religious obligation to protect the flock
```

1  or the congregation?

2  A.    Each person, I believe, has their right to believe as they

3  will.  I don't dictate even to my staff.

4       So, like, when I teach Rock Solid Faith and I teach a

5  doctrine that has a multiplicity of belief systems to it, I

6  teach all of the belief systems and allow them to personally

7  choose which ones they want to apply to themselves.

8            **MR. MAGUIRE:**  I think that's all I have, Your Honor.

9            **THE COURT:**  Thank you, Mr. Maguire.

10           Any questions from anyone on the phone?

11           **MR. WALKER:**  This is Jeff Walker from the County of

12  Chemung.  I just have one.

13

14                **CROSS EXAMINATION BY MR. WALKER:**

15

16  **BY MR. WALKER:**

17  Q.    Good morning, Mr. Spencer.  You testified earlier about an

18  incident where a neighbor -- you said you didn't see him, but

19  you believe that there were shots fired and some police people

20  came out.

21       Do you remember talking about that?

22  A.    Yes.

23  Q.    Can you tell me the location of that incident?

24  A.    My residence at that point was 2597 Wyncoop Creek Road in

25  Erin, New York.  The neighbor was across the street, but I do

 1    not know their address.

 2    Q.    Okay.

 3            **MR. WALKER:**  Thank you.  That's all.

 4            **THE WITNESS:**  Yes, sir.

 5            **THE COURT:**  Anyone else on the phone?

 6            Any redirect, Mr. Ezell?

 7            **MR. EZELL:**  Yes, Your Honor, briefly.

 8

 9                    **REDIRECT EXAMINATION BY MR. EZELL:**

10

11    **BY MR. EZELL:**

12    Q.    Pastor Spencer, I want to just clarify some terminology

13    things from your conversation with my friend on the other side.

14            Are you familiar with, for example, the structure of, like,

15    the Anglican Church?

16    A.    No.  Not the structure.

17    Q.    Are you -- are you familiar with the -- who the archbishop

18    of Canterbury is?

19    A.    Through education only.

20    Q.    Do you know anything about the sort of oversight role that

21    the archbishop of Canterbury has over churches within that

22    denomination?

23    A.    I do not.

24    Q.    Okay.  You talked about Bishop Thomas with my friend

25    earlier.

1        Do you need Bishop Thomas's permission to determine what
2   people can and cannot bring to His Tabernacle Church?
3   A.    No.
4   Q.    Okay.  Pastor Spencer, are you aware that the statute at
5   issue in this case makes certain allowances for individuals like
6   law enforcement, active-duty military, retired law enforcement,
7   that those folks potentially could carry inside of a church?
8   A.    I've actually just learned that in the last few days, so --
9   Q.    Okay.  Do you have a requirement that someone fall into the
10  bucket of law enforcement, active-duty military, retired law
11  enforcement to be a member of the volunteer security team?
12  A.    Are you asking is that a requirement?
13  Q.    Yes, sir.
14  A.    It is not a requirement.
15  Q.    Okay.  And I think you discussed this with my friend, but
16  some of the people on your security team aren't -- their
17  full-time job is not working in law enforcement and the
18  military?
19  A.    Majority of them are not.
20  Q.    Okay.  Why can't you just use the, I think you said, two or
21  three people on the team who do fall into that bucket to provide
22  all the church's security needs throughout the week?
23  A.    Well, there is only two that I know of, and they work a
24  regular job.  They work a lot of hours.  And we're in church
25  often.

1      I mean, something is happening every single day.  And,

2  sadly, there are still voids.

3      Monday nights, there is nobody there for anybody.  And if

4  something happened that was strange or dangerous, there is no

5  one there.

6      We -- you know, it's -- Tuesdays, I don't believe there is

7  anybody there.

8      Wednesdays, there is definitely somebody there because of

9  all the children we bus in.

10     Thursdays, there is somebody there because of all the

11 people that are there.

12     And Sundays, they are there.  But, I mean, I'm talking to

13 the team, and have been, about expanding the team.  There is a

14 need to expand the team.

15     I have a situation happening right now where, for the last

16 year, I have been receiving a manila envelope once or twice a

17 week.

18     And in that manila envelope is a piece of paper, and it's

19 laminated.  And it's anything from an inferred threat, to

20 pornography, to the craziest things you could ever imagine that

21 make no sense.

22     And finally, after, like, four months, the team wouldn't

23 even put them on my desk.  They just take them up and put them

24 in a file.

25     We have tried to find the guy.  We can't find the guy.  I

1   just -- Sunday, just signed another cease and desist.  We can't

2   find the guy.

3       I mean, that's just one of the things that brings concern.

4   We had another gentleman years ago where he was sending letters

5   at least twice -- at least twice a week.  One was, "I'm going to

6   kill you and the million people in your church," and our guys

7   found him.

8       And we had to get the Pennsylvania State Police involved

9   because he was over the border.

10  Q.   Pastor, we just talked a second ago about how you have a

11  security team; a limited number of people on that team, you

12  know, maybe work in law enforcement or are military or retired

13  from that type of work; and you have other security people

14  throughout the week.

15      Why can't you just hire State police officers to be on

16  church grounds the other times that you don't have volunteers

17  that are able to serve?

18  A.   I'll be honest with you, even that statement brings an

19  irritation in -- in two forms.

20      Number one, the people of the church, my job is to equip

21  them for the work of the ministry.  If they're safety security

22  team, that's what they are called to do.  They have special

23  gifts called the gift of discernment that's aimed towards that.

24      The second factor is, who -- how many children don't I bus

25  in?  How many kids don't I feed?

1          During the summers, do we not go to the park because I've

2     got to hire State police officers to come and protect our

3     church?

4          There's something in the Bible called a hireling, and the

5     shepherds sometimes -- the Bible talks about a hireling is a

6     hired shepherd.

7          And when real danger comes, they don't protect the sheep

8     because they are protecting their own assets.  And that's why a

9     shepherd is different from a hireling.

10          I don't have anything against the State police officers

11     or -- but they don't have the same care and concern and love for

12     the people.

13          They don't have the same gifting -- spiritual giftings.

14     They don't have the same spiritual calling.

15          And, like I said earlier, right at this very moment, I'm

16     $38,008 in arrears.  Now, we have money in the bank, but our

17     general fund is $38,008 negative.

18          Where am I going to hire these people?  Where is the money

19     coming from?

20          Well, that means I've got to stop helping people.  I've got

21     to stop being a blessing to folks.  I've got to stop feeding.

22     I've got to stop TV, where the shut-in has no other option.

23     People in the hospital.

24          Well, we have a state penitentiary -- we had two; one shut

25     down -- they watch the program.  I get letters from people in

1  the prison.

2      I'd have to stop that if I had to hire people to come and

3  protect every time the doors were open.

4  Q.   Pastor, you mentioned a moment ago, special giftings of

5  people that are on your security team.

6      Can you maybe talk for a minute about how that relates to

7  what you were discussing with my friend, about how you have some

8  members of your pastoral staff who don't -- who don't carry at

9  the church?

10  A.   Some of them just didn't even grow up near weapons or

11  anything of that matter, but when somebody -- the Bible says,

12  again, fitly formed and joined together.  That each one of us

13  have gifts.

14      I found that the people who have the gift for safety

15  security team, they have a real passion as they watch.  They see

16  things that nobody else sees.

17      We had a man walk in one day to the church who -- and the

18  gentleman from Chemung will know what I'm talking about -- who,

19  when he was in high school, had pipe bombs, and he was going to

20  blow up the school, and he got caught and went to jail.

21      Got out of jail.  On a Sunday morning, he walked into the

22  foyer and my team buzzed.  They just buzzed.  They just knew

23  something wasn't right; something is wrong with this guy.

24      They didn't know who he was because, you know, he -- many

25  years in jail, facial feature changes.

1    And he -- they researched, they found out who he was, and

2  he came to -- they watched him closely, but he was in church for

3  a period of time and then joined the local satanic coven.

4    I mean, it's like, this is real stuff, and I just think

5  that there is a lack of understanding.  And as a church, it's my

6  responsibility to make sure that there is at least care for the

7  people, that they are safe.

8  Q.   Pastor, if you were forced to hire outside security, bring

9  in state or local government officials to sort of keep the

10  church safe, how would that impact your desire to use your

11  giftings to protect your flock?

12  A.   Well, I'm no longer equipping saints for the work of the

13  ministry.  I'm hiring from the outside.

14    It's no longer about ministry.  It's all about getting a

15  hireling.  You got to hope that hireling is really loving the

16  people, because if something occurs, are they busting out the

17  door and running for safety or are they taking care of business

18  themselves.

19         **MR. EZELL:**  Thank you, Pastor Spencer.

20         Nothing further, Your Honor.

21         **THE COURT:**  Thank you.

22         Mr. Maguire, anything else?

23         **MR. MAGUIRE:**  Just two.

24         **THE COURT:**  Okay.  I will count them.

25

1                    **RECROSS EXAMINATION BY MR. MAGUIRE:**

2

3   **BY MR. MAGUIRE:**

4   Q.   We talked a little bit about the potential cost of hiring

5   security personal.

6        Have you made any inquiry since the passage of the CCIA

7   into the precise cost that it would be to the church to hire,

8   for example, a State police or a law enforcement to act as

9   security personnel at His Tabernacle?

10  A.   I didn't, and I'll tell you why.  I want to make sure that

11  I don't have to let anybody go.  I can't afford to lose a

12  minister to hire a State police officer to come.

13  Q.   Have you made -- and we talked a little about it -- you've

14  used social media to disseminate administrative messages to the

15  congregation.

16       Have you made any announcements on social media or any

17  other mechanism you use to speak to your congregants asking for

18  current law enforcement, retired law enforcement, current

19  active-duty personnel to volunteer to provide armed security at

20  His Tabernacle?

21  A.   From within the church itself, sir?

22  Q.   On -- so that you can disseminate this to all your

23  congregants.

24  A.   No, sir.

25            **MR. MAGUIRE:**  That's it, Your Honor.  Thank you.

1            THE WITNESS:  You're welcome.

2            THE COURT:  Anybody left on the phone?  Going once,

3    twice.

4            Thank you very much, Pastor.

5            THE WITNESS:  Thank you.

6            THE COURT:  You may step down.

7                (Witness Excused)

8            THE COURT:  All right.  We're going to take another

9    quick break and then I've got some questions for whomever is

10   taking the questions.  Okay?  Thanks.  How about 11:25?  Eight

11   minutes.

12

13       (Recess at 11:17 a.m., until 11:24 a.m.)

14

15           THE COURT:  I'm going to jump right into the free

16   exercise argument.  And then at the end, if there is really some

17   compelling Second Amendment argument, Mr. Maguire, that you need

18   to make --

19           MR. MAGUIRE:  I do not.

20           THE COURT:  -- to try to get me off the dime now.

21           MR. MAGUIRE:  No.

22           THE COURT:  All right.  So what is the standard?

23   Look, I'm a novice -- I'm a free exercise novice; I haven't

24   spent this much time on the Free Exercise Clause.  I confess.

25   So what is the standard?

1          If you read the newest cases from the Supreme Court,

2     from a COVID era, they are a little bit truncated and almost

3     seems a little bit to me that the Court is parachuting in with a

4     short amount of time and writing the best they can, like we do

5     sometimes, in a short amount of time.

6          But if you look at some of the older cases, Lukumi,

7     the Kennedy case, that was a more robust decision.  The standard

8     is a little bit more wordy.

9          So what is the standard?  And let's start with -- who

10    is talking from plaintiff's side?

11         **MS. MURPHY:**  I will be.

12         **THE COURT:**  What is the standard and why is it met

13    here?  And you can remain seated the whole time.  Yeah.  You

14    don't have to get up.

15         **MS. MURPHY:**  Thank you.  So I think the standard here

16    is strict scrutiny, and the reason I think it's strict scrutiny

17    is because what we have here is not a facially neutral law.

18         It's a law that, by its terms, Subsection C, applies

19    to a facility if and only it's a facility that's used for

20    religious purposes, for worship or religious observation.

21         And long before you get to cases like Roman Catholic

22    Diocese and Tandon, the Supreme Court had said, long before

23    that, that if you don't have a facially neutral law, the law,

24    instead, singles out religion as such, then you are always in

25    strict scrutiny.

1          And so we think that is the right standard here, and I

2    think what Tandon added to the analysis is Tandon actually was a

3    facially neutral law.

4          But the Court said even their strict scrutiny applied,

5    because while it was neutral on its face, it had enough

6    exceptions and all of these other kind of components of it that

7    meant that it didn't actually operate in a neutral and generally

8    applicable way.

9          And so what Tandon made clear is, even if you are

10   facially neutral, that doesn't necessarily mean you don't have

11   strict scrutiny.

12         But when you have something like the law -- the

13   restriction in Roman Catholic Diocese or, you know, going back

14   to earlier laws long before Smith, where you're talking about

15   things that single out religion as such, like in the recent

16   Kennedy versus Bremerton School District case, that's -- that's

17   automatically in strict scrutiny land.

18         **THE COURT:**  So I maybe should have said a little bit

19   more in the question, and you are right where we need to be on

20   one of my other questions, but I -- I should have given you

21   more.

22         What I meant by jumping right into the middle of it is

23   they don't -- the newer cases don't spend much time talking

24   about whether there is a burden on a sincere religious brief or

25   practice, because I think maybe because it's assumed, like going

1  to a place of worship, in and of itself, is --

2          **MS. MURPHY:**  Sure.

3          **THE COURT:**  -- or praying on the middle of the -- you

4  know, praying -- those are sincere beliefs, and so the Court

5  kind of, like I said, parachutes right into the middle of the

6  analysis because it's assumed that what's being burdened is a

7  sincerely held belief or practice.

8          Is that the right way I'm looking at it?

9          And in other words, then if you are looking at Lukumi,

10  for example, you've got an animal sacrifice, is the practice,

11  and the Court does what it does to say, you know, we're not

12  really here to question the sincerity -- nobody is questioning

13  the sincerity of it as -- as maybe abhorrent to some people as

14  it might be, they are not questioning the sincerity.

15          So that's what I wanted you to start with.  Start a

16  little bit farther back.

17          **MS. MURPHY:**  Sure.  And I think here, what makes it

18  clear, there is a burden on religious exercise is the fact that

19  this is a restriction on the ability to go to a house of

20  worship.  And you go to house of worship to engage in religious

21  exercise.

22          And so if you have a law that's by its terms,

23  applies -- you know, I mean, I understand, obviously, there is

24  other provisions of this law -- but Subsection C, by its terms,

25  applies if, and only if, you are at a place where worship is

 1   conducted.

 2        I take the Court's jurisprudence to basically say, at

 3   that point, it's clear.  There is a burden on religion because

 4   you are saying you can't go practice your faith unless you

 5   comply with this law.

 6        And if you take, for example -- you know, if the State

 7   passed a law that said something like, you have to pay a massive

 8   fee in order to go to church, I don't think the Court has to

 9   stop and ask, like, would you have a sincere religious belief

10   that you shouldn't have to pay fees.  What's been burdened is

11   your ability to go to church.

12        **THE COURT:**  Right.

13        **MS. MURPHY:**  It's all more complicated if you have a

14   facially neutral law because, then, you need to show that the

15   facially neutral law does apply to your faith.

16        But when you are singling out the faith as such, I

17   think that makes that threshold part of the analysis quite easy.

18        **THE COURT:**  So what if -- so any time that a statute

19   ventures into this realm and speaks to places of worship, which

20   is rare -- statutes -- State statutes, Federal statutes don't

21   typically legislate in this area overtly.

22        Whenever that happens, automatically strict scrutiny,

23   or do we need to do anything else?

24        In other words -- maybe this isn't the best example.

25   I worked on it a little bit yesterday as I was walking through

1   the hallway -- but what if the legislation said that everybody

2   has to have a mailbox, but places of worship have to have a

3   bigger mailbox?  Or the numbers on the mailbox need to be of a

4   bigger font for places of worship?

5        Does that even -- I mean, do we do strict scrutiny

6   there?  What's the difference, right?

7        **MS. MURPHY:**  I think the answer is yes.  I think the

8   answer is, if you have a law that, by its terms, singles out

9   religion for a burden, you know, as -- if you go back to

10  Justice Kavanaugh's decision in the Calvary Church case, he

11  talked about, you know, it's a little different if you have a

12  law that gives special privileges to religion.

13       But if you have a law that says religion has to do

14  something that others don't, you know, the State can certainly

15  come in and try to make an argument, as I assume they will

16  today, that, yes, we may have legislated in religious terms, but

17  let us explain to you why.

18       If you look at the rest of the law, we think that it

19  actually regulates everybody.  You know, we obviously disagree,

20  but -- you know, they can make those arguments.

21       But I think it becomes the State's burden to

22  demonstrate either that it hasn't really singled out religion or

23  that, to the extent it has treated religion differently than

24  anybody else comparable, that it satisfies strict scrutiny.

25       **THE COURT:**  So in other words, Tandon, Roman Catholic

 1    Diocese of Brooklyn, you know, your position is they --

 2    basically, they mean what they say, right?

 3          If you are creating a special burden, of any sort,

 4    then we're in strict scrutiny, right?

 5          **MS. MURPHY:**  Yeah.  And I think the thing that Tandon

 6    adds most clearly, that is actually quite relevant to this

 7    particular case and this particular law is, if the State wants

 8    to try to say:  Yes.  We may have, you know, regulated religion

 9    as such, but don't worry, we've treated a lot of other types of

10    entities the same way we're treating religion.

11          What Tandon says is, it's not enough that you treated,

12    you know, some other entities the way you treated religion.

13          You have to have treated every comparable entity out

14    there the same way.  And if there is anyone you are treating

15    better, then you have to satisfy strict scrutiny.

16          So that's really the piece of it that they add because

17    they did deal with -- you know, a lot of the COVID restrictions

18    were a little bit more in the vein of this, where they're

19    regulating religion as such, but that's not the only thing

20    they're regulating.

21          **THE COURT:**  So, Mr. Maguire, the quote, I think, that

22    we are kind of dancing around in Tandon is the Government

23    regulations are not neutral and generally applicable, and,

24    therefore, trigger strict scrutiny under the Free Exercise

25    Clause whenever they treat any comparable secular activity more

1    favorably than religious exercise.

2          Is that the test?  And do you have a problem with

3    meeting that test here today?

4          **MR. MAGUIRE:**  I -- I agree that that's the second part

5    of the test.  I think what plaintiffs are attempting to do is to

6    compress the free exercise jurisprudence into a two-part test in

7    this case, right?

8          In -- because you can look at cases -- and I direct

9    the Court -- just recognizing that it's not binding on this

10   Court, but for a good explanation of how to walk through the

11   free exercise test, would be the Redlich case from the Eastern

12   District of Missouri, where the first part of the test is -- as

13   the Court observed, is to ask the question whether or not the

14   regulation is a substantial burden on the observation of a

15   central religious belief.

16         That language comes from the Second Circuit, and that

17   language stems from the language of the Free Exercise Clause

18   itself in the Constitution, which prohibits -- you know,

19   prohibits us from infringing upon the free exercise of religion.

20         So I think Your Honor's example was a good one.  When

21   you have a regulation, even if directed at -- specifically at a

22   religious institution, if that is only focused on an

23   administrative function of that religion -- the mailbox being a

24   good example of that -- you would not be in strict scrutiny

25   because there is no substantial burden on any of that

1  organization's central religious beliefs.

2         Assuming, of course, that they have no central

3  religious beliefs associated with mailboxes, right?

4         So that -- the need to satisfy that first, right?

5  That this law, which our position is, regulates a secular

6  activity, right?

7         The regulation of firearms and the carrying of

8  firearms is a secular activity, even when regulated at church in

9  the same way that any manner of loss that regulate what

10  individuals can possess, whether it be drug possession,

11  dangerous chemicals possession, all of those types of laws

12  regulate secular activities, even when they regulate

13  individual's actions within the sanctuary or within the church.

14         Those are still secular laws, and there is still a

15  requirement to show that there is a substantial burden on the

16  central religious belief.

17         After you've satisfied that, right, in cases, that's

18  when you get to a neutral and generally practical full standard.

19         It's at that point at which -- can -- the State can

20  try to save itself again.

21         We recognize that this law does infringe on a

22  religious belief, but we recognize that the State has certain

23  powers under the Constitution that would allow us to regulate a

24  religious belief or -- or -- not regulate a religious belief,

25  but make more burdensome a religious practice, provided that

 1    it's neutral and generally applicable.

 2         **THE COURT:**  So if Pastor Spencer has a sincerely held

 3    belief about protecting his flock, isn't there a burden on that

 4    belief when you are telling him that he can't rely on everybody

 5    in the congregation to protect themselves and each other

 6    anymore?

 7         He doesn't have the same choice that a mall might have

 8    or a hair salon or a coffee shop or whatever the other examples

 9    are?

10         Or you are telling him that if he's going to protect

11    his flock, he's got to do it by a knife or a sword or pepper

12    spray or hire a security guard or -- or designate people as

13    keepers of the peace.

14         Aren't you impairing his ability to keep his flock

15    safe?

16         **MR. MAGUIRE:**  We don't believe so, Your Honor.  And,

17    again, I'm going to refer to this Redlich decision, because I

18    think it provides a good typology and the only kind of analogous

19    typology -- type of case that I can find in this -- when I was

20    researching is, in that case, you had a regulation that --

21    basically, it's a food and safety regulation, right?

22         It made you get a permit if you were going to be

23    distributing food in public.  And it made it burdensome -- you

24    had to have handwashing stations and such if you were going to

25    be distributing certain types of food, right?

1           So if you were going to be distributing meat, you had

2     to have certain types of food.  So religious organizations filed

3     lawsuits challenging that regulation, saying that it was a

4     substantial burden on their -- on their religious obligation to

5     provide food to the poor.

6           And the Court -- in the substantial burden analysis,

7     right, in that decision, you have the different sections broken

8     out -- finds that there was no substantial burden on the

9     religious belief and the religious requirement to distribute

10    food because the law allowed for alternative mechanisms to

11    fulfill that religious belief.

12          In that case, they could distribute food that was not

13    meat.  They could pay the permitting expenses and get a permit

14    to distribute the food.

15          And those Courts found that that was still not a

16    substantial burden, right?  I mean, it's not just a burden.

17    There's that adjective associated with it of "substantial" on

18    that poor religious belief.

19          And in the same manner here, the State's position is

20    that the law itself allows for alternative mechanisms for

21    Pastor Spencer to protect his flock.

22          He can hire security -- and not just protect his

23    flock.  It provides alternative mechanisms for armed protection

24    of his flock.

25          It allows him to hire security officers as -- as, you

1   know, many churches do.

2        It allows him to designate the individuals at his

3   church who are already law enforcement to carry a gun.  It

4   allows retired law enforcement to carry a gun.

5        And through those mechanisms, he's still able to

6   fulfill his religious obligations of protecting his flocks.

7        **THE COURT:**  There's a case from the Second Circuit

8   that I spent time with, and it's not in any of the papers, but

9   it's called Central Rabbinical Congress of the United States and

10  Canada versus New York City Department of Health and Mental

11  Hygiene, 763 F.3d 183 from 2014.

12        And there, the case is addressing the City

13  regulation -- Health Department regulation.

14        I don't know if you are familiar with this case about

15  how a bris ought to be done and whether the rabbi can do oral

16  suction or not.  And a Court wasn't too impressed, I don't

17  think, with the argument that there's other ways to do a

18  circumcision.

19        So other ways to do it, you know, sometimes are -- who

20  is the State to say, you know, you've got maybe ten ways, but

21  we're only going to let you do seven ways?

22        **MR. MAGUIRE:**  I think probably one of the distinctions

23  that can be made in that -- I have not read that case, Your

24  Honor.

25        **THE COURT:**  Yeah.  I assumed so.

1          **MR. MAGUIRE:**  So I'm going to assume what a potential

2    distinction would be, is that in Judaism, right, it's not just

3    the -- it's not just the circumcision that is a religious -- the

4    religious act, right?

5          It's not just the circumcision itself that's a

6    religious act.

7          It's doing a circumcision in the way that the Jewish

8    practice requires it to be done, you know, by a rabbi, in these

9    sort of -- in whatever prescribed location that faith requires.

10          And I think that's different than here in which, in

11    Pastor Spencer's own declaration, there is never any sort of

12    statement that it is a sincerely held religious belief that he

13    has to carry a gun, specifically, to protect his flock, right?

14          There is a belief about protecting his flock, but it's

15    not about needing to carry a -- carrying a firearm.

16          **THE COURT:**  Right.

17          And what about that point, Ms. Murphy, that

18    Pastor Spencer has a sincerely held belief, and the congregants

19    do, that they need to protect each other as well, but no one

20    says that you have a sincerely held religious belief to be

21    armed, specifically with a firearm?

22          What about that maybe shortcoming?

23          **MS. MURPHY:**  Well, I'm not sure that's quite how I

24    understand Pastor Spencer's views.

25          I mean, I believe him -- I understand his belief to

1  be, I have a duty to protect the flock, and, therefore, that

2  means I have a duty to protect them in the means that I can,

3  which, for me, is carrying a firearm.

4       And, you know, it's not -- I don't -- certainly, the

5  claim is not that to be a part of this church, every pastor

6  needs to be somebody who can carry a firearm.

7       But the belief about having a communal body who can

8  use their gifts is, if this is one I have, and I have the

9  ability and the legal right through a concealed carry license to

10  carry, then I have a religious obligation to do so.

11       But I also do want to be clear that we -- while my

12  clients absolutely do have a sincere religious belief about the

13  need to protect the flock here, I don't think that that's

14  necessary for there to be a burden here on free exercise rights.

15       Because there is a burden on free exercise rights by

16  virtue of the State imposing direct restrictions on the ability

17  to engage in worship, singling out worship, for restrictions

18  that don't apply to other activities.

19       And what is quite different, the Redlich case that was

20  just being discussed, that was a facially neutral law.

21       And so the burden was then on the religious on --

22  under current, there is jurisprudence and the Smith case, when

23  you really have a facially neutral law that applies to

24  everybody, then you are in a different position and you need to

25  come in an explain how I know you are just trying to regulate

1    sanitation, but it ends up having an effect on my church.

2         Quite different when you have a law that says, but its

3    terms, you can carry a firearm some places and other people can

4    decide whether you can carry them on their private property, but

5    you can't make that decision if you're a church.

6         **THE COURT:**  Are the only other analogs where a

7    government is regulating, in any way, a religion, those

8    COVID-era restrictions, or are there other analogs out there in

9    the annals of history?

10        **MS. MURPHY:**  I mean, I confess I'm not familiar with

11   the bris case, but that sounds an awfully lot like they were

12   doing a bit of a direct regulation there.

13        I mean, Church of Lukumi, I think that the Court

14   ultimately decided there is this law purports to be facially

15   neutral, but you are actually clearly trying to regulate because

16   you have a disfavored view about a religious practice.

17        I mean, you know, more often, I think you run into

18   this in situations like the Kennedy case, where it's not a law,

19   it's Government taking action on the basis of religion, often

20   because they are worried about Establishment Clause concerns and

21   things like that.

22        So you do have plenty of instances of the Government

23   trying to single out religion for disfavored treatment, but what

24   you also have is a long series of Supreme Court cases over the

25   past two decades where they rejected pretty much every single

 1  effort in which the Government has tried to say, we won't let

 2  you do something precisely because it's religious or we are

 3  going to require you to change your religious belief, or

 4  whatever it may be.

 5       So I do think here, just the bare fact that we have a

 6  law singling out a religion distinguishes it from pretty much

 7  all of the cases that the State is citing in its brief, which

 8  almost all involve facially -- loss of or at least facially

 9  neutral.

10       **THE COURT:**  All right.  Let's assume that we're

11  applying strict scrutiny.

12       Mr. Maguire, how does the State meet its burden there?

13       **MR. MAGUIRE:**  Your Honor, with respect to the strict

14  scrutiny, I just direct you to our footnote in our brief

15  regarding strict scrutiny.

16       I don't have anything further to add to that footnote,

17  so that's where I would direct the Court to the extent, you

18  know, our position is that we do not need to meet strict

19  scrutiny.

20       But that the desire of the State to protect

21  individuals from gun worship, including those attending

22  religious services, or even at -- you know, even on church

23  properties is a legitimate State interest and --

24       **THE COURT:**  I thought I heard you say it, and she

25  wrote it down that way as well, so protecting individuals from

 1  gun worship.

 2          I'm sure that's not what you meant to say, is it?

 3          **MR. MAGUIRE:**  That is not what I meant to say.

 4          **THE COURT:**  You want to try one more time on that

 5  sentence?

 6          **MR. MAGUIRE:**  That would be a different case, right?

 7          **THE COURT:**  Yeah.  So what did you mean to say?

 8          **MR. MAGUIRE:**  Religious worship.

 9          **THE COURT:**  Because the court reporter and I both

10  heard "gun worship."

11          **MR. MAGUIRE:**  Religious worship.

12          **THE COURT:**  Religious worship, okay.

13          So if we are applying strict scrutiny, and we're

14  looking for something that is narrowly tailored, isn't it a

15  problem, Mr. Maguire, that other secular activities -- other

16  property owners have the ability to choose for themselves?

17          **MR. MAGUIRE:**  Well, you know, now we're on -- I want

18  to try to keep, as the State perceives, the different burdens

19  and requirements separate.

20          Because I think the general -- the general

21  applicability and neutrality analysis actually happens before

22  you get to strict scrutiny.

23          You know, the State believes we satisfied that here,

24  too, and I'm happy to talk about that.

25          **THE COURT:**  Right.  No.  But doesn't the fact that

1  you've got other people out there choosing for themselves,

2  doesn't that fact also bear on whether the statute is narrowly

3  tailored?

4          **MR. MAGUIRE:**  Correct, Your Honor.  That that is

5  correct.  So on that point, I would say, as we state in our

6  brief, this law treats comparable places, secular places, the

7  same.

8          You know, theatres, conference rooms, area --

9  conference centers, areas where you have large gatherings of

10 individuals that are seated -- often seated, often at specific

11 places at specific times, that we treat those comparables, those

12 secular institutions and what should be the proper comparisons

13 here just like a place of worship.

14         **THE COURT:**  Are there any analogs out there that the

15 State didn't include in its list of sensitive places?

16         Like shopping malls, for example, are there others?

17 Does it matter if people are sitting and all facing in the same

18 direction or --

19         **MS. MURPHY:**  We certainly think there are plenty of

20 other analogs out there -- shopping malls, retail stores,

21 restaurants that don't serve alcohol, private homes where people

22 are having large gatherings of friends over.

23         There are all sorts of places here that, even if you

24 assume that there is always large crowds not moving around at a

25 church, which, as you have heard today, is not true a hundred

1  percent of the time -- so there is an overbreadth problem in

2  that respect, too -- but even taking that as the metric, I --

3  this is, obviously, an extremely broad definition of sensitive

4  places.

5      But even as broad as it is, I don't think it captures

6  all of the comparable facilities and situations in which you

7  could have significant numbers of people gathered together for a

8  significant period of time.

9      **THE COURT:**  The places of worship provision is not

10  limited to the sanctuary either, is it?

11      It would cover anterooms, offices, et cetera,

12  bathroom.

13      **MR. MAGUIRE:**  That's correct, Your Honor.

14      **THE COURT:**  What about the Establishment Clause

15  argument, while we're on the First Amendment?

16      Ms. Murphy, why is there an Establishment Clause

17  problem here?

18      **MS. MURPHY:**  So I think that's a distinct problem with

19  taking away from the house of worship the ability to make its

20  own decision about what is -- is and is not appropriate to

21  protect the flock on its property.

22      And here, too, I do think it makes quite a difference

23  that, again, we have a law that is imposing regulations on

24  houses of worship as such.  We are not dealing with a facially

25  neutral law.

 1          Of course, there are -- you know, houses of worship

 2   have to comply with general fire codes and laws like that, but

 3   when you have the Government saying, by its terms in a law, some

 4   people can make this decision, but a house of worship can't, I

 5   think that implicates those church autonomy principles that are

 6   reflected in both the Establishment Clause and the Free Exercise

 7   Clause.

 8          And, ultimately, I think that leads you to the same

 9   place Your Honor already is under our other claims, because you

10   either need to do strict scrutiny or, if you took very seriously

11   the Court's recent instructions about the Establishment Clause

12   being tied to historical practice, you would end up doing an

13   analysis quite similar to the one that Your Honor has already

14   done under the Second Amendment.

15          So I think it is another path that leads you -- you

16   know, all roads lead either to strict scrutiny or a historical

17   analog, neither of which the Government has here.

18          **THE COURT:**  Mr. Maguire --

19          **MR. MAGUIRE:**  Your Honor, I think, with respect to the

20   Establishment Clause, the first issue is that when you review

21   Establishment Clause-specific cases, this type of case does not

22   exist in the Supreme -- you know, a law which is a regulation

23   that is regulating some sort of conduct within a church, there

24   is not Establishment Clause cases like that.  They are all

25   analyzed under the Free Exercise Clause.

1           For the Establishment Clause, you kind of have types

2    of cases.  You have -- the first are, you know, cases where the

3    Government is potentially actively trying to establish religion,

4    right, prayers in church, prayer- and meeting-type cases,

5    statutes on public property.

6           The other type of case is these -- this church

7    autonomy doctrine that was referenced, which, you know, if you

8    go through the historical cases where this church autonomy

9    doctrine is mentioned, you know, starts out as almost a judicial

10   prudential concern about the courts not wanting to get involved

11   in settling theological disputes about who should be the leaders

12   of church, who shouldn't be the leaders of certain churches.

13          And then gets expanded, recently in the employment

14   decisions, about whether or not individuals fall within or

15   without, kind of, this ministerial exception.

16          So you don't have these types of cases getting

17   analyzed under the Establishment Clause, and Ms. Murphy

18   referenced, you know, that the Establishment Clause issue here

19   is that it takes away -- and one of the points they make in

20   their brief is it restricts what worshipers are able to carry

21   within their sanctuary, within their places of worship, which,

22   of course, we have all -- you know, broad laws that restrict

23   that ability.

24          They are all, generally, facially neutral, right?  You

25   know, drug possession laws, dangerous chemical-type laws, those

1    are similar.

2         But I don't think -- first off, you are not going to

3    see that kind of facial neutral analysis in any of the Supreme

4    Court's Establishment Clause jurisprudence.

5         And I don't know, if you look at the actual text of

6    the Constitution, why whether or not it's facially neutral would

7    be relevant.

8         You know, ultimately, what the Establishment Clause

9    and the church autonomy doctrine is trying to establish is

10   that -- is to allow churches and to allow other -- is to allow

11   churches the ability to make their own determinations as to

12   their own theologic beliefs.

13        And part of that is being able to appoint their own

14   ministers; part of that is being able to appoint their religious

15   educators; and that the State can't get involved in who is a

16   religious educator and who propagates the faith through

17   religious education.

18        **THE COURT:**  Can the State get involved in who protects

19   the flock?

20        **MR. MAGUIRE:**  I think the State can be involved in

21   that question.  And in this context, it can.

22        You know, the State couldn't tell you, specifically,

23   this individual can or cannot act as a security guard, but the

24   State can do -- regulate the secular activity of carrying or not

25   carrying a gun.

1          **THE COURT:**  Before September 1, you had one group of

2    people that were entitled to protect themselves and each other.

3          And after September 1, you have a different -- you

4    know, kind of shift the kaleidoscope a little bit, and now it's

5    a different group of people, maybe, who are entitled.

6          And those are people that, under the statute, are

7    security guards, active police officers, military, that sort of

8    thing.

9          And under this kind of exception that's out there now

10   in the stay from the Second Circuit, people who are designated

11   by the pastor, that's the new group of people who can carry

12   inside a place of worship.

13         **MR. MAGUIRE:**  Correct.

14         **THE COURT:**  And that's an involvement by the State

15   that's acceptable under the Establishment Clause?

16         **MR. MAGUIRE:**  I think it is, Your Honor, because it's

17   not actually getting into -- I think what the Establishment

18   Clause is most concerned with is getting into the actual

19   doctrinal and influencing the actual doctrinal teaching of the

20   church, and that's not what this law does.

21         And this change about who protects the flocks is not

22   actually about the doctrinal -- you know, the doctrinal

23   teachings.

24         **THE COURT:**  Do you agree with that, Ms. Murphy?

25         **MS. MURPHY:**  No.  And I think the colloquy you just

1  had demonstrates exactly why there is an Establishment Clause

2  problem here.

3         I mean, the State's response seems to be there is not

4  a problem because this isn't really something that's central to

5  the church.

6         And it doesn't, you know, really implicate their faith

7  that much, who it is that's doing the protecting as long as

8  there is protection.

9         That's exactly the kind of inquiry that the

10 Establishment Clause is saying is not the type of thing that we

11 should have secular governments and courts doing, deciding who

12 it is that is best suited.

13        I mean, I think that the notion that the State could

14 say, actually, you have to have, like, an armed, State-approved

15 police officer in church all the time, seems to me to be even a

16 greater offense to what the framers would have thought of as the

17 autonomous rights of religion than many of the things that the

18 courts have confronted in more recent years.

19        So I think, you know, we really are not far removed at

20 all from the concerns about the types of decisions that are

21 supposed to be left for houses of worship to make for

22 themselves.

23        **THE COURT:**  Is the irreparable harm analysis in this

24 case different from the irreparable harm analysis in Hardaway,

25 Mr. Maguire?

1          **MR. MAGUIRE:**  Your Honor, we think it is, largely

2   because, currently, the Hardaway injunction is largely in -- it

3   has that exception which allows -- would allow Pastor Spencer to

4   carry and it would allow individuals that he designates at the

5   church to carry.

6          So as to their religious beliefs in terms of

7   protecting the flock, Mr. Spencer is currently able to fulfill

8   that obligation.

9          He is -- given the stay from the Second Circuit, is

10  allowed to --

11         **THE COURT:**  So under the stay, the pastor, and any

12  pastor, can designate the whole world, right?

13         I mean, isn't that what the State is allowing to

14  private property owners now?  And -- and follow me here, isn't

15  -- who is legislating now.

16         **MR. MAGUIRE:**  Legislating how?

17         **THE COURT:**  Well, where does that exception come from

18  in the statute, that is carved out in the stay?

19         **MR. MAGUIRE:**  That's carved out in the stay?

20         **THE COURT:**  Yeah.

21         **MR. MAGUIRE:**  In terms of who is making the decision

22  to -- to who can --

23         **THE COURT:**  Where does that carve-out in the stay come

24  from?  That's not in the statute.

25         **MR. MAGUIRE:**  From the Second Circuit.  It comes from

1   the Second Circuit, right?

2           **THE COURT:**  Is that how the State requested it?

3           **MR. MAGUIRE:**  I don't want to put my foot in it too

4   much, but I do believe that that is -- that was the carve-out

5   that the State requested.

6           **THE COURT:**  Isn't that a problem, Ms. Murphy?  We're

7   kind of, like, taking a second hack at this legislation here and

8   saying:  Well, what is this other big exception now, after all?

9           **MS. MURPHY:**  Honestly, I find the whole thing a little

10  puzzling, Your Honor.

11          I mean, I don't quite -- if the State -- and having

12  read the papers, I mean, this language, as I understand, it does

13  come from what the State requested.

14          I don't quite understand why -- if -- if this

15  exception is really so broad that they can designate anyone in

16  the world to carry, then I don't know why the State sought a

17  stay, because the stay has no meaning at all.

18          So I -- I'm just left -- you know, I think it leaves

19  people like my clients in a very uncertain position as to what

20  is and isn't permissible at this point.

21          And in all events, to me, you know, as long as the

22  State is up there actively trying to get Your Honor's injunction

23  overruled, I think that we are still in the same position as the

24  Hardaway plaintiffs and entitled to relief that will ensure that

25  if the State succeeds in that endeavor on the Second Amendment

1    ground, we won't have to wait and come back and do this all over

2    again before my clients can be protected on First Amendment

3    grounds.

4         **THE COURT:**  If I were to grant the preliminary

5    injunction, the next question, Mr. Maguire, is going to bring up

6    to me is, should I stay it, pending -- and what should my stay

7    look like, pending the Second Circuit's decision on your

8    application to stay?

9         Mr. Maguire --

10        **MR. MAGUIRE:**  So our position would be that if you

11   were to grant this preliminary injunction, you would stay it,

12   pending its appeal with the same exception that the Second

13   Circuit has put into its --

14        **THE COURT:**  Right.

15        **MR. MAGUIRE:**  -- orders.

16        And we would also ask that the preliminary injunction,

17   because we are kind of outside the Second Amendment.  You know,

18   if we are just looking at the First Amendment issue, because we

19   kind of already know how the Second Circuit is going to act as

20   to the Second Amendment, that the preliminary injunction only

21   apply to the plaintiffs in this case, right?

22        It would enjoin these defendants from enforcing the

23   CCIA and -- well, it wouldn't at all, but consistent with the

24   stay, that it would just apply it to these plaintiffs.

25        Because, obviously, it's their religious beliefs that

1    are being allegedly implicated.

2         **THE COURT:**  Yeah.  I've been thinking some about that

3    and you see how kind of, like, nauseatingly uncomfortable I am

4    with this carve-out.

5         And so I'm trying to come up with a way, if I go down

6    this road, to get you to your application for a stay at the

7    Second Circuit.

8         So, perhaps, a stay of the decision, pending the

9    Second Circuit's decision on the State's application for a stay,

10   pending appeal, probably gets you there as well.

11        There are multiple ways to skin the cat, but putting

12   that carve-out in my own stay is something that I'm not

13   comfortable doing.

14        **MR. MAGUIRE:**  I think, you know, our request would

15   primarily be that this is stayed long enough that our office is

16   not filing stay applications in the Second Circuit next week.

17        It would be --

18        **THE COURT:**  On an emergency basis?  I understand.

19        **MR. MAGUIRE:**  Yes.

20        **THE COURT:**  So if I were to stay it, pending the

21   Second Circuit's decision on some forthcoming stay application,

22   then you can do it in the ordinary course.

23        **MR. MAGUIRE:**  Right.  So if you were to premise it on

24   the stay application of, for example, the -- on -- are you

25   talking about in another case?

1          THE COURT:  No, no.

2          MR. MAGUIRE:  Sorry.

3          THE COURT:  No.  This -- there would be an appeal --

4          MR. MAGUIRE:  Right.

5          THE COURT:  -- and you would have to ask the Circuit

6    for a stay in the ordinary course, rather than on an emergency

7    basis.

8          MR. MAGUIRE:  Okay.  Right.

9          THE COURT:  And then, presumably -- well, look --

10         MR. MAGUIRE:  I just -- what would the stay be asking

11   for?

12         Would there be a time period at which the preliminary

13   injunction would go into effect, absent an application from the

14   State for a stay?

15         THE COURT:  I hadn't thought of that.  I just assumed

16   the State would be moving for a stay.

17         MR. MAGUIRE:  Well, of course, if you have already

18   stayed it, what are we moving for?

19         MS. MURPHY:  A stay pending --

20         THE COURT:  A stay pending your application for a stay

21   from the Second Circuit.

22         MR. MAGUIRE:  Okay.

23         THE COURT:  See what I mean?  So the issue is -- look,

24   I know what they are going to do on the Second Amendment issue,

25   but I don't know what they are going to do on the First

1    Amendment issue.  It is different.

2         When they put all of this stuff on the scales to try

3    to decide whether a stay pending an appeal of the preliminary

4    injunction is appropriate -- which they did, right?

5         **MR. MAGUIRE:**  Right.

6         **THE COURT:**  I don't know what the scale looks like

7    when the First Amendment is on that scale.  I don't know.  I'm

8    not on that panel.

9         So it is a little bit different, so we ought to give

10   them a chance to look at it themselves.  That's why I don't want

11   to stay the whole thing, pending the whole appeal, right?

12        **MR. MAGUIRE:**  Right.

13        **THE COURT:**  Because I would maybe put things on the

14   scale differently than the Second Circuit would.

15        Does that make sense?

16        **MR. MAGUIRE:**  Uh-huh.  That makes sense, Your Honor.

17   Well, I'm going to say, for preservation purposes --

18        **THE COURT:**  I understand.

19        **MR. MAGUIRE:**  Yes.

20        **THE COURT:**  Yeah.  I understand, but I'm not trying to

21   jam anybody up either.

22        On the other hand, plaintiffs want to get this issue,

23   if I agree with their view of things, up to the Circuit.

24        **MR. MAGUIRE:**  Right.  And I will say, you know, I know

25   talking to our A and O department, they are -- they are not

1  looking -- once this get up here, you know, they are willing to

2  discuss expedited briefing schedules and so on and so forth, so

3  that this is being decided by the Second Circuit in a more

4  timely time frame than is normal.

5          THE COURT:  All right.

6          Ms. Murphy, do you want to comment on that colloquy?

7          MS. MURPHY:  Yes.  First, I want to be clear that what

8  Your Honor is proposing is a stay on the same terms as the

9  Second Circuit's stay, so it would have the exception --

10         THE COURT:  No.  That's my point, is I don't -- I feel

11  like, where do we come up --

12         MS. MURPHY:  No, no.  I -- I understand.  So would --

13         THE COURT:  So now I've got to bless it -- I've got to

14  bless --

15         MS. MURPHY:  Would your stay, pending the filing of

16  their appeal, include the exception that the Second Circuit's

17  stay order does?

18         THE COURT:  I don't know.  Why?

19         MS. MURPHY:  I mean, we would request that it does.

20         THE COURT:  I understand, but --

21         MS. MURPHY:  I understand.  I --

22         THE COURT:  -- I feel like, who am I to say that this

23  new thing is now part of the -- you know --

24         MS. MURPHY:  Sure.

25         THE COURT:  And what's the difference, really?  If I

 1   issue the preliminary injunction and stay the whole thing, and

 2   give the Second Circuit a chance to issue its own stay, then

 3   they can put that carve-out in there, couldn't they?

 4        **MS. MURPHY:**  Yeah.  The difference to me is, you know,

 5   I care a lot more about how long the State has to get its stay

 6   paper on file, if my clients are unprotected during that time

 7   period, versus if there is a stay that has -- if it's a stay

 8   that has this exception, then I understand the State to take the

 9   position that my clients are still, in some respect, protected

10   during the time it takes them to file their stay application.

11        So, you know, I guess, another way I would put it is,

12   I don't mind -- you know, we're not looking to, like, ruin

13   everybody's holidays and make them file an emergency-basis stay,

14   but --

15        **THE COURT:**  Now I understand what you're saying.

16        **MS. MURPHY:**  -- we also don't -- I don't want to

17   prejudice my clients.

18        **THE COURT:**  I understand what you're saying.  Yeah.

19   So my desire to make it analytically pure and stay away from

20   this mess probably does prejudice the plaintiff here, doesn't

21   it, Mr. Maguire?

22        **MR. MAGUIRE:**  The only situation, though, is,

23   currently, the current situations, is that their client can

24   designate individuals to -- we all agree -- I think we're all in

25   agreement that under the Hardaway injunction, currently, as it

1    is in front of the Second Circuit, currently, plaintiffs can

2    designate individuals to carry -- he can carry at church.  I --

3    we agree on that.

4            **THE COURT:**  Yep.

5            **MR. MAGUIRE:**  So at the point, then, that all you are

6    doing is issuing an order that is going to be stayed, that

7    doesn't change the current situation, right?

8            I mean, he can still designate individuals.  I mean --

9    right?

10           I mean, for practical purposes, because you are

11   staying it, this order has no import on what Mr. Spencer does or

12   does not do with the health of his -- with the church, as it,

13   you know, doesn't change anything.

14           **THE COURT:**  All right.  I see it.

15           **MR. MAGUIRE:**  We get there eventually.

16           **THE COURT:**  My head hurts now.

17           **MS. MURPHY:**  I would also just -- just for Your

18   Honor's edification, I don't know if you know, there was a

19   Supreme Court application filed yesterday, not in the Hardaway

20   case, but in the Antonyuk case, seeking a Supreme Court,

21   essentially, stay of the stay.

22           So that could -- that will probably be resolved in the

23   next couple of weeks and could implicate the Second Amendment

24   piece of all of this as well.

25           **THE COURT:**  We are going to be working on this over

1    the next several days.  We don't have -- unlike maybe in the

2    past, I've been more ready to issue a decision, I'm not quite

3    there yet, so maybe next week.

4         So if there is anything you absolutely feel compelled

5    to submit, you can Monday or Tuesday.  I don't think you need

6    to, but if you feel you need to, Monday or Tuesday.  So that

7    would be a Tuesday deadline, then.

8         And if I go down the road of granting the preliminary

9    injunction, perhaps you can circulate among yourselves a draft

10   of what that stay might look like and take the burden off of me,

11   because, really, it's -- look, it's -- you see where I'm coming

12   from?

13        That stay is really abhorrent to me, the way it's

14   drafted, and I can't go there.  But if you give it to me, maybe

15   I'll be able to close my nose and grant it, okay?

16        **MR. MAGUIRE:**  Yeah.  That would be much better for me,

17   Your Honor, because -- you know, ultimately, it's not me.

18        There's people who know more about the Second Circuit

19   and such that can negotiate this better --

20        **THE COURT:**  Yeah.  So if you work it out with your --

21   and, you know, submit it to me as if, and then I'll enter it --

22   if I grant the preliminary injunction, I'll enter the stay, if

23   you negotiate one.  I think you're going to be able to do that.

24        The plaintiff is protected, and the State's interest

25   is not, you know, jeopardized either, and nobody's holidays are

 1  messed up either.

 2          Does that all make sense?

 3          **MS. MURPHY:**  Absolutely.

 4          **MR. MAGUIRE:**  Yes.

 5          **THE COURT:**  Does anyone on the telephone have anything

 6  else to say?

 7          **MR. WALKER:**  No, sir.

 8          **MR. TROY:**  No, Your Honor.  Thank you.

 9          **THE COURT:**  Okay.  Ms. Murphy, anything from you?

10          **MS. MURPHY:**  No, Your Honor.

11          **THE COURT:**  Mr. Maguire?

12          **MR. MAGUIRE:**  No, Your Honor.

13          **THE COURT:**  All right, we're done.  Happy holidays.

14  Go Bills.

15

16              (Proceedings concluded at 12:08 p.m.)

17                      *   *   *

18

19

20

21

22

23

24

25

1

2      In accordance with 28, U.S.C., 753(b), I certify that these

3    original notes are a true and correct record of proceedings in

4     the United States District Court for the Western District of

5        New York before the Honorable John L. Sinatra, Jr.

6

7

8

9

10    *s/ Bonnie S. Weber*                    January 9, 2023
        Signature                              Date

11

12    BONNIE S. WEBER, RPR

13    Official Court Reporter
      United States District Court
14    Western District of New York

15

16

17

18

19

20

21

22

23

24

25

1                        **E X A M I N A T I O N S**

2

**Witness**                              **By (Type)**           **Page**

3

**MICHEAL SPENCER**

4                              DIRECT EXAMINATION              5
                              BY MR. EZELL:
5                              CROSS EXAMINATION             38
                              BY MR. MAGUIRE:
6                              CROSS EXAMINATION             59
                              BY MR. WALKER:
7                              REDIRECT EXAMINATION          60
                              BY MR. EZELL:
8                              RECROSS EXAMINATION           67
                              BY MR. MAGUIRE:

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25