

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————

HIS TABERNACLE FAMILY
CHURCH, INC. and
MICHEAL SPENCER,

               Plaintiffs,

      v.

STEVEN G. JAMES, Superintendent of
the New York State Police, in his
official and individual capacities;
WEEDEN A. WETMORE, District
Attorney for the County of Chemung,
New York, in his official and individual
capacities; and
MATTHEW VAN HOUTEN, District
Attorney for the County of Tompkins,
New York, in his official and individual
capacities,

               Defendants.

———————————————————

6:22-CV-6486 (JLS)

## DECISION AND ORDER

Plaintiffs' motion for attorneys' fees and costs is granted. *See* Dkt. 86.

Plaintiffs—a Christian church in Horseheads, New York, and its senior pastor—

commenced this action to enjoin New York State from enforcing a restriction on

possessing firearms in places of worship. *See* Dkt. 1. They sought to "ensure the

ability to protect the Church and its worshippers in case of violent confrontation,"

as well as guard against "the kind of violence that other houses of worship across

the country have suffered." *See id.* ¶¶ 45, 47. And they urged this Court to "put an

end to New York's latest attempt to trample on its citizens' First and Second

Amendment rights." *Id.* ¶ 7.

Plaintiffs were represented by a legal team that included out-of-district attorneys who are among few attorneys nationwide with the required skillset to litigate this case effectively. These lawyers are specialists in First and Second Amendment litigation, as well as expert appellate practitioners. But just as importantly, they were willing to accept a complex case under stringent time limitations that dealt with controversial subject matter. Ultimately, due largely to counsel's excellent advocacy before this Court and the Second Circuit, the State was permanently enjoined from enforcing the houses of worship exclusion against Plaintiffs. *See* Dkt. 81.

Plaintiffs now seek to "fully compensate" their attorneys under the applicable fee-shifting statute—namely, 42 U.S.C. § 1988. *See* Dkt. 86. Congress enacted that provision because "the private market for legal services" has "failed to provide many victims of civil rights violations with effective access to the judicial process." *City of Riverside v. Rivera*, 477 U.S. 561, 576 (1986). As explained below, the facts and circumstances of this case justify granting Plaintiffs' request in full. Indeed, this is the type of rare and important case with broader implications in terms of the state of the law that justify the most highly specialized and highly qualified counsel— irrespective of geography. As such, Plaintiffs' motion is granted in its entirety such that they may recover $817,636.50 in attorneys' fees, as well as $7,166.60 in costs.

## BACKGROUND

### I.    PROCEDURAL HISTORY

Plaintiffs His Tabernacle Family Church, Inc. (the "Church") and Pastor Micheal Spencer commenced this action on November 3, 2022, challenging a portion of New York's Concealed Carry Improvement Act ("CCIA") making it a felony for a conceal-carry license holder to possess a firearm at "any place of worship or religious observation." *See* Dkt. 1.[1]  Plaintiffs sued three Defendants in their official and individual capacities—namely, the Superintendent of the New York State Police, as well as the District Attorneys of Chemung County and Tompkins County. *See id.*[2]

Plaintiffs alleged that place of worship exclusion "is a compendium of constitutional infirmities" that infringes on Pastor Spencer's and the Church's "rights to freely engage in religious exercise, to exercise autonomy over the Church's internal affairs, and to carry firearms to ensure the safety of all persons on the Church's premises." *Id.* ¶ 55.  They asserted claims pursuant to 42 U.S.C. § 1983

---

[1] The relevant portion of the statute added to the Penal Law, as relevant here:

§ 265.01-e Criminal possession of a firearm, rifle or shotgun in a sensitive location. 1. A person is guilty of criminal possession of a firearm, rifle or shotgun in a sensitive location when such person possesses a firearm, rifle or shotgun in or upon a sensitive location, and such person knows or reasonably should know such location is a sensitive location. 2. For the purposes of this section, a sensitive location shall mean: ... (c) any place of worship or religious observation . . . .

[2] Steven G. James was appointed Superintendent of New York State Police on April 4, 2024.  Pursuant to Fed. R. Civ. P. 25(d), he was automatically substituted as a party for Superintendent Bruen.

based on deprivation of their rights under the Second Amendment, as well under
the Free Exercise and Establishment Clauses of the First Amendment.  *See* Dkt. 1
¶¶ 56-86.[3]

Plaintiffs moved for a preliminary injunction to enjoin Defendants from
enforcing the houses of worship exclusion.  *See* Dkt. 13.  This Court received
submissions from the parties and held a preliminary injunction hearing.[4]

On December 29, 2022, this Court issued a Decision and Order granting
Plaintiffs' preliminary injunction motion.  Dkt. 56.  The Court concluded that:

> Ample Supreme Court precedent addressing the individual's freedoms
> under the First and Second Amendments to the Constitution dictate
> that New York's new place of worship exclusion is unconstitutional.  As
> in *Hardaway*[*v. Nigrelli*, No. 22-CV-771, 639 F. Supp. 3d 422 (W.D.N.Y.
> Nov. 3, 2022)], the State fails the Second Amendment test set forth in
> *Bruen*.  And it fares no better with respect to Plaintiffs' claims under the
> Free Exercise and Establishment Clauses of the First Amendment.

*Id.* at 2.[5]  As such, the Court ordered that "Defendants, in their official capacities, as
well as their officers, agents, employees, attorneys, and all persons in active concert
or participation with them who receive actual notice of the Order, are enjoined,
effective immediately, from implementing or enforcing" the houses of worship
exclusion "against Pastor Spencer, the Church, its members, or their agents and

---

[3] Plaintiffs also included a claim for violation of their Equal Protection rights under
the Fourteenth Amendment.  *See id.* ¶¶ 87-94.

[4] At the State's request, Pastor Spencer testified in person.  *See* Dkt. 53.  No other
witnesses testified in person; however, the State submitted several declarations.
*See* Dkt. 43

[5] Unless otherwise noted, page numbers refer to the CM/ECF stamped numbering
in the header of each page.

licensees." *Id.* at 35.  The Court further ordered that the "preliminary injunction shall remain in effect pending disposition of the case on the merits." *Id.*

The Second Circuit affirmed the preliminary injunction in a decision addressing the appeal "in tandem" with three other appeals of similar district court orders.  *See Antonyuk v. Chiumento*, 89 F.4th 271, 288 (2d Cir. 2023), cert. granted, judgment vacated sub nom. *Antonyuk v. James*, 144 S. Ct. 2709 (2024), and reinstated in part by *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024) ("[w]e uphold the district court's injunction[] with respect to . . . N.Y. Penal L. § 265.01-e(2)(c) as applied to Pastor Spencer, the Tabernacle Family Church, its members, or their agents and licensees . . . .").[6]  *See also* Dkt. 73 (mandate).

On November 4, 2024, this Court so-ordered a Stipulated Order for Permanent Injunction.  Dkt. 81.  The Stipulated Order provides, as relevant here, that "Plaintiffs are a 'prevailing party' under 42 U.S.C. § 1988 and are therefore entitled to their reasonable attorneys' fees from Steven G. James, Acting Superintendent of the New York State Police," *id.* at 2, and that the "Court will decide the amount of reasonable attorneys' fees." *Id.*

## II.    PLAINTIFFS' MOTION FOR ATTORNEYS' FEES AND COSTS

On February 18, 2025, Plaintiffs filed the instant motion requesting that this Court award "their attorneys' fees and costs as prevailing parties in this matter"

---

[6] The three other district court cases are: *Hardaway v. Nigrelli*, 639 F. Supp. 3d 422 (W.D.N.Y. 2022) (Sinatra, *J.*); *Christian v. Nigrelli*, 642 F. Supp. 3d 393 (Sinatra, *J.*); and *Antonyuk v. Hochul*, 639 F. Supp. 3d 232 (N.D.N.Y. 2022) (Suddaby, *J.*).

5

pursuant to Section 1988 and Fed. R. Civ. P. 54(d).  *See* Dkt. 86 at 1.[7]

> Plaintiffs were represented by a
>
> team that included attorneys at three law firms, two out-of-district and one in-district: (1) Clement & Murphy, a law firm based in the Washington, D.C., area that is one of the very few law firms with considerable experience litigating First and Second Amendment cases on behalf of plaintiffs at all levels of the federal court system, (2) First Liberty Institute, a nationwide law firm based in the Dallas, Texas, area that is dedicated exclusively to defending religious liberty, and (3) Ganguly Brothers, a law firm based in Rochester, New York, that is familiar with local practices and procedures in this district.

Dkt. 86-1 at 14.

According to Plaintiffs, a "fair estimate of the total number of hours worked to date is 699.7." Dkt. 86 at 1. And a "fair estimate of the value of these hours is $817,636.50." *Id.* They further state that their "costs to date are $7,166.60." *Id.*[8] Along with their motion, Plaintiffs submitted declarations from Erin E. Murphy (a partner at the law firm Clement & Murphy, PLLC), Jeremiah G. Dys (Senior Counsel at First Liberty Institute), and Anjan Ganguly (a partner at the law firm Ganguly Brothers, PLLC), which attach documentation regarding the requested fees and costs. *See* Dkt. 86-2; 86-3; 86-4.

Plaintiffs argue that the "requested attorney's fees reflect the customary hourly rates that Plaintiffs' attorneys actually charged in other matters during the pendency of this litigation and the actual number of hours that Plaintiffs' lawyers

---

[7] There is no dispute that Plaintiffs are "prevailing parties." *See* Dkt. 81 at 2.

[8] Plaintiffs "are not seeking attorney's fees for the preparation of [their] reply brief" on this motion. *See* Dkt. 95 at 13 n.2

expended here." Dkt. 86-1 at 18.  And they maintain that these amounts are "eminently reasonable given both the extraordinary success that Plaintiffs' attorneys achieved and the special expertise and substantial labor that this case demanded on a compressed schedule." *Id.*  In short, Plaintiffs' legal team was "uniquely suited to address the issues here," *id.* at 25, and "secured all that their clients ever wanted." *Id.* at 11.

Defendant James opposes this fee motion.  Dkt. 94.  According to the State,[9] "Plaintiffs' attorneys' fees are so high because (1) the 'customary' rates charged by plaintiffs' attorneys far exceed (sometimes quadrupling) the customary rates charged by attorneys in the Western District of New York or even in plaintiffs' attorneys home districts and (2) plaintiffs overstaffed the case resulting in excessive work." *Id.* at 6.  The State argues that, while "plaintiffs' attorneys are well-credentialed, only some have demonstrated the necessary experience and specialization to command an out-of-district hourly rate." *Id.*  And it maintains that "Plaintiffs' counsel spent an excessive amount of time on all aspects of this litigation." *Id.*  Defendant further purports that "plaintiffs' fees far exceed what a reasonable legal services consumer would pay to obtain the same results obtained by plaintiffs' counsel and far exceed what a comparable law firm would charge such work." *Id.* at 7.  As such, the State urges this Court to "reduce plaintiffs' attorneys' fees to $134,245.80." *Id.* at 6.

---

[9] "Defendant," "Defendant James," and the "State" are used interchangeably in this decision.

## DISCUSSION

### I.    LEGAL FRAMEWORK

The "general rule in our legal system is that each party must pay its own attorney's fees and expenses." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550 (2010). But "Congress enacted 42 U.S.C. § 1988 in order to ensure that federal rights are adequately enforced." *Id.* The statute provides that, "[i]n any action or proceeding to enforce a provision of . . . [42 U.S.C. § 1983] . . . the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs." 42 U.S.C. § 1988(b).[10] Section 1988 "embodies three policy concerns: to encourage civil right[s] plaintiffs who otherwise would not bring suit; to deter obstructive litigation tactics; and to deter civil rights violations by increasing defendants' liability." *Furtado v. Bishop*, 635 F.2d 915, 918 n.5 (1st Cir. 1980) (internal citation omitted). *See also Evans v. Jeff D.*, 475 U.S. 717, 732 (1986) (Congress added fee awards "to the arsenal of remedies available to combat violations of civil rights").

The statute, however, "does not explain what Congress meant by a 'reasonable' fee, and therefore the task of identifying an appropriate methodology for determining a 'reasonable' fee was left for the courts." *Perdue*, 559 U.S. at 550. The Second Circuit instructs "district courts to calculate a 'presumptively reasonable fee' by determining the appropriate billable hours expended and 'setting

---

[10] In addition, Fed. R. Civ. P. 54(d)(2) provides that a "claim for attorney's fees and related nontaxable expenses must be made by motion" that satisfies certain criteria.

a reasonable hourly rate, taking account of all case-specific variables.'" *Lilly v. City of New York*, 934 F.3d 222, 229–30 (2d Cir. 2019) (quoting *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cnty. of Albany & Albany Cnty. Bd. of Elections*, 522 F.3d 182, 189-90 (2d Cir. 2008) ("*Arbor Hill*")).[11]  And the Second Circuit has "consistently applied this method of determining a reasonable hourly rate by considering all pertinent factors, including the *Johnson* factors,[12] and then multiplying that rate by the number of hours reasonably expended to determine the presumptively reasonable fee." *Id.* at 230.

It is "only after this initial calculation of the presumptively reasonable fee is performed that a district court may, in extraordinary circumstances, adjust the presumptively reasonable fee when it 'does not adequately take into account a factor that may properly be considered in determining a reasonable fee.'" *Id.* (quoting *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 167 (2d Cir. 2011)).

## II.    ANALYSIS

Plaintiffs request $817,636.50 in attorneys' fees based on 699.7 hours of work at their customary hourly rates in their home districts, along with another $7,166.60 to reimburse costs.  *See* Dkt. 86.  All of the relevant factors support granting these requests in full.

---

[11] The Second Circuit uses "the term 'presumptively reasonable fee' instead of the traditional term 'lodestar.'"  *Id.* at 230 n.33.  For "all intents and purposes, the two terms mean the same thing."  *Id.*

[12] These factors are discussed further below.

## A. Hourly Rates

The Second Circuit instructs that, to calculate a "reasonable hourly rate," the district court should "bear in mind all of the case-specific variables." *Lilly*, 934 F.3d at 230 (quoting *Arbor Hill*, 522 F.3d at 190) (internal quotation marks omitted). The "reasonable hourly rate is the rate a paying client would be willing to pay." *Id.* The court should "bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Id.* And the court "should also consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case." *Id.*

In "determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson* factors . . . ." *Id.* Those factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Arbor Hill*, 522 F.3d at 187 n.3 (citing *Johnson v. Georgia Highway Exp., Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), abrogated on other grounds by *Blanchard v. Bergeron*, 489 U.S. 87 (1989)).

10

The "most critical factor in a district court's determination of what
constitutes reasonable attorney's fees in a given case is the degree of success
obtained by the plaintiff." *Barfield v. New York City Health & Hosps. Corp.*, 537
F.3d 132, 152 (2d Cir. 2008) (quoting *Farrar v. Hobby*, 506 U.S. 103, 114 (1992))
(internal quotation marks omitted).  And where "a plaintiff has obtained excellent
results, his attorney should recover a fully compensatory fee." *Holick v. Cellular
Sales of New York, LLC*, 48 F.4th 101, 106 (2d Cir. 2022) (quoting *Hensley v.
Eckerhart*, 461 U.S. 424, 435 (1983)) (internal quotation marks omitted).

Here, Plaintiffs seek the following "effective hourly billing rates" for
each attorney or paralegal who performed work on this case:

- Erin E. Murphy, partner, Clement & Murphy:
  $1,795.48 (Dkt. 86-2 ¶ 14);

- Andrew C. Lawrence, partner, Clement & Murphy:
  $1,372.43 (*id.* ¶ 18);

- Trevor W. Ezell, associate, Clement & Murphy:
  $1,130 (*id.* ¶ 19);

- Nicholas M. Gallagher, associate, Clement & Murphy:
  $950.92 (*id.* ¶ 20);

- Kyle R. Eiswald, associate, Clement & Murphy:
  $850 (*id.* ¶ 21);

- H. Bartow Farr, partner, Clement & Murphy:
  $1,650 (*id.* ¶ 23);

11

- Matthew D. Rowen, partner, Clement & Murphy:
  $1,200. (*id.* ¶ 24);

- Harker Rhodes, partner, Clement & Murphy:
  $1,350 (*id.* ¶ 25);

- Mariel Brookins, associate, Clement & Murphy:
  $1,200 (*id.* ¶ 26);[13]

- Joseph J. DeMott, associate, Clement & Murphy:
  $1,100 (*id.* ¶ 27);

- Chadwick J. Harper, associate, Clement & Murphy:
  $900 (*id.* ¶ 28);

- Darina Merriam, associate, Clement & Murphy:
  $800 (*id.* ¶ 29);

- Ilan J. Posner, associate, Clement & Murphy:
  $750 (*id.* ¶ 30);

- Ashley Britton, senior paralegal, Clement & Murphy:
  $474.85 (*id.* ¶32)

- Aviana Vergnetti, paralegal, Clement & Murphy:
  $416.49 (*id.* ¶ 33);

- Jeremiah G. Dys, Senior Counsel, First Liberty Institute:
  $1,150 (Dkt. 86-3 ¶ 15);

---

[13] Plaintiffs "seek $18,000 for 15 hours of work performed by Ms. Brookins," but the hourly rate is erroneously depicted as "$1,1200." *See* Dkt. 86-2 ¶ 26.

- David Hacker, Vice President of Legal & Senior Counsel, First
  Liberty Institute:

  $1,400 (*id.* ¶ 18);

- Jordan Pratt, Senior Counsel, First Liberty Institute:

  $1,200 (*id.* ¶ 19);

- Ryan Gardner, Counsel, First Liberty Institute:

  $850 (*id.* ¶ 20)

- Amy Stoermer, paralegal, First Liberty Institute:

  $75 (*id.* ¶ 22);

- Anjan K. Ganguly, partner, Ganguly Brothers, PLLC:

  $395 (Dkt. 86-4 ¶ 8).[14]

1. Out-of-District Rates

When, like here, a district court is "faced with a request for an award of

higher out-of-district rates," the Second Circuit requires that the Court "first apply

a presumption in favor of application of the forum rule." *Simmons v. New York City

Transit Auth.*, 575 F.3d 170, 175 (2d Cir. 2009). The "forum rule" provides that,

"courts should generally use the hourly rates employed in the district in which the

reviewing court sits in calculating the presumptively reasonable fee." *Id.* at 174

(internal citation and quotation marks omitted).

---

[14] The State "does not object to Anjan Ganguly's hourly rate of $395/hr." Dkt. 94 at
9 n.2.  It also concedes that "Erin Murphy, Andrew Lawrence,
and Nicholas Gallagher are entitled to out-of-district rates for their work on the
appeal." *Id.* at 13.

The Court, however, "may apply an out-of-district rate (or some other rate, based on the aforementioned 'case-specific variables') if, in calculating the presumptively reasonable fee, it is clear that a reasonable, paying client would have paid those higher rates." *Id.* (internal citation, quotation marks, and alterations omitted). More specifically, to "overcome that presumption, a litigant must persuasively establish that a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Id.* at 175. In "determining whether a litigant has established such a likelihood, the district court must consider experience-based, objective factors." *Id.* Among "the objective factors that may be pertinent is counsel's special expertise in litigating the particular type of case, if the case is of such nature as to benefit from special expertise." *Id.* at 175-76.

A "litigant cannot overcome the presumption through mere proximity of the districts, nor can a litigant overcome the presumption by relying on the prestige or 'brand name' of her selected counsel." *Id.* at 176. Indeed, lawyers "can achieve prestige and fame in numerous ways that do not necessarily translate into better results." *Id.* The party "seeking the award must make a particularized showing, not only that the selection of out-of-district counsel was predicated on experience-based, objective factors, but also of the likelihood that use of in-district counsel would produce a substantially inferior result." *Id.*

Here, all of the "case-specific variables" overwhelmingly support the out-of-district rates. This is the type of case where strict application of the forum rule is

inappropriate. This was indeed an "appellate-heavy constitutional-law case" that "demanded far more than ordinary civil-litigation experience that an in-district attorney could supply." Dkt. 86-1 at 26. And the Court shares Plaintiffs' conclusion that they "are not aware of attorneys in this district who could have offered the 'level of skill required to perform the legal service properly' here." *Id.* (quoting *Arbor Hill*, 522 F.3d at 186 n.3).

In sum, it is clear, on this record, that "a reasonable client would have selected out-of-district counsel because doing so would likely (not just possibly) produce a substantially better net result." *Simmons*, 575 F.3d at 175. For these reasons, which are discussed fully below, Plaintiffs' attorneys are entitled to their customary rates in their home districts.

2. <u>The Requested Rates are Reasonable</u>

All of the relevant factors, including the *Johnson* factors, support the requested rates.

a. *Customary Rates*

First, the requested rates reflect the hourly rates customarily charged by the attorneys and paralegals in their home districts during the relevant timeframe. *See* Dkt. 86-1 at 21-22 (detailing customary hourly rates of each attorney and paralegal during 2022-2025, as applicable). *See also* Dkt. 86-2 ¶ 13 ("The itemization reflects the customary hourly rates charged by Clement & Murphy personnel in other hourly matters during the pendency of this litigation . . . ."); *id.* ¶ 38 ("these customary hourly rates reflect what Clement & Murphy's clients did, in fact, pay in

15

other matters during the course of this litigation"); Dkt. 86-3 ¶ 13 ("The itemization reflects First Liberty Institute's customary hourly rates . . . .); Dkt. 86-4 ¶ 9 ("[the requested rate] is the hourly rate that I charged—and the hourly rate that other paying clients in fact paid—in all other hourly matters during the course of this litigation . . . .").[15]

Plaintiffs also provide evidence that these rates are consistent with rates charged by peer firms in the relevant markets—namely, Washington, D.C., Dallas, TX, and Rochester, NY. *See* Dkt. 86-2 ¶ 36 ("The hourly rates of Clement & Murphy's attorneys are consistent with the rates charged by other attorneys in Washington, D.C., and other major legal markets.") (citing *Franciscan All., Inc. v. Becerra*, No. 16-cv-108 (N.D. Tex.), Dkt. 224-2 at 4)); Dkt. 86-3 ¶ 25 ("First Liberty Institute is located in the greater Dallas area, and the hourly rates for First Liberty Institute's attorneys are comparable to those charged by other attorneys in the area." (citing *Becerra,* Dkt. 224-3 at 5-6)); Dkt. 86-1 at 23 ("Ganguly Brothers is law firm based in this district—in Rochester—and '$400-$500 per hour is generally deemed a reasonable hourly rate for experienced trial counsel' here." (quoting

---

[15] The fact that other clients willingly pay these hourly rates, *see* Dkt. 86-2 ¶ 38; 86-3 ¶ 13; Dkt. 86-4 ¶ 9, supports their reasonableness. *See Arbor Hill*, 522 F.3d at 192 ("the Supreme Court[] emphas[izes] . . .the need to use the approximate market rate for an attorney's services in calculating the presumptively reasonable fee."); *Rozell v. Ross-Holst*, 576 F. Supp. 2d 527, 544 (S.D.N.Y. 2008) ("[T]he range of rates that plaintiff's counsel actually charge their clients . . . is obviously strong evidence of what the market will bear."); *Tomazzoli v. Sheedy*, 804 F.2d 93, 98 (7th Cir. 1986) ("For private counsel with fee-paying clients, the best evidence is the hourly rate customarily charged by counsel or by her law firm.").

*Capax Discovery, Inc. v. AEP RSD Invs., LLC*, 2023 WL 140528, at *6 (W.D.N.Y. Jan. 10, 2023)).[16]

### b. Preclusion of Employment

In addition, Plaintiffs' attorneys could have received compensation using their customary rates from paying clients in other matters but for "preclusion of employment" due to accepting this case. *Arbor Hill*, 522 F.3d at 187 n.3. *See* Dkt. 86-2 ¶ 40 ("Clement & Murphy is a small firm. . . . And its services are in demand. This case took up a substantial proportion of the firm's time . . . which we could and would have devoted to other, paying matters."); Dkt. 86-3 ¶ 27 ("While working on this action, First Liberty Institute's attorneys were necessarily precluded from working on other religious-liberty matters."); Dkt. 86-4 ¶ 7 ("During the time devoted to this matter, [Attorney Ganguly] could not work on other matters for paying clients."). Indeed, "once the employment is undertaken the attorney is not free to use the time spent on the client's behalf for other purposes." *Johnson,* 488 F.2d at 718.

---

[16] This Court has also considered that the rates Plaintiffs request are somewhat outdated, given that they are primarily based on the attorneys' customary rates in 2022 and 2023. Indeed, "compensation received several years after the services were rendered—as it frequently is in complex civil rights litigation—is not equivalent to the same dollar amount received reasonably promptly as the legal services are performed, as would normally be the case with private billings." *Missouri v. Jenkins by Agyei*, 491 U.S. 274, 283 (1989). And "[c]ompensation for this delay is generally made 'either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value.'" *Perdue*, 559 U.S. at 556 (quoting *Missouri*, 491 U.S. at 282). This fact favors the fee motion as well.

### c. *Experience, Reputation, and Ability of Plaintiffs' Attorneys*

These customary hourly rates are also reasonable in light of the exceptional "experience, reputation, and ability" of Plaintiffs' attorneys. *Arbor Hill*, 522 F.3d at 187 n.3. As to Clement & Murphy—Plaintiffs point to numerous instances of the firm being recognized for its expertise in constitutional law and appellate practice. *See* Dkt. 86-1 at 23-24. And this expertise has led to "numerous landmark cases, including religious-liberty and Second Amendment cases" such as "[*New York State Rifle & Pistol Association, Inc. v.*] *Bruen*, 597 U.S. 1 [(2022)], *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), and *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020)." *Id.* at 23-24. The individual attorneys also have impressive credentials, including degrees from top-tier law schools, and judicial clerkships with U.S. Supreme Court justices and Circuit Court judges. *See, e.g.,* Dkt. 86-2 ¶¶ 18-33.[17]

First Liberty Institute is "likewise highly decorated." Dkt. 86-1 at 24. Plaintiffs explain that First Liberty Institute has had "a victory rate of over 90% across all legal matters that [it] handle[s] . . . [and has] . . . achieved victories at all levels of the court system, including the U.S. Supreme Court." Dkt. 86-3 ¶ 4. They point to "notable recent victories at the Supreme Court" including *Groff v. DeJoy*, 600 U.S. 447 (2023), *Kennedy v. Bremerton School District*, 597 U.S. 507 (2022), *Carson v. Makin*, 596 U.S. 767 (2022), and *American Legion v. American Humanist*

---

[17] Attorney Erin E. Murphy "served as a law clerk to Chief Justice John Roberts." Dkt. 86-2 ¶ 2.

*Association*, 588 U.S. 29 (2019)." *Id.* Their individual attorneys are also well-credentialed. *See, e.g., id.* ¶¶ 18-20. Lastly, Plaintiffs' local counsel, Anjan Ganguly, has served as one of the two principals at his law firm for nearly 15 years and has "developed expertise in local practices and procedures." *See* Dkt. 86-4 ¶¶ 3-4.

> ### d. *Results Obtained*

Next, as to the "most critical factor"—namely, the "degree of success obtained," *see Barfield*, 537 F.3d at 152—there is no question that Plaintiffs' counsel "obtained excellent results" in this case. *See Hensley*, 461 U.S. at 435. Plaintiffs commenced this action alleging that the houses of worship exclusion violates their rights under the First, Second, and Fourteenth Amendments. *See* Dkt. 1 ¶¶ 56-94. They sought injunctive relief that would prohibit Defendants from enforcing that provision against them. *See* Dkt. 1 at 24-35 (prayer for relief). And that is precisely what they achieved. In December 2022, this Court preliminarily enjoined Defendants from enforcing the houses of worship exclusion against Plaintiffs upon determining that the houses of worship exclusion likely violates not only the Free Exercise and Establishment Clauses of the First Amendment—but also the Second Amendment. *See* Dkt. 56 at 35. The Second Circuit then affirmed. *See* Dkt. 73. Finally, in November 2024, this Court made the injunctive relief permanent upon stipulation of the parties. *See* Dkt. 81 at 1-2. The fact that Plaintiffs' counsel secured full relief for their clients supports that they "should recover a fully compensatory fee." *See Holick*, 48 F.4th at 106.

e. *Time and Labor Required; Time Limitations*

Plaintiffs' counsel also expended significant time and labor to achieve such success. *See Arbor Hill*, 522 F.3d at 187 n.3. Clement & Murphy "performed work at all stages of this action, from drafting and filing the complaint, drafting and filing the motion for preliminary injunction, presenting oral argument and conducting witness examination in this Court, drafting and filing motions and briefs in the Second Circuit, and presenting oral argument in the Second Circuit." Dkt. 86-2 ¶ 11. First Liberty Institute likewise "participated in this action at all stages, with a particular emphasis on the activity in this Court, including preparation of the complaint and preliminary injunction motion, and supporting co-counsel at all hearings and arguments." Dkt. 86-3 ¶ 12.

The attorneys also performed their work on this case under stringent time limitations. *See Arbor Hill*, 522 F.3d at 187 n.3. New York State amended its firearms laws to include the place-of-worship provision in July 2022, and made the provision effective in September 2022. *See* 2022 N.Y. Sess. Laws ch. 371, §§ 4, 26. Counsel, therefore, needed to prepare rapidly to commence this lawsuit and move for preliminary injunctive relief—which they did by early November 2022. *See* Dkt. 1 (Complaint); Dkt. 13 (Motion for Preliminary Injunction). Counsel then had to keep up with the rapid paces set by this Court and the Second Circuit—which required them to brief fully the preliminary injunction motion and participate in a hearing in fewer than two months, and then to brief the appeal and participate in oral argument in fewer than three months. *See* Dkt. 13-54; *Spencer v. Nigrelli*, No.

22-3237 (2d Cir.).  *See also* Dkt. 56 at 35 (directing parties to "follow an expedited briefing schedule in the Second Circuit"); *Spencer*, No. 22-3237 (2d. Cir. Jan. 23, 2023), Dkt. 47 (granting motion to expedite appeal).

> f.   *Novelty and Difficulty of the Questions and Level of Skill Required*

Significantly, this case involved novel and complex issues requiring particularized skills.  *See Arbor Hill*, 522 F.3d at 187 n.3.  It explored the intersection of the First Amendment's Religion Clauses and the Second Amendment—areas of the law that have changed dramatically in recent years.  *See, e.g., Antonyuk*, 89 F.4th at 298 ("*Bruen* rejected step two of the predominant framework described above and set out a new test rooted in the Second Amendment's text, as informed by history") (internal citation and quotation marks omitted).  And because the case involved a newly enacted law and a preliminary injunction, one could reasonably expect it to shift promptly from district court into the Second Circuit—as did other cases involving New York's efforts to restrict First and Second Amendment rights.  *See, e.g., New York State Rifle & Pistol Ass'n, Inc. v. City of New York, New York*, 590 U.S. 336 (2020).  *See also* Dkt. 56 at 33-36 (discussing stay pending appeal and providing instructions for appellate proceedings).  Indeed, this appellate-heavy constitutional-law case demanded far more than routine civil-litigation experience from in-district attorneys.[18]

As Plaintiffs explain, there is "a relatively small contingent of attorneys

---

[18] Notably, other plaintiffs who challenged the CCIA in cases that the Second Circuit considered in tandem with this one also utilized out-of-district attorneys. *See Antonyuk*, 89 F.4th at 283 (listing attorneys).

capable of successfully litigating high-stakes constitutional-law appeals in the Second Circuit and Supreme Court . . . ." Dkt. 86-1 at 26.  And Plaintiffs "needed appellate litigators who were not only able, but willing, to vindicate their First and Second Amendment rights—a universe that is vanishingly small." *Id.*  They also "needed attorneys *already* familiar with the First and Second Amendment [issues] that the place-of-worship provision presented" so that they could "file a complaint and seek injunctive relief expeditiously" in light of New York's "rapid legislative response" to the Supreme Court's *Bruen* decision.  *Id.* at 27-28.

The State argues that, while "many of plaintiffs' attorneys have significant experience in constitutional litigation and are exceedingly well-credentialed," this "experience does not entitle plaintiffs' counsel to attorney hourly rates quadruple the reasonable in-district rates or ***paralegal*** hourly rates that approach the highest ***attorney*** hourly rates ever approved in the Western District."  Dkt. 94 at 10 (emphasis in original).

But the State ignores that Plaintiffs' attorneys were uniquely suited to handle this matter.  Indeed, they are among very few attorneys with the necessary skillset to litigate this case effectively—namely, specialty in First and Second Amendment litigation as well as expertise in appellate practitioners.  Clement & Murphy is one of very few law firms with considerable experience litigating First and Second Amendment cases on behalf of plaintiffs at all levels of the federal court system.  The firm "is devoted substantially to litigation over issues of constitutional and other federal law, with a particular focus on appellate and Supreme Court

22

litigation." Dkt. 86-2 ¶ 3.  Attorney Murphy, who "personally supervised and
managed the work of Clement & Murphy's attorneys and staff" during this
litigation, *id.* ¶ 15, is "recognized by Chambers & Partners as one of the leading
appellate practitioners in the Nation." *Id.* ¶ 3.  She has "argued and briefed cases
before the Supreme Court and appellate and trial courts throughout the country"
and has "argued in the Supreme Court on four occasions . . . and prevailed in three
of them." *Id.*

    First Liberty Institute, moreover, is a nationwide law firm dedicated to
defending religious liberty.  The firm "is devoted exclusively to First Amendment
litigation and protecting religious liberty" and is "the largest legal organization in
the nation dedicated exclusively to defending religious liberty for all Americans."
Dkt. 86-3 ¶ 3.  To round out the legal team, Plaintiffs' local counsel contributed
"expertise in local practices and procedures."  Dkt. 86-4 ¶ 4.

        *g.  Type of Fee Arrangement and Nature of Lawyer-Client Relationship*

    Plaintiffs' out-of-district attorneys also agreed to an arrangement in which
they could receive attorney's fees only in the event of victory.  *See Arbor Hill*, 522
F.3d at 187 n.3.  *See also* Dkt. 86-2 ¶ 7; Dkt. 86-3 ¶ 8.  Additionally, Plaintiffs do not
have a longstanding relationship with any of the firms that represented them in
this matter.  *See* Dkt. 86-2 ¶ 7; Dkt. 86-3 ¶ 8; Dkt. 86-4 ¶ 6.  Indeed, a downward
adjustment in an attorney's rate may be appropriate where there are "expectations
of future business"—and related financial rewards.  *See Johnson v. AutoZone, Inc.*,
2019 WL 2288111, at \*10 (N.D. Cal. May 29, 2019).  But no such expectation exists

here, given that "Plaintiffs hope that they will have no future relationship with their attorneys . . . as repeat business would mean that the state is infringing their constitutional rights again." Dkt. 86-1 at 29.

### h. *Awards in Similar Cases*

Furthermore, other courts in analogous cases have approved even higher awards where the plaintiffs prevailed on religious liberty grounds. *See Arbor Hill*, 522 F.3d at 187 n.3. *See, e.g., Franciscan All., Inc. v. Becerra,* 681 F. Supp. 3d 631, 646 (N.D. Tex. 2023) (requiring federal government to pay over $2.2 million in attorneys' fees "based on the Washington, D.C. rates" in religious-liberty dispute); *S. Bay United Pentecostal Church v. Newsom*, 2021 WL 2250818, at *1 (S.D. Cal. June 1, 2021) (requiring California to pay $1.6 million in attorney's fees in religious-liberty dispute); *Harvest Rock Church, Inc. v. Newsom*, No. 20-cv-6414 (C.D. Cal. May 14, 2021), Dkt. 95 at 3 (requiring California to pay $1.35 million in attorneys' fees in religious-liberty dispute).[19]

The State argues that *Hardaway* is a "a touchstone for what reasonable attorneys' fees are in this case" because the plaintiffs there "challenged the same Place of Worship Provision at issue in this case and obtained a nearly an identical result . . . ." Dkt. 94 at 7.[20]  This ignores that *Hardaway* did not involve any First

---

[19] *Bay United Pentecostal Church v. Newsom* and *Harvest Rock Church, Inc. v. Newsom* involved stipulations as to the fee amounts.

[20] In *Hardaway,* the parties "settled their fee application for $150,000." *Id.  See also Hardaway v. Nigrelli,* No. 22-CV-771 (W.D.N.Y. Apr. 11, 2024), Dkt. 87 (stipulation and order).

Amendment claim. And although the *Hardaway* plaintiffs secured a Second Amendment-based preliminary injunction in this Court, that injunction was vacated on appeal due to a mootness issue that counsel here successfully navigated around. *See Antonyuk*, 89 F.4th at 343 ("We must consider whether the statutory amendment has mooted any of the Plaintiffs' claims. With respect to *Hardaway* and *Antonyuk*, it has."). This belies any notion that Plaintiffs' out-of-district attorneys here "had no impact" in this case.[21]

### i. *"Undesirability" of the Case*

Lastly, this case demanded special expertise with arguments that are commonly deemed "undesirab[le]," *Arbor Hill*, 522 F.3d at 187 n.3—in other words, where the lawyers' work is "not pleasantly received by the community or [their] contemporaries," *Johnson*, 488 F.2d at 719. *See, e.g., Becerra*, 681 F. Supp. 3d at 644 (finding that attorneys' fees in religious liberty dispute "should be awarded under the 'home' rates of Plaintiffs' counsel" where "it is highly unlikely that a large international firm would agree to take on a case like this due to the controversial subject matter, coupled with the longevity and complexity of the litigation"). Indeed, Plaintiffs' attorneys "have firsthand experience with that unfortunate dynamic," given that they secured "a landmark civil-rights victory" dealing with similar subject matter "that effectively cost them their jobs at their former law

---

[21] The State also provides a "chart summarizing the rates awarded in recent cases." *See* Dkt. 94 at 9-10. These cases, however, are not instructive because they addressed only routine issues under Section 1983. *See id.*

firm." *See* Dkt. 86-1 at 9, 26 (discussing attorneys Paul Clement and Erin Murphy in connection with the "Supreme Court victory in *Bruen*").

In sum, all of the relevant factors support the hourly rates Plaintiffs request. Indeed, not only was Plaintiffs' "selection of out-of-district counsel" predicated on "experience-based, objective factors," but that use of in-district counsel would likely have "produce[d] a substantially inferior result." *Simmons*, 575 F.3d at 176. This was a difficult case, in a niche area, with demanding time constraints—all navigated in a successful manner.

### B. Hours Expended

The hours that Plaintiffs' attorneys expended on this matter are also reasonable. When "determining the reasonable number of hours, a court must make 'a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended.'" *D.P. v. New York City Dep't of Educ.*, No. 21 CIV. 27 (KPF), 2022 WL 103536, at *5 (S.D.N.Y. Jan. 10, 2022), aff'd sub nom. *H.C. v. New York City Dep't of Educ.*, 71 F.4th 120 (2d Cir. 2023) (quoting *Haley v. Pataki*, 106 F.3d 478, 484 (2d Cir. 1997)). The Court should "examine the hours expended by counsel with a view to the value of the work product to the client's case." *Id.* (citing *Lunday v. City of Albany*, 42 F.3d 131, 133-34 (2d Cir. 1994)). And the Court should "exclude 'excessive, redundant[,] or otherwise unnecessary hours, as well as hours dedicated to severable unsuccessful claims.'" *Id.* (quoting *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999)). The "relevant issue" is "not whether hindsight vindicates

an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992).[22]

Here, Plaintiffs' counsel expended a reasonable number of hours on this matter. As Plaintiffs point out, their attorneys

> billed the vast majority of their hours between October 2022 and May 2023—*i.e.*, when they prepared the complaint, drafted the preliminary-injunction filings, participated in the preliminary-injunction hearing and a related moot court, filed a motion to have the Second Circuit hear the appeal in tandem with the other related appeals, drafted the appellate response brief, participated in the Second Circuit oral argument and related moot court, and drafted the response to the state's suggestion of mootness.

Dkt. 86-1. Their contemporaneous billing records confirm that. *See generally* Dkt. 86-2 at 20-54; Dkt. 86-3 at 12; Dkt. 86-4 at 6. In this Court's judgment, reasonable attorneys in private practice clearly would have engaged in similar time expenditures. *See Grant*, 973 F.2d at 99. And the same is true of other activities reflected in the time entries—such as reviewing relevant intervening decisions issued by other courts, analyzing the Second Circuit's decision, negotiating the stipulated final order, and preparing this fee application.

The State argues that the hours worked are unreasonable. *See* Dkt. 94 at 17. It claims that Plaintiffs "overstaffed" this case and that time spent on certain tasks was "excessive" and "redundant." *Id.* at 18. According to the State, there was "no

---

[22] Additionally, "a reasonable fee should be awarded for time reasonably spent in preparing and defending an application for § 1988 fees." *Weyant v. Okst*, 198 F.3d 311, 316 (2d Cir. 1999).

need for such a large team, and the size of the team undoubtedly led to duplication, redundancy, and inefficiencies." *Id.* For example, the State points out that "three partners and three associates billed over 80 hours drafting and revising the preliminary injunction motion," and later "spent over 100 hours . . . preparing for the Second Circuit argument." *Id.* at 19-20. Defendant believes that, given "the excessive amount of time that Plaintiffs spent litigating this case, an across-the board reduction of 30% is warranted on Clement & Murphy and First Liberty Institute's attorneys' fees." *Id.* at 20.[23]

The Court disagrees. As the State recognizes, "this action involved complex First and Second Amendment issues." Dkt. 94 at 12. This was a national litigation at the highest levels with the most involved challenges.

In addition, many of the activities reflected in Plaintiffs' billing records were necessary because of *Defendants'* litigation decisions. For example, the *State* that requested that Pastor Spencer provide live testimony at the preliminary-injunction hearing. *See* Dkt. 53. And it later decided to appeal this Court's preliminary-injunction order, *see* Dkt. 57, which required Plaintiffs' counsel to defend the preliminary injunction on appeal. To be sure, the "strongly favorable results" that Plaintiffs obtained in this case "support a finding that the hours billed were reasonable." *28th Highline Assocs., LLC v. Roache*, No. 18-CV-01468 (VSB) (KHP),

---

[23] Defendant "largely does not object to the hours spent by Anjan Ganguly in this litigation." *Id.* at 17 n.6. But it maintains that the "Court should reduce Mr. Ganguly's attorney's fees for travel time by 50%." *Id.*

2021 WL 12313375, at *5 (S.D.N.Y. Dec. 7, 2021), report and recommendation adopted, No. 18-CV-1468 (VSB) (KHP), 2025 WL 1000699 (S.D.N.Y. Apr. 2, 2025) (citing *Hensley*, 461 U.S. at 435).[24]

The State also argues that a "further reduction of hours is appropriate based on block-billing and vague time entries." Dkt. 94 at 21. It claims that "Clement & Murphy often engaged in block-billing and used vague time entries to document large amounts of time," and identifies various time entries they believe are objectionable. *Id.*[25] Based on "these vague and block-entries," the State claims, "the Court should further reduce the billed hours of Clement & Murphy and First Liberty Institute by 10%." *Id.* at 22.

No further discount is warranted on these grounds. In the Second Circuit, block billing is "permissible as long as the district court is still able to conduct a meaningful review of the hours for which counsel seeks reimbursement." *Raja v. Burns*, 43 F.4th 80, 87 (2d Cir. 2022) (internal citation and quotation marks omitted). Indeed, the "practice is by no means prohibited in this Circuit because block billing will not always result in inadequate documentation of an attorney's hours." *Id.* Here, even though certain activities sometimes have been grouped together, the entries are sufficiently detailed to permit the Court to assess meaningfully the value of the work product. The hours, therefore, are adequately

---

[24] So, too, should courts encourage robust papers and oral argument preparation.

[25] By way of example only, Defendants object to a 2.5 hour entry by Erin Murphy described as "Revise draft complaint; exchange emails re. local counsel." *Id.*

documented.

The Court also rejects Defendant's argument that the time entries are impermissibly vague. As Plaintiffs point out, the entries are "sufficiently clear" for Defendant "to protest the amount of time that Clement & Murphy spent preparing for moot courts and drafting briefs." Dkt. 95 at 13. The Court agrees that the time entries are sufficiently clear, and no further discount is warranted due to alleged vagueness. The State, moreover, is already receiving a discount—akin to discounts that law firms typically give paying clients—because "Plaintiffs are not seeking attorney's fees for the preparation of [their] reply brief, even though they are entitled to such fees." *See id.* at 13 n.2. *See also Hines v. City of Albany*, 862 F.3d 215, 223 (2d Cir. 2017) ("Prevailing parties under Section 1988 are . . . entitled to recover a reasonable fee for preparing and defending a fee application.").[26]

In sum, upon "a conscientious and detailed inquiry" into Plaintiffs' billing records, the Court is satisfied that the hours worked were "were usefully and reasonably expended." *See D.P.*, 2022 WL 103536, at *5.

## C. Costs

Lastly, Plaintiffs may recover their costs. Under Section 1988(b), attorneys' fees awards "include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." *LeBlanc-Sternberg v. Fletcher*, 143 F.3d 748, 763 (2d Cir. 1998) (internal citation and quotation marks omitted).

---

[26] The old-rate and reply brief discounts, together, adequately resemble what a private client might expect and receive—based on these time entries and on these facts.

Here, Plaintiffs "seek reimbursement of $7,166.60 in out-of-pocket costs related to the payment of filing fees, service of process, postage, photocopying, travel, lodging, meals, and parking." Dkt. 86-1 at 32.[27] The State "does not object to the $7,166.60 sought by plaintiffs in costs." *See* Dkt. 94 at 24 n.7. And because these are "expenses" that "are usually billed in addition to the attorney's hourly rate," *Arbor Hill*, 369 F.3d at 98, Plaintiffs may recover them too.

## CONCLUSION

This was a rare and exceptional case, demanding experienced counsel at the top of the practice—from wherever they can be located. A reasonable client would pay for this very result. It bears noting, too, that the judicial system encourages lawyers to take meritorious cases like this one. To ensure that proper incentives exist to achieve that, appropriate compensation is required. Perennial "haircuts" will discourage well qualified counsel.

---

[27] Of those total costs, $1,768.84 came from Clement & Murphy, *see* Dkt. 86-2 ¶ 42, $2,988.91 came from First Liberty Institute, *see* Dkt. 86-3 ¶ 29, and $2,408.85 came from Ganguly Brothers, *see* Dkt. 86-4 ¶ 10.

For all of the foregoing reasons, Plaintiffs' [86] motion is GRANTED.
Attorneys' fees in the amount of **$817,636.50**, as well as costs in the amount of
**$7,166.60**, are imposed against Defendant Steven G. James, Acting Superintendent
of the New York State Police.

SO ORDERED.

Dated:          September 2, 2025
                Buffalo, New York

                                                _____
                                                JOHN L. SINATRA, JR.
                                                UNITED STATES DISTRICT JUDGE